

# OPINIONS IN THE MATTER OF
## RESEARCH COMMUNICATIONS, LTD.
### v. MEREDITH CORPORATION
### AND
### MEREDITH CORPORATION v.
## RESEARCH COMMUNICATIONS, LTD.
### AND VALERIE CRANE


**Prepared by Michael A. Grossman**
**June 27, 2003**

Pursuant to Fed. R. Civ. P. 26, Research Communications, Ltd. ("RCL") and Valerie Crane herby submit this expert report of Michael A. Grossman. RCL and Valerie Crane hereby reserve the right to supplement this report. Mr. Grossman states as follows:

## I.    QUALIFICATIONS

I am the President of Strategic Advantage Inc. a company founded and incorporated in 1990. I have been a management consultant for over thirty (30) years and have previously worked for the New York Life Insurance Company, Transportation Systems Center, Arthur D. Little, Inc., Bank of Boston, Dove Associates, and Abt Associates, Inc. I have a B.A. from New York University and an M.A. from State University of New York (Stony Brook). I have specific experience with market segmentation studies, including without limitation studies concerning products and customer preferences for distributors of industrial supplies, leading soft drink bottlers, a maker of distilled spirits, a large national brewing company and the US Department of Transportation. I have personal experience using factor analysis, principal components analysis, canonical correlation analysis, cluster analysis, including both hierarchical and K-means clustering, multiple regression, analysis of variance and many other multivariate statistical methods. Attached hereto as Exhibit 1 is my curriculum vitae, including a partial list of publications. I have not testified as an expert at trial or by deposition in any cases within the last four years. I am being paid $10,000 for my time in preparing this report. I will be compensated at the rate of $250 per hour for any further services in this matter. My expenses are being reimbursed.

## II.    INFORMATION CONSIDERED

In preparing this report, I have relied upon my educational and occupational training and experience in statistics and marketing research, including market segmentation studies. I have also consulted a number of books and scholarly texts on theses topics, which references are listed in the

footnotes to this report. In addition, I have reviewed or consulted the following materials: the RCL Benefits Segmentation Study (both the executive summary and the technical report) for WGNX (Atlanta), WOFL (Orlando) and KVVU (Las Vegas); the SPSS output for two factor analyses performed by Bonita Soley (or her team under her direction) for WGNX; the factor and cluster analyses performed by Lori Rossi, RCL Research Analyst, for KVVU; the factor and cluster analyses performed for WOFL, Orlando by and/or under the direction of Beth Rabin, RCL Vice President, Research, and that portion of the RCL Analysts' Handbook pertaining to market segmentation analyses. I have also reviewed the reports of Ronald L. Nuttall, Suzanne Sell, and Allen Dwayne Ball (both his initial report of March 2002 and his supplement of May 2002). In addition, I have spoken at length with Susan Crohan, Vice President of RCL, and Valerie Crane, President of RCL, concerning RCL's research practices and procedures, including without limitation those practices and procedures relating to benefits segmentation studies, factor analysis and cluster analysis.

## III.    THE GOALS AND METHODOLOGY OF RCL BENEFITS SEGMENTATION STUDIES

### A.    The Goal and Design of Benefits Segmentation Studies

RCL conducts various types of research for a range of clients in broadcast TV, the cable industry, and magazines. This research for clients includes without limitation benefits segmentation studies, product studies, positioning studies, promotion studies, and lifestyles studies. This report will address in depth benefits segmentation studies and the use of factor and cluster analyses in connection therewith.

The goal of a benefits segmentation study conducted by RCL on behalf of a broadcast television station is to discover consumer needs, wants and desires for a service or product, translate them into a set of benefits that can be perceived by the consumer, and then measure or rank the impact of each of the benefits on the consumer.

The theory upon which the RCL benefits segmentation study is based is known as the hierarchy of needs, which was developed by Abraham H. Maslow. Based on the hierarchy of consumers' needs for a service or a product, RCL has distilled this theory to produce a methodology that identifies a set of benefits to using the product or service that can be perceived by the consumer. A product or service that provides these benefits will be purchased or used by the consumer.

With regard to benefits segmentations studies conducted by RCL for broadcast television stations such as those stations owned by Meredith Corporation ("Meredith"), there are generally three to five objectives or goals of such studies:

1.     Identify key benefits of watching local news/understand the benefits of local news viewing for the development of news product and promotion;

2.     Segment the news viewing audience by benefits of local viewing;

3,     Determine opportunities and restraints for building key audience segments;

4.     Define a target audience for the station in terms of primary and secondary targets; and

5.     Measure the image of local area newscasts, including that of the client.

A benefits segmentation study consists of several steps:

1.     A small number (less than 50) of in-depth telephone interviews with local news viewers are conducted. The participants are paid a nominal fee for their time. Viewers respond to questions designed to discover the reasons they watch local news and the benefits they derive therefrom.

2.     The qualitative information obtained in the in-depth interviews is used to develop a telephone survey for a large sample (600) of local news viewers.

3.     The participants in the telephone survey answer questions about demographics, psychographics, media usage, and local news usage and image, and rate a series of benefits statements about local news.

4.     A segmentation analysis is performed, which includes the following steps:

    a.     A factor analysis is performed to define a set of benefit factors (fewer than ten) based on the benefits questions in the survey.

3

    b.  Market segments are developed by performing a cluster analysis of the respondents based on their scores on the benefit factors.

    c.  In order to identify opportunities and restraints for the client, each segment is profiled according to responses to questions on demographics, psychographics, local news attitudes and behaviors, media usage and habits, interest in topics (news), and local news viewing habits and image, overall and by time of day.

5.    A report is delivered and a presentation is made to the client.

**B.    Data Gathering**

RCL uses a two-stage process in gathering the data upon which a benefits segmentation study is based. RCL first conducts a series of in-depth interviews to identify the issues for the consumer. From the results of these in-depth interviews, a questionnaire is constructed to elicit consumer demographics, attitudes, preferences and benefits derived from watching local newscasts. Benefits are measured on a ten-point scale (10 is strongly agree to 0 strongly disagree).

The telephone survey is administered to a random sample of people 18 years or older who watch the local news at least once a week. A random sample is used to avoid a bias in the data due to the selection of respondents. As the respondents were chosen randomly, the results should be representative of the population being sampled. If the demographics of the survey respondents differ from the population demographics by more than five percent, the sample is weighted to ensure that the results of the sample are representative of the population. For example, if the percentage of women in the sample is 46% but the percentage of women in the population is 52%, the results for women would be multiplied by 1.13 (52/46), and the results for men would be multiplied by 0.93 (46/52).

Typically, RCL uses a sample size of 600 to yield an accurate sample. A sample is accurate if the characteristics of the participants are close to the characteristics for the population as a whole, i. e., the difference between the characteristics of the sample and the population as a whole are within the specified margin of error for the sample.

B1257320.2

4

C.    **Segmentation of the Data**

The answers to the benefits questions (called variables) in the telephone survey serve as the basis for the segmentation of the local news market.  Only answers to benefits questions (i.e. questions designed to discern the experienced benefits of watching local news) should be used for the benefits segmentation.  RCL uses only benefits questions in its segmentations.  Including responses to attitudinal, preference, demographic or media usage questions is inappropriate and confounds the analysis.  In addition, mixing benefits statements with non-benefits statements makes interpretation difficult and may result in the inability to form a plan of action to take advantage of the benefits that consumers experience.

The segmentation is accomplished in two stages:  a factor analysis to extract the latent benefits perceived by consumers and a cluster analysis to group the respondents into market segments.

1.    **Factor Analysis**

Factor analysis is a statistical technique used to identify a relatively small number of factors.  A factor is a group of responses that correlate strongly with each other.  A factor can be thought of as a grouping of items or questions that bear a significant relationship to each other.  Factors can be used to represent relationships among sets of many interrelated variables.  "One goal is to represent relationships among sets of variables parsimoniously.  That is, we would like to explain the observed correlations using as few factors as possible.  If many factors are needed, then little simplification or summarization occurs.  We would also like the factors to be meaningful.  A good factor solution is both simple and interpretable.  When factors are interpretable, new insights are possible."[1]  Factor analysis is a method by which to summarize the observed data.  Factor analysis characterizes both the relationships between several answers given by an individual participant, as well as the relationships between the different individuals answering the questions.

The two terms in the previous paragraph, **meaningful** and **simple**, have specific statistical definitions in the context of factor analysis. The term simple (or statistical simplicity) means that each of the observed variables is related to one and only one factor. More than one variable may be related to the same factor, but no variable may be related to more than one factor. If a variable is related to more than one factor, it is said to cross-load on the factors.

An analysis is meaningful (or scientifically meaningful) if it provides a model of the data which retains the relationship between the variables measured and which conforms to what is known about the data. "If scientific meaningfulness rather than a mathematical standard is imposed, then the judgment of the investigator must be invoked"[2] The judgment of the researcher is required to ensure that the model of the data is not counterintuitive and conforms to what is known of the data being studied. Any deviations from this intuitive model must be backed-up by specifically identified relationships in the data. In short, it must make sense to the researcher and the business executive who will try to implement the researcher's results.

The first step in a factor analysis is to extract the initial factors from the data. The goal of factor extraction is data reduction. The number of variables (i.e. answers to questions) should be significantly reduced to a much smaller number of factors. " … [O]ne objective of factor analysis is to "best" reproduce the observed correlations. This objective can be traced to Thurstone's statement: "The objective of a factor problem is to account for the tests, or their inter-correlations, in terms of a small number of derived variables, the smallest possible number that is consistent with acceptable residual errors."[3]

There are many equally valid methods by which to extract factors. RCL uses the unweighted least squares method for its benefits segmentation. The unweighted least squares method (also referred to as the minres method) accomplishes the objective of factor analysis. Unweighted least squares maximizes

the correlation between the factors and the observed variables. This may be thought of as the best method for retaining the relationships between the large number of original variables and the reduced number of factors. Any error is measured by the sum of squares of residuals between the observed correlations (i.e., the original variables) and the reproduced correlations (i.e., the factors). This method minimizes the sum of the squared residuals and is therefore referred to as least squares or minimum residuals. The unweighted least squares method of factor extraction is a method that is well-accepted in the discipline of statistics and the market research industry.

The factor scores calculated from the factors obtained in the factor analysis are clustered to form the benefits segments. It is desirable to keep the relationship between the factors as close to that between the original variables for the purpose of clustering them.

**D.      Sensitivity and Stability of the Factor Analyses Solution; Factor Analysis Requires the Researcher to Make Judgments About the Data.**

The work of a researcher does not end upon specifying the method of factor extraction. Factor analysis is an exploratory technique. Factor analysis requires the researcher to uncover the underlying structure of a relatively large number of variables. "The researcher's à priori assumption is that any variable may be associated with any factor. This is the most common form of factor analysis. There is no prior theory and one uses factor loadings to intuit the factor structure of the data."[4] At RCL this judgment is a team effort among senior staff, the project manager, the team leader and the final reviewer. Each factor analysis generates a result, or "solution". The researcher must test the stability and sensitivity of the solution to changes in the variables entered into the analysis and the optimality and parsimoniousness of the solution. In other words, the researcher must consider whether there exists a better, more informative solution, and must determine whether an equivalent solution can be achieved with fewer variables in the analysis. To arrive at an optimal solution, therefore, the researcher must perform a number of analyses by adding and deleting variables (responses to questions) from the analysis. The

researcher should be able to gauge the influence of any variable on the solution and on the other variables. If removing or adding a variable from the analysis does not change the solution in a material manner, then the variable may be eliminated as superfluous.

Sensitivity analysis of a factor model whereby the researcher deletes a number of variables or varies the number of factors to study the effects on the solution is an accepted and standard statistical practice. The stability of the solution is checked by doing this and alternate and perhaps superior forms of the solution are evaluated. By stability, statisticians mean the effect of one variable or factor being able to radically change the solution by its inclusion or omission. A small change in the data should only result in a small change in the result for a stable solution.

**E.     Cluster Analysis - Segmentation**

The segments of a local news viewing audience are formed using cluster analysis, a statistical technique to group similar items or individuals together. The goal is to minimize the variation among the items in a cluster, while maximizing the variation among the clusters. Items within a cluster should be very similar to each other and the items in each cluster should be different and distinct from items in other clusters. In the benefits segmentations conducted by RCL, factor scores were used as a basis for clustering the survey respondents.

One particularly efficient and commonly used method for clustering a large number of observations (600 respondents) with a relatively few number of variables (5 to 10 factors) is the K-means algorithm. The K-means algorithm optimally segments the data in distinct clusters once the researcher has specified the number of clusters. Since the number of clusters specified is based on the researcher's judgment and is not optimized by an objective measure, it is commonly accepted and good statistical practice to perform several K-means cluster analyses varying the number of clusters.

As the researcher examines the results of each cluster analysis, the criteria that are used to judge the solutions are: simplicity of the clusters, balanced size of the clusters, meaningfulness of the clusters, and reduction in the number of clusters from the original number of respondents. The goal is to simplify the data so that this last criteria judges whether the cluster analysis has reduced the number of respondents to the smallest number of clusters that can explain the data in a scientifically meaningful manner. Simplicity of the clusters is similar to simplicity of factors discussed above. Each original variable should load primarily in one cluster and not cross-load onto multiple clusters. Benefits should not be split among clusters. The meaningfulness of each of the clusters implies they should be easily explainable to the end user of the analysis and not contradict prior knowledge of the data. (If the researcher finds results that contradict prior knowledge of the data, then a strong and well-reasoned argument must be made for the new interpretation of the data.) The size of the clusters should be balanced. No cluster should contain a majority of the observations. Nor should any cluster be so exclusive as to contain only a few observations.

## IV.    OPINIONS

I expect to testify to the following four opinions. Each opinion is rendered to a reasonable degree of scientific certainty. In addition to the specific bases identified with respect to each of the following opinions, each such opinion is based on my education, training and experience, the information I reviewed (described in Section II of this report) and the detailed discussion set forth in Section III of this report).

A.    **The Methodology Employed By RCL In The Performance Of Benefits Segmentation Studies, Including Factor And Cluster Analyses, Was Proper And Was Consistent With Well-Established Statistical And Market Research Standards.**

The bases of this opinion are as follows:

- RCL's practice was to select participants based on a random sample that was weighted where necessary to conform to the sex, age, ethnicity and household income of the population.

B1257320.?

9

- Factor and cluster analyses are well accepted, statistical methods by which to simplify, interpret and reduce a large amount of data.

- The protocols established by RCL for the application of factor and cluster analyses ensure solutions that were simple, meaningful and interpretable.

- The methodology employed by RCL required the researcher to test the solution for stability and sensibility, in addition to simplicity and meaningfulness.

- The procedures outlined in the RCL Analysts' Handbook concerning factor analysis were entirely consistent with and met good and accepted statistical and marketing research standards.

**B.     The Benefits Segmentation Study For WGNX Was Conducted In A Manner Consistent With Well-Established Statistical And Marketing Research Standards.**

The bases of this opinion are as follows:

- RCL followed all the procedures and statistical methodologies outlined in Section III above and as specified in its Handbook.

- The results of the factor model presented to WGNX exhibit statistical simplicity and meaningfulness.

- The results presented to WGNX are statistically simple, balanced and easily interpretable.

**C.     The Benefits Segmentation Studies Conducted By RCL For WOFL And KVVU Were Performed In A Manner Consistent With Well-Accepted Statistical And Marketing Research Standards; To The Extent The Other Benefits Segmentation Studies Conducted By RCL For Meredith Employed Similar Methodology, Such Other Studies Also Were Properly Performed.**

The bases of this opinion are as follows:

- RCL followed all the procedures and statistical methodologies outlined in Section III above and as specified in its Handbook.

- The results of the factor model presented to WOFL and KVVU exhibit statistical simplicity and meaningfulness.

- The results presented to WOFL and KVVU are statistically simple, balanced and easily interpretable.

**D.**     **The Two Factor Analyses Conducted By Bonita Soley On The WGNX Benefits Segmentation Study Deviated From Accepted Statistical And Marketing Research Standards; RCL's Decision To Correct Dr. Soley's Work Was Proper.**

The bases of this opinion are explained below.

I have reviewed the syntax for two factor analyses that were run by Dr. Soley or her team on the WGNX benefits segmentation study. The first factor analysis was identified by Dr. Soley as "without questions 47 & 45". The second analysis built on the first by removing questions 16-20 and specifying ten (10) factors that were to be included in the final model. These two factor analyses were performed using principle components analysis extraction, the SPSS software default. As noted in Section III above, however, RCL's practice was to employ the unweighted least squares method of factor extraction.

To facilitate the review of these two factor analyses, RCL input the syntax into the same statistical program used by Dr. Soley. SPSS is a commonly used and well-accepted computer program for Statistical analysis. The tables that resulted were printed out and given to me for review. The two factor analyses lack statistical simplicity and scientific meaningfulness. Fourteen of the thirty-five variables included in the first factor analysis (without questions 47 and 45) cross-load on to other factors. This result for the first factor analysis is shown in <u>Exhibit 2</u> hereto and the result for the second factor analysis is shown in <u>Exhibit 3</u> hereto.

Employing a commonly used statistical standard and one that is recommended in the RCL Analysts' Handbook to remove the cross-loading variables (any variable that does not load on a factor by more than 1.25 times the second highest loading on any other factor)[5] yielded a factor model with five factors composed of 25 variables. This result is shown in <u>Exhibit 4</u> hereto. The shortcoming of this factor model is that each of these factors does not have a distinctive, unique benefit theme, and, therefore, is not a scientifically meaningful solution. For example, factor 5 is composed of questions 44 and 30. Question 44, however, is a "make up my own mind" benefit, whereas question 30 is a convenience

benefit. Question 44 is most similar to questions 42, 26, 23, and 12 that make up the bulk of factor 3. Question 30, however, appears to be most similar to question 33 in factor 2. This "cross loading" of questions with similar import onto different factors violates the statistical principal of simplicity. Question 16 has a completely different theme from the remainder of the questions in factor 3. Factor 2 is also not homogenous. Questions 41, 37, 38, and 39 are entertainment benefits, whereas question 20 is a connection/familiarity benefit; questions 40 and 33 are two completely different and new themes for the factor.

This phenomenon of variables with similar benefits loading on different factors and the lack of a logical explanation of the factors indicate that this iteration of the factor model has failed. It is neither statistically simple nor scientifically meaningful. The factor model is not finished and must be rerun by adjusting the variables entered into the model and/or the number of factors in the model. RCL properly did not present this solution to WGNX because the solution did not contain a set of coherent segments. It would have been meaningless to the station. As this factor analysis was not complete and required further work, no cluster analysis could be run based on it.

The second factor analysis (with the ten factors) run by Dr. Soley has similar flaws. See Exhibits 3 and 5. The results from these models do not yield a clear, understandable set of segments. Therefore, these models have failed to produce segmentations that meet the commonly accepted statistical criteria for simplicity and meaningfulness. Additional work on the factor analysis was needed. RCL properly did not present this solution to WGNX. Again, because this factor analysis was not complete and required further work, no cluster analysis could be run based on it.

Footnotes:

1.  Marija J. Norusis, *SPSS Advanced Statistics Guide*, SPSS, Inc., Chicago, Il, P. 151

2.  Harry H. Harmon, Modern Factor Analysis, 3rd Edition Revised, University of Chicago Press, Chicago, IL, 1976. P. 5.

3.  IBID, P. 174. Quoting Thurstone, L. L., *Multiple Factor Analysis*, Chicago, University of Chicago Press, 1947. P. 61.

4.  From the Exploratory Factor Analysis paragraph in the StatNotes - Overview to Factor Analysis for PA 765 an online textbook for Quantitative Research in Public Administration, Professor G. David Garson, North Carolina State University, Raleigh, NC
    URL: http://www2.chass.ncsu.edu/garson/pa765/factor.htm

5.  RCL Analysts' Handbook P. 67

Respectfully submitted,

Michael A. Grossman

COUNSELLORS AT LAW

# HUTCHINS, WHEELER & DITTMAR

A PROFESSIONAL CORPORATION

101 FEDERAL STREET, BOSTON, MASSACHUSETTS 02110
TELEPHONE: 617-951-6600   FACSIMILE: 617-951-1295

DAVID B. MACK
DBM@HUTCH.COM
617-951-6731

November 26, 2001

*VIA Federal Express*

Roger T. Stetson, Esq.
Belin Lamson McCormick Zumbach & Flynn
666 Walnut Street - Suite 2000
Des Moines, Iowa 50309-3989

     Re:    *Research Communications, Ltd. v. Meredith Corporation*

Dear Mr. Stetson:

     Enclosed please find Plaintiff's Objections and Responses to Meredith's First Set of Interrogatories.

     Thank you for your cooperation with respect to the deadline.

Very truly yours,

David B. Mack

DBM/prl
Enclosure

cc:    Service List
       Joseph C. Tanski, Esq.
       Ms. Valerie Crane

HWD2 951991v3

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| RESEARCH COMMUNICATIONS, LTD., )<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>)<br>MEREDITH CORPORATION, )<br>)<br>Defendant, )<br>)<br>)<br>and )<br>)<br>MEREDITH CORPORATION, )<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>)<br>VALERIE CRANE, )<br>)<br>Defendant. )<br>) | CASE NO 3:00CV2179-AVC |

## PLAINTIFF'S OBJECTIONS AND RESPONSES
## TO MEREDITH'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff

Research Communications, Ltd. ("RCL"), by its undersigned counsel, responds to

defendant Meredith Corporation's ("Meredith") First Set Of Interrogatories (the

"Interrogatories") as follows:

HWD2 952914v1

## GENERAL OBJECTIONS AND RESPONSES

1.    RCL objects to the Interrogatories to the extent that they seek to impose obligations and duties beyond those required by Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the District of Connecticut.

2.    RCL objects to the Interrogatories to the extent that they are overly broad and would subject RCL to unreasonable, oppressive and undue burden and expense, and are not reasonably calculated to lead to the discovery of admissible evidence.

3.    RCL objects to the Interrogatories to the extent that they purport to require RCL to "Identify all persons" who either "participated in" or have "knowledge of" identified subject matters.  To the extent that they do so, the Interrogatories are overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  RCL will not provide the names of "all persons" who either "participated in" or "have knowledge of" the identified subject matters, but instead with provide the names of those individuals whom it knows had some responsibility with respect to those subject matters.

4.    RCL objects to the Interrogatories to the extent that they seek information subject to the attorney-client privilege and/or the work-product doctrine.

5.    RCL objects to the Interrogatories to the extent that they call for speculation and conjecture, opinion, or legal conclusion.

6.    RCL objects to the Interrogatories to the extent that they assume the truth of facts not proven or facts not in evidence.

7.    RCL objects to the Interrogatories to the extent that they are so broad, vague, ambiguous or uncertain that RCL cannot determine the precise nature of the

- 2 -

HWD2 952914v1

information sought and, therefore, is made to answer with the risk of inadvertently providing a misleading, confusing, inaccurate, or incomplete response.

8.    To the extent the Interrogatories call for information that may be derived or ascertained from RCL's business records and the burden of deriving or ascertaining the answers is substantially the same for defendant as it is for RCL, pursuant to Fed. R. Civ. P. 33(d), RCL refers Meredith to RCL's Objections And Responses To Meredith's Request For Production Of Documents and the documents made available by RCL for inspection and copying in connection therewith.

9.    These responses are based on the present recollection, knowledge and belief of RCL's current officers and employees, as well as certain information obtained to date. The responses represent information ascertainable by RCL after diligent inquiry as of the date hereof and should not be construed to reflect all facts or documents that may be responsive to these interrogatories.  RCL reserves the right to supplement or amend these responses or to supply additional documents if further information becomes available in the course of RCL's diligent inquiries, through discovery, or otherwise.  These responses should not be construed as, and do not constitute, a waiver of RCL's right to prove additional facts at trial.

10.    RCL expressly reserves all objections as to relevance, authenticity, or admissibility of any information or responses.

11.    RCL expressly reserves its right to supplement these interrogatory answers based on the evidence reviewed and/or revealed during the course of discovery.

12.     Counsel for RCL will be prepared to discuss the objections presented herein with counsel for defendant for the purpose of resolving any disputes that may arise without need for intervention by the Court.

## SPECIFIC OBJECTIONS AND RESPONSES

Subject to the foregoing objections and without waiving them, RCL responds to the Interrogatories as set forth below.  Each individual interrogatory answer specifically restates and incorporates each of the General Objections set forth above, irrespective of whether any or all of the General Objections are specifically referenced in the interrogatory answer.  Each answer is made subject to, and without waiver of, the General Objections.

INTERROGATORY NO. 1:

Please identify all persons involved in negotiating the July 1998 contract between RCL and Meredith, and describe each person's role in negotiations.

RESPONSE TO INTERROGATORY NO. 1:

RCL objects to this interrogatory to the extent it is vague and ambiguous and fails to define with particularity the terms "negotiating" and "role".  Subject to the foregoing, RCL states that the following individuals were involved, to the extent set forth below, in discussions regarding entering into the July 1998 contract (exclusive of amendments thereto).

> John Loughlin
> Executive Vice President
> Primedia, Inc.
> 260 Madison Ave.
> New York, NY
> (212) 726-4347

- 4 -

HWD2 952914v1

Valerie Crane
Research Communications Ltd.
220 Forbes Road
Suite 400
Braintree, MA 02184
(781) 794-3031


Perry Bradshaw
Meredith Corporation
1716 Locus Street
Des Moines, IA
(515) 284-3042

Ms. Crane prepared the initial proposal and the first version of the July 1998

contract.   Mr. Loughlin, Ms. Crane and Mr. Bradshaw discussed the first version.  Mr.

Bradshaw revised the proposal.

INTERROGATORY NO. 2:

Please identify all persons involved in negotiating the November 1998 contract
between RCL and Meredith, and describe each person's role in negotiations.

RESPONSE TO INTERROGATORY NO. 2:

RCL objects to this interrogatory to the extent it is vague and ambiguous and fails

to define with particularity the terms "negotiating" and "role".   Subject to the foregoing,

RCL states that at present it has no recollection of negotiating a contract in November

1998.

INTERROGATORY NO. 3:

Please identify all persons involved in drafting paragraph 10 of the July 1998
contract between RCL and Meredith.

RESPONSE TO INTERROGATORY NO. 3:

Perry Bradshaw and Valerie Crane.

HWD2 952914v1

INTERROGATORY NO. 4:

Please describe all evidence that RCL alleges will show that Exhibit A to the July 1998 contract was intended by RCL and Meredith to bind Meredith to perform specific studies described in Exhibit A or to mandate payment by Meredith to RCL in the amounts indicated on Exhibit A.

RESPONSE TO INTERROGATORY NO. 4:

RCL objects to this interrogatory on the ground that it seeks information protected from disclosure by the attorney-client privilege and/or work-product doctrine. This interrogatory improperly requests that RCL reveal the mental impressions of its attorneys concerning what constitutes "evidence" and whether such "evidence" demonstrates the intention of the parties to be bound to engage in certain conduct. RCL objects to this interrogatory on the further ground that it is vague and ambiguous and seeks information beyond the scope of permissible discovery. RCL objects to this interrogatory on the additional ground that it would require RCL to describe <u>all</u> evidence demonstrating an intent to be bound to the studies in Exhibit A to the contract. Requiring RCL to describe all such documents and evidence would impose an undue burden on RCL.

Subject to the foregoing, RCL states that the facts and documents identified below, among other facts and evidence RCL expects will be ascertained during the course of discovery, demonstrate that RCL and Meredith intended to be bound to conduct and to pay for, respectively, the studies identified in Exhibit A to the July 21, 1998 contract.

- The July 21, 1998 contract itself specifically states that "This constitutes an agreement between Meredith and [RCL] to conduct the research studies set out in Exhibit A attached hereto and incorporated herein, at ten Meredith stations (the "Stations")."

- The conduct of Meredith and RCL at all relevant times was consistent with the understanding that the specific studies identified in Exhibit A were to be conducted. Many of the studies identified in Exhibit A as of July 21, 1998 were

- 6 -

rescheduled to accommodate the needs of the particular Meredith station and/or to accommodate Meredith's budget. On each occasion when RCL and Meredith discussed the rescheduling of such studies, however, the discussion related solely to *when* the studies would be conducted, *not if* such studies would be conducted.

- Letter dated April 12, 1999 from Kathy Zehr to Valerie Crane stating "While we are committed to fulfilling our contracted studies with you, we hope to be able to have some flexibility with regard to the timing of these projects." (Bates Stamp MC0017),

- Email dated July 10, 2000, from Zehr stating that there is no corporate deal with RCL for fiscal year 2002, but that "we will live up to the approximately $900,000 that is left" in FY '01. (MC00436)

- Email dated July 26, 2000 from Zehr to several Meredith station general managers stating "we have the leverage of Valerie wanting new contracts and should use that to defer unneeded studies into FY '02." (MC0394)

- Discussions between Cary Jones and Valerie Crane in the Summer of 2000 concerning the timing of studies, during which Mr. Jones repeatedly offered to pay RCL the remainder due under the contract ($938,000) rather than extend the research beyond calendar year 2000. Ms. Crane followed up those conversations with a letter to Mr. Jones dated July 19, 2000 reflecting one of the options being payment of the remainder due under the contract. (MC0477)

- Email dated February 10, 2000 from Jeff Schill to Judy Wallace expressing concern that Meredith had agreed to pay for more studies than budgeted. (MC0020)

- Email dated August 1, 2000 from John Rose to Zehr requesting that Zehr negotiate with Valerie Crane to move a study to the following year. (MC0027).

- Handwritten notes on August 9, 2000 letter from Crane to Rose reflecting possible discrepancy between budgeted studies and those required by contract. (MC0028)

- Letters in August 2000 from Valerie Crane to Meredith stations informing each station that "[RCL] will continue to bill corporate for these studies through the end of our contract for FY 01. When you begin planning for the next fiscal year, we can discuss the number of studies and budgeted amounts for FY 02. At that time, we each sign an agreement between [RCL] and your station to guarantee exclusivity to your station beyond the end of our corporate contract." (See, e.g., MC0013).

- 7 -

- Letter dated January 17, 2000 from Loughlin to All General Managers and News Directors concerning Phase Two of the Branding Effort. (MC0039).

- Email dated July 10, 2000 from Zehr to Al Bova stating "we will live up to the approximately $900k that is left under the current contract . . ." (MC0393).

- Statements made during the course of negotiation and performance of the contract.

The above list of facts and documents is not exhaustive. RCL reserves its right to introduce and otherwise rely upon additional facts and documents for all purposes related to this litigation.

INTERROGATORY NO. 5:

Please identify all persons allegedly involved in negotiating the alleged amendments to Exhibit A of the July 1998 contract between RCL and Meredith, as alleged in paragraph 9 and Exhibit 2 of RCL's Complaint, and describe each person's alleged role in the negotiations.

RESPONSE TO INTERROGATORY NO. 5:

RCL objects to this interrogatory on the grounds and to the extent it is vague and ambiguous. The interrogatory does not define with particularity the terms "negotiating" and "role". Subject to the foregoing objection, RCL states that the following individuals were involved in discussions concerning amendments to Exhibit A to the July 1998 contract.

For RCL

Rob Cluxton
3 Commonwealth Avenue
Attleboro, MA 02703

Valerie Crane
Research Communications Ltd.
220 Forbes Road
Suite 400

- 8 -

Braintree, MA 02184

For Meredith

Wayne Cunningham
[present address unknown]

Jack Griffin
Parade
711 Third Ave.
New York, NY

Cary Jones
[current address unknown]

John Loughlin
Executive Vice President
Primedia, Inc.
260 Madison Ave.
New York, NY

Kathy Zehr
[current address unknown]

INTERROGATORY NO. 6:

Please state when RCL and Meredith allegedly agreed to amend Exhibit A to the
July 1998 contract, as alleged in paragraph 9 and Exhibit 2 of RCL's Complaint.

RESPONSE TO INTERROGATORY NO. 6:

In or about May 1999 and in or about July 2000.

INTERROGATORY NO. 7:

Please identify any document that purports to bind Meredith to an amended Exhibit
A, as alleged in paragraph 9 and Exhibit 2 of RCL's Complaint.

RESPONSE TO INTERROGATORY NO. 7:

RCL objects to this interrogatory on the ground that it seeks information protected

from disclosure by the attorney-client privilege and/or work product doctrine. This

interrogatory improperly requests that RCL reach a legal conclusion as to what documents

- 9 -

"bind" Meredith to an amended Exhibit A, which would require RCL to reveal the mental impressions of its attorneys. RCL objects to this interrogatory on the ground that it is vague and ambiguous. RCL objects to this interrogatory on the additional ground that it would require RCL to identify all documents reflecting an amendment to the contract, which would impose an undue burden on RCL. Subject to the foregoing, RCL restates and incorporates by reference its Answer to Interrogatory No. 4 above as if fully stated herein. In addition, RCL states that the following documents, among others, demonstrate that the parties amended Exhibit A to the contract:

- Meredith FY01 research schedule. (MC0036).

- Loughlin letter to GMs and News Directors. (MC0040).

- Emails dated June 2000 from stations to Zehr regarding scheduling of studies throughout FY01. (MC0073-78).

- Valerie Crane Research Schedule. (MC0080).

- Memorandum dated December 4, 1999 from Schill to Business Managers, attaching FY01 Schedule. (MC0328).

- Exhibit A with notes. (MC0333).

- Meredith Corporation list of studies and amounts paid. (MC0371).

- Statements made during the course of negotiation and performance of the contract.

The above list of facts and documents is not exhaustive. RCL reserves its right to introduce and otherwise rely upon additional facts and documents for all purposes related to this litigation.

INTERROGATORY NO. 8:

Please describe all actions taken by RCL to mitigate the damages alleged in RCL's

- 10 -

HWD2 952914v1

Complaint and Initial Disclosure.

RESPONSE TO INTERROGATORY NO. 8:

RCL objects to this interrogatory on the ground that it seeks information protected from disclosure by the attorney-client privilege and/or work product doctrine. This interrogatory improperly requests that RCL reach a legal conclusion as to what conduct constitutes "mitigation of damages", which would require RCL to reveal the mental impressions of its attorneys. Subject to the foregoing, and without admitting that RCL had any obligation to mitigate its damages, RCL sought to locate and perform additional work.

INTERROGATORY NO. 9:

Please describe RCL's role in Meredith's decision to award the Better Homes & Garden production contract to Steadfast Film & Television, Inc. in 1998, including any recommendation made by RCL to Meredith.

RESPONSE TO INTERROGATORY NO. 9:

RCL objects to this interrogatory on the grounds that it is so vague and ambiguous that RCL cannot meaningfully respond to it. The decision to award the Better Homes & Garden production contract to Steadfast Film and Television, Inc. ("Steadfast") was made by Meredith. RCL played no role in Meredith's decision to award the Better Homes & Garden production contract to Steadfast in 1998, nor did RCL make any recommendation to Meredith with respect to such decision.

INTERROGATORY NO. 10:

Please identify each person whom you expect to call as an expert at trial, and provide, as to each person:

    (a)    A full name, home and business addresses;
    (b)    The business name of the witness or his/her employer;
    (c)    A description of the specialized field in which it is claimed that the expert will testify in this case;

- 11 -

(d)   The subject matter or area on which the expert is to testify;
(e)   The substance and the facts and opinions on which the expert is to testify;
(f)   A summary of the grounds for each opinion; and
(g)   A full statement of the qualifications of the expert including, but not limited
      to, his or her education, employment, memberships, teaching
      responsibilities, publications and/or honors.  In lieu of the answer to this
      particular subpart, you may attach a complete and current curriculum vitae.

## RESPONSE TO INTERROGATORY NO. 10:

RCL has not identified any expert whom it expects to call as an expert at trial.

RCL will duly supplement this interrogatory as required by the Federal Rules of Civil

Procedure when and if any such expert is retained.

## INTERROGATORY NO. 11:

Please identify each and every research study performed by RCL for Meredith.

## RESPONSE TO INTERROGATORY NO. 11:

RCL objects to this interrogatory on the ground and to the extent it seeks

information neither relevant to this action nor reasonably calculated to lead to the

discovery of admissible evidence.  Subject to the foregoing, RCL refers Meredith to

Exhibit A hereto, a list of studies performed by RCL for Meredith stations during the

period April 1998 through August 2000, which is incorporated herein by reference.  RCL

also refers Meredith to the research studies, copies of which have been made available to

Meredith by RCL for inspection and copying.

## INTERROGATORY NO. 12:

With respect to each research study identified in RCL's answer to Interrogatory No.
11, please identify all persons employed by or affiliated with RCL, including contractors or
subcontractors, who performed work in connection with the study.

HWD2 952914v1

RESPONSE TO INTERROGATORY NO. 12:

RCL objects to this interrogatory on the ground and to the extent it seeks

information neither relevant to this action nor reasonably calculated to lead to the

discovery of admissible evidence. RCL objects to this interrogatory on the further grounds

that it is vague and ambiguous, overly broad and unduly burdensome. Subject to the

foregoing, RCL refers Meredith to Exhibit A hereto, which is incorporated herein by

reference. In addition, RCL refers Meredith to the documents made available for

inspection and copying in response to Meredith's request for production of documents,

including without limitation the research studies themselves (which reveal the employees

who worked on the projects (such documents are located in boxes identified by station))

and RCL's financial documents (which reveal the identity of subcontractors).

INTERROGATORY NO. 13:

Please describe the academic qualifications and training of each person identified in
RCL's answer to Interrogatory No. 12, state whether there is an employment file for each
employee, and provide a table of organization for RCL during the period 1998 to 2000.

RESPONSE TO INTERROGATORY NO. 13:

RCL objects to this interrogatory on the ground and to the extent it seeks

information neither relevant to this action nor reasonably calculated to lead to the

discovery of admissible evidence. RCL objects to this interrogatory on the further grounds

that it is vague and ambiguous, overly broad and unduly burdensome. Subject to the

foregoing, RCL refers Meredith to Exhibits A and B hereto, which are incorporated herein

by reference.

- 13 -

There is an employment file for each RCL employee. There does not exist an organizational chart for RCL for the period 1998 to 2000. Valerie Crane was RCL's President, Treasurer and Clerk during such period.

<u>INTERROGATORY NO. 14:</u>

With respect to each study identified in response to Interrogatory No. 11, please provide the following information:

a) Describe how the raw data gathered during the research study was maintained by RCL.

b) List all variables on which raw data was collected, the coding for each variable on the data record (i.e., what each number means), and the position of each variable on the data record. Please identify all invalid codes and missing data codes.

c) Describe what respondents or particular variable values were deleted form the raw data prior to segmentation analysis, and explain the reasons for any such deletion.

d) Describe any recoding of variables done on the data prior to segmentation analysis, and explain the reasons for any such recoding.

e) Identify what variables RCL originally intended to test for possible use to form the bases of the segmentation analysis, whether or not such variables eventually were used.

f) Describe any item analysis (i.e., scale variable analysis), if any, performed prior to, in conjunction with, or subsequent to the factor analysis, and used to create scales or summary variables for later use in the cluster analysis. This answer should include the specifications for any analysis performed, the sequent of item analysis, if any, and factor analysis.

g) For any item analysis that was performed, describe the criteria used to delete variables from a scale, explain why each variable deleted was so deleted, and provide any other information necessary to reproduce the final variables used to form final scales input into the cluster analysis.

h) Provide a list of the variables used to form each scale in the final cluster analysis used for reporting segmentation results or recommendations to Meredith.

i) Provide a description of the factor analysis done on the variables. If more than one factor analysis was performed, describe each analysis, including the particular software package and version employed (and, if other than SPSS or SAS, the vendor through which the package may be obtained).

j) If the factor analysis performed was exploratory, describe the variables included, extraction method employed, community estimates used, normalization method employed (if any), the criterion or criteria employed to determine the number of factors, and the reason for the use of that

- 14 -

criterion or those criteria, the specific rotation method employed and any parameter values set for that rotation method, and any other information necessary to reproduce the analysis exactly.

k)  If the factor analysis performed was confirmatory, provide the input matrix (including whether it is a covariance or correlation matrix or some other specified matrix), all model parameter values that were fixed and their values, specifications regarding any other parameter values that were set equal to others, and all other information necessary to reproduce the analysis exactly. If multiple factor analyses were done by successively removing or re-including variables, specify the variables removed or re-included the reasons why there were removed or re-included.

l)  Describe how each summary or factor score used to form the basis of segmentation in the cluster analysis was formed, both in any initial analysis that was not reported to Meredith, and in any final analysis that was eventually reported to Meredith. Please describe the criteria used to include or delete variables in order to form the summary score, the weighing system used to weight the variables (i.e., unitary weights, factor scoring, or another specified method), the criteria used to determine the number of factors (such as "eigenvalue one" or screen test), and all other information necessary to reproduce the results of the cluster analysis exactly.

m)  Describe the specifications for the cluster analyses that were done on the summary scores used to form the basis of segmentation. For each cluster analysis, please include the name of the software package and option (such as SPSS fast cluster analysis, Ward's method, or K-means) that were used, with all parameters specified; reasons for any method employed to eliminate outliers, if any, and identification of the outlier respondents discarded, the number of clusters extracted, the criteria or criterion used to decide on the number of clusters, the specific value of the criterion or criteria and/or the decision rule employed, and all other information necessary to reproduce the results of the cluster analysis exactly.

n)  Identify the final cluster assignment (i.e., the assignment that was used in reporting the results and recommendations to Meredith) of each respondent that was assigned to a cluster.

o)  Describe the means of each cluster on each score used to form the bases of segmentation, along with the interpretation of each cluster as suggested to Meredith.

p)  Describe any other information necessary to reproduce the analyses performed to provide a segmentation to Meredith.

q)  Describe the sampling plan of the study, including (1) the definition of the population to which statistical inferences were intended to be made, (2) all sampling frame or frames employed, (3) the recruitment method(s) used to obtain respondents, including any recruitment questionnaire or script and any screening questions, the criteria for inclusion in or exclusion from the sample, the specifications and proportions for any quotas that were being filled, and the rationales behind those quotas, (4) the number of people or

- 15 -

HWD2 952914v1

households in the population, the sampling frame, and the sample, (5) a statement of the type of sample produced (i.e., sample random, proportionate stratified random, disproportionate stratified random, one-stage cluster, two-stage cluster, convenience, quota, snowball, etc.),and the reasons why it would qualify as such a sample, including the strata or cluster designations if appropriate, and the reasons why such a sample type was chosen, and (6) any other information necessary to obtain a sample that would, within sampling error, produce the same results as those reported to Meredith.

r)  Describe any weighting schemes used to weight the respondents' data and the statistical rationales behind such schemes.

s)  Describe all demographic information collected from the respondents, and provide a comparison of this demographic information with the same demographic information from the population about which inferences were being made.

RESPONSE TO INTERROGATORY NO. 14:

RCL objects to this interrogatory on the ground that it is vague and ambiguous, overly broad and unduly burdensome.  Subject to the foregoing, RCL responds as follows

a.)  RCL maintained the raw data for a study for six months following its delivery.

b.)  RCL refers Meredith to the questionnaire with data and tables that are bound with the final reports submitted to Meredith by RCL. With respect to the particular recode and cleaning syntax written for each specific study and the position of each variable on the data record, RCL refers Meredith to the documents made available for inspection and copying in response to Meredith's request for production of documents.

c.)  RCL deleted a respondent if he or she did not pass the screening criteria for each specific study (e.g., age, local news viewership, etc.). When appropriate, RCL deleted or recoded variable values, such as "don't know" or "refused". Outliers were also deleted.

d.)  In addition to recoding described above in (c), variables that were used for crossbreak analysis are shown and described in the final reports submitted to Meredith by RCL.

- 16 -

HWD2 952914v1

e.) In benefits segmentation studies, benefits statements were initially entered into the factor analysis to form the bases of the factors or benefits.

f.) No item analysis (i.e., scale variable analysis) was performed on any of the factors.

g.) No item analysis was performed.

h.) RCL refers Meredith to the reports submitted to Meredith for the list of variables used to form the benefits used in the cluster analysis. Information concerning the variables used can also be found in the syntax for each study. RCL did not make recommendations to Meredith.

i.) RCL used SPSS for Windows, Version 6.1 to perform factor analyses. RCL typically ran and examined a number of factor analysis solutions before making a final decision on what factors to use and what items to include under each factor. RCL refers Meredith to the factor syntax in the production of documents for the final factor solutions used for each study.

j.) RCL used the "unweighted least squares" method of extraction. RCL examined the "unforced solution" first to see how many factors naturally emerged from the data, using the "Eigenvalues over 1" option. This option was the rule of thumb for determining the number of initial factors to be extracted. Based on these results, RCL often specified a number of factors on subsequent analyses. The communalities were estimated iteratively. RCL often specified a maximum number of iterations for convergence between 25 and 50. RCL also specified a "varimax" rotation method for orthogonal rotation, because it is simpler to understand and interpret than oblique rotations. RCL refers Meredith to the

- 17 -

documents produced for inspection and copying for the factor syntax for each study, which have been categorized by station.

k.) No confirmatory factor analyses were performed by RCL.

l.) There were at least two ways to create factor scores: 1) Averaged Factor Scores: this method computes a new variable that is the average of all of the variables that load on the factor (without crossloading); or 2) SPSS Generated Factor Scores: this method uses the SPSS generated factor scores that are provided when the options "Save as Variables" is selected on the Scores box. The method used was Regression. These scores were used only when the factors SPSS generates were used without any changes. The factors produced by SPSS were standardized. The cluster analysis can be run on either the Average Factor Scores or the SPSS Generated Factors. RCL refers Meredith to the studies for the cluster syntax.

m.) RCL used SPSS for Windows, Version 6.1, to perform cluster analyses. RCL used the Quick Cluster command in SPSS and specified a "K-means cluster" method, an example of a partitioning method. RCL followed the teachings of a leading authority and began a partition clustering analysis by asking the computer to produce several solutions, with different numbers of clusters in each. RCL typically began with 3 or 4 and then continued to run cluster analyses until one solution made theoretical sense and had enough respondents in each segment to be able to perform further statistical analyses. In order to determine the number of segments, the research team considered several indicators such as cluster sizes (i.e., number of respondents, meaningful cluster profiles on the variables used to form them, and cluster profiles on demographics and other variables). RCL used all of these criteria in reaching a final cluster solution. RCL chose the "exclude cases listwise"

- 18 -

option, which excluded from the cluster analysis people with missing data on any of the variables used. In certain cases, a cluster analysis resulted in a cluster with such a small number of people that RCL excluded such group from the final reporting of the results.

n.) RCL refers Meredith to the studies for the syntax used for cluster analyses conducted for each specific station's benefits and positioning studies. The final cluster assignment was made by SPSS and then saved as a variable in the final SPSS dataset. That variable shows the cluster assignment of each respondent in the dataset. RCL did not make recommendations to Meredith.

o.) RCL refers Meredith to the reports and tables for the means or standardized score of each factor for each cluster used to form the bases of segmentation and the interpretation of each cluster.

p.) RCL cannot meaningfully respond to this portion of interrogatory 14 due to the vagueness and ambiguity thereof.

q.)

1.) The screening criteria (definition of the population) used in each of the studies differed and was achieved, in part, in consultation with Meredith. With regard to the specific screening criteria utilized in each study, RCL refers Meredith to the methodology section of each report issued to Meredith by RCL.

2.) The sample for the studies was randomly selected and was drawn from a sampling frame of listed household telephone numbers. In order to increase the representativeness of the sample to also include unlisted telephone numbers, RCL policy was to "plus-one" to the listed number, that is, take the sampled telephone number and adding a constant digit (in this case, "1") to the last digit.

- 19 -

HWD2 952914v1

3.) For product and promotion studies, RCL recruited targeted respondents to attend group test sessions in the DMA. RCL refers Meredith to the printed screeners made available for inspection and copying in response to Meredith's request for production of documents. With regard to the recruitment or screening questions asked, RCL refers Meredith to each product or promotion study.

4.) All benefits segmentation and some positioning studies utilized telephone surveys. RCL refers Meredith to the documents made available for inspection and copying in response to Meredith's request for production of documents for information concerning the instruments used in each study. The questions asked at the beginning of each telephone survey served as the screening questions.

5.) The sample for each study was a proportionate stratified random sample. RCL set demographic targets so that the sample demographics matched the demographics of the population it studied. RCL used many different sources to obtain demographic information, including information from Meredith, Nielsen, previous studies, Snap USA, SRDS Lifestyles, and Census data. Depending on the market, demographic targets were set for gender, age, education, ethnicity, income, and county distribution. RCL refers Meredith to the documents made available for inspection and copying in response to Meredith's request for production of documents for information concerning the methodology for each study. The methodology describes the screening criteria for each study, the demographic distribution of the sample, and any weighting that occurred to bring the sample within 5% of demographic targets. The sample criteria were approved by each Meredith station.

- 20 -

r.) If the actual demographics of the data set were off of the target by more than 5%, RCL weighed the data so that it more closely resembled the target demographics. RCL refers Meredith to the documents made available for inspection and copying in response to Meredith's request for production of documents for information concerning the weighting syntax used in each study.

s.) RCL refers Meredith to the documents made available for inspection and copying in response to Meredith's request for production of documents (specifically the questionnaires with data and the final reports) for information concerning demographic information collected from the respondents.

INTERROGATORY NO. 15:

Please provide a detailed itemization of all costs incurred by RCL in connection with each research study identified in RCL's answer to Interrogatory No. 11.

RESPONSE TO INTERROGATORY NO. 15:

RCL objects to this interrogatory on the ground that the term "costs" is ambiguous. RCL objects to this interrogatory on the additional grounds that it is overly broad and unduly burdensome and to the extent it seeks information concerning invoices already presented to and paid for by Meredith. Subject to the foregoing, RCL refers Meredith to Exhibit C hereto, which is incorporated herein by reference.

INTERROGATORY NO. 16:

With respect to each study begun by RCL for Meredith, but suspended before completion based on directions from Meredith, please identify and describe all actual costs incurred by RCL from the date each study was commenced until the date the study was suspended.

- 21 -

RESPONSE TO INTERROGATORY NO. 16:

RCL objects to this interrogatory on the ground that the term "costs" is ambiguous.

Subject to the foregoing, RCL refers Meredith to Exhibit D hereto, which is incorporated

herein by reference.

INTERROGATORY NO. 17:

Please describe how RCL established "target levels" used in any research study
performed by RCL for Meredith.

RESPONSE TO INTERROGATORY NO. 17:

RCL objects to this interrogatory on the ground that it is vague and ambiguous.

Subject to the foregoing, RCL states that it maintained multiple normative data bases

which were used to calculate both RCL averages and target levels for tested materials. A

target is a numerical benchmark against which to gauge the data and the target level is

where one would want to score. A successful product or service with satisfied customers

scores at or above target on the measured dimension. Each normative data base was

maintained in Statistical Package for the Social Science (SPSS) format allowing the user to

calculate the mean or average across similar types of studies for a particular measure (RCL

average) as well as the upper 25% percentile (RCL target).

INTERROGATORY NO. 18:

Please describe the purpose and use of "action plans" as a part of each branding
project performed by RCL for Meredith.

RESPONSE TO INTERROGATORY NO. 18:

RCL objects to this interrogatory on the grounds that it is vague and ambiguous.

Subject to the foregoing, RCL states that each Meredith station (with the exception of

KPDX), through a series of Meredith workshops facilitated by RCL, developed a "brand

- 22 -

strategy and action plan". RCL refers Meredith to the brand strategy and action plans, copies of some of which RCL has made available to Meredith for inspection and copying. Moreover, Meredith likely has a copy of all of the brand strategy and action plans developed as part of the branding process facilitated by RCL, including those not in RCL's possession, because the Meredith stations themselves developed such plans.

Further responding, RCL states that a brand strategy and action plan itself was generally comprised of individual action plans for the various departments of each station, such as management, sales, news, programming and promotion. The purpose of the action plan for each department of each Meredith station varied from department to department within the same station and/or from station to station. In general, however, the purposes of the brand strategy and action plan were, among others, to identify the elements of a station's brand, to specify the goals, objectives and tactics of the station and to establish a plan to implement and achieve such goals and objectives. The plan involved each station identifying its strengths and weaknesses and the means to overcome such weaknesses. The brand strategy and action plans were to be used by the Meredith station, at the station's discretion, as a reference and resource guide for planning and implementing the branding efforts on a going forward basis.

INTERROGATORY NO. 19:

Please describe the procedures or methods by which "action plans" were developed, adopted, and implemented as a part of each branding project performed by RCL for Meredith.

RESPONSE TO INTERROGATORY NO. 19:

RCL objects to this interrogatory on the grounds that it is vague and ambiguous. Subject to the foregoing, RCL states that the brand strategy and action plan for each station

- 23 -

was developed through a series of workshops in which the department heads and other

individuals from the station typically participated. The workshops were led and facilitated

by Tom Simon, Valerie Crane, Bill Howe, and/or various news consultants (including Rich

Sabreen, Valerie Hyman and Al Tompkins). Each station developed its plan in the final

workshop based on the information supplied and the discussions which took place during

the previous workshops.

Each station completed, adopted and implemented its own plan at its discretion.

INTERROGATORY NO. 20:

Please describe all instances in which Valerie Crane directed any RCL employee to
remove variables from samples gathered in connection with research studies performed for
Meredith.

RESPONSE TO INTERROGATORY NO. 20:

RCL objects to this interrogatory on the grounds that it is vague and ambiguous.

Subject to the foregoing, RCL states that at no time did Valerie Crane direct any RCL

employee to remove variables from samples gathered in connection with research studies

performed for Meredith.   Some statistical analyses done for Meredith were performed

using a subset of variables.

INTERROGATORY NO. 21:

Please describe the basis for RCL's recommendations to Meredith concerning the
volume of research that each television station owned by Meredith should conduct during
1998 through 2000.

RESPONSE TO INTERROGATORY NO. 21:

RCL objects to this interrogatory on the grounds that it is vague and ambiguous,

specifically that it fails to define with sufficient particularity "research" or "volume".

Subject to the foregoing, RCL states that the number of research studies listed in Exhibit A

- 24 -

HWD2 952914v1

to the contract was established, in part, based upon the branding work performed by RCL

at WSMV in Nashville, Tennessee. Meredith was aware of the work RCL had done at

WSMV through Meredith's ownership of that station and contacted RCL to request that the

same model be applied to the Meredith stations as a whole. At WSMV, RCL performed

sixteen brand positioning, news product, benefits segmentation, programming and

anchor/weathercaster studies from January 1995 through June 1998. RCL used the work at

WSMV as a building block and established Exhibit A to the contract in consultation with

Meredith. Based upon its eighteen years of experience with television stations and its

success at WSMV, RCL believed that the number of studies set forth in Exhibit A, and the

timing of such studies, would best serve Meredith's goals of improving the quality of its

stations' products and services. RCL in addition refers Meredith to a letter dated December

24, 1997 from Ms. Crane to Mr. Loughlin (Bates No. MC 16127), which is incorporated

herein by reference.

INTERROGATORY NO. 22:

    Please describe the internal review process for the preparation of RCL research
reports sent to Meredith, and identify each person involved in that process for each study
prepared by RCL for Meredith.

RESPONSE TO INTERROGATORY NO. 22:

    RCL objects to this interrogatory on the ground and to the extent it is vague and

ambiguous. The interrogatory fails to define with any degree of particularity "internal

review process" and therefore RCL cannot meaningfully respond to this interrogatory.

Subject to the foregoing, RCL states that it assigned a team of four individuals to manage

the branding effort and research at each Meredith station. Each team consisted of a team

leader, a project manager, a research analyst and a research assistant. Valerie Crane

- 25 -

assisted and consulted with each team on an as needed basis. The particular individuals

involved in each study are set forth in Exhibit A, which is incorporated herein by

reference.

INTERROGATORY NO. 23:

Please describe how employees of RCL qualified for participation in RCL's profit-
sharing plan between 1997 and the present.

RESPONSE TO INTERROGATORY NO. 23:

RCL objects to this interrogatory on the ground that it seeks information that is

neither relevant to this action nor reasonably calculated to lead to the discovery of

admissible evidence.

INTERROGATORY NO. 24:

Please identify and describe all communications between RCL and John Loughlin
between September 2000 and the present.

RESPONSE TO INTERROGATORY NO. 24:

RCL objects to this interrogatory on the ground and to the extent it seeks

information that is neither relevant to this action nor reasonably calculated to lead to the

discovery of admissible evidence. RCL objects to this interrogatory on the further ground

that it is overly broad and unduly burdensome. Subject to the foregoing, RCL states that

Ms. Crane and Mr. Loughlin have had the following communications concerning, among

other things, the subject matter of this litigation, on or after September 30, 2000 through

and including the date of this response:

On October 31, 2000, Ms. Crane and Mr. Loughlin discussed the lawsuit filed

against Meredith by Larry Emsweller, the research conducted by RCL for WSMV, the

contract between RCL and Meredith and the fact that Meredith had canceled studies.

- 26 -

HWD2 952914v1

On February 15, 2001, Ms. Crane and Mr. Loughlin discussed the Meredith-RCL lawsuit. On March 19, 2001, Ms. Crane and Mr. Loughlin communicated by telephone concerning the litigation and the contract. On June 5, 2001, Mr. Loughlin and Ms. Crane communicated concerning the Meredith-RCL dispute. On October 10, 2001, Mr. Loughlin and Ms. Crane communicated concerning allegations made by Meredith concerning RCL.

INTERROGATORY NO. 25:

Please identify and describe all communications between RCL and Chuck Cordray between September 2000 and the present.

RESPONSE TO INTERROGATORY NO. 25:

RCL objects to this interrogatory on the ground and to the extent it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to the foregoing objection, RCL states that Ms. Crane and Mr. Cordray have had the following communications concerning, among other things, the subject matter of this litigation, on and after September 30, 2000 through and including the date of this response:

On October 31, 2000, Ms. Crane and Mr. Cordray discussed the Larry Emsweller case. On November 10, 2000, Mr. Cordray and Ms. Crane discussed John Zeiser's interview of Mr. Cordray. On December 12, 2000, Mr. Cordray and Ms. Crane discussed that John Zeiser had stopped by Mr. Cordray's office and asked if he had heard from Ms. Crane and requested that he be informed if he had. On February 26 and 27, 2001, Mr. Cordray and Ms. Crane communicated concerning a statement from a viewer of WGCL concerning the positioning work RCL had done for that station. On October 16, 2001, Mr. Cordray and Ms. Crane discussed the Meredith-RCL litigation.

- 27 -

HWD2 952914v1

INTERROGATORY NO. 26:

Please describe all contractual relationships in effect at any time between RCL and Disney Televentures or The Walt Disney Company, and identify any documents evidencing such relationships.

RESPONSE TO INTERROGATORY NO. 26:

RCL objects to this interrogatory on the ground that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

INTERROGATORY NO. 27:

Please describe all contractual relationships in effect at any time between RCL and Continental Cablevision, and identify any documents evidencing such relationships.

RESPONSE TO INTERROGATORY NO. 27:

RCL objects to this interrogatory on the ground that it seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

- 28 -

HWD2 952914v1

Sworn to under the pains and penalties of perjury this 16th day of November, 2001.  *

*Valerie Crane*

Valerie Crane
President, Research Communications, Ltd.

*with the exception of Answer No. 14.

HWD2 947948v1

I, Susan Crohan, hereby depose and state, under the pains and penalties of perjury this 14th day of November, 2001, that the facts and information set forth in Answer to Interrogatory No. 14 are true and accurate to the best of my knowledge.

*Susan Crohan*

Susan Crohan

UWD2 951093v1

Dated:    November 26, 2001                As to objections,
          Boston, Massachusetts

                                           Joseph C. Tanski   Ct. 22211
                                           David B. Mack   Ct. 23151
                                           HUTCHINS, WHEELER & DITTMAR
                                           101 Federal Street
                                           Boston, Massachusetts  02110
                                           (617) 951-6600


                                           Charles W. Pieterse   Ct. 01577
                                           WHITMAN, BREED, ABBOTT & MORGAN
                                           100 Field Point Road
                                           P.O. Box 2250
                                           Greenwich, CT 06836
                                           (203) 869-3800

                                           Counsel for Plaintiff
                                           Research Communications, Ltd.


                       CERTIFICATE OF SERVICE
            I certify that a true copy of this document
            was served upon (each party appearing pro se
            and) the attorney of record for each party by
          * mail) ( hand) on  11/26/01  .  * 1rd x to R. Stetson
                        David B. Mack
                          (Signature)

HWD2 952914v1