UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| RESEARCH COMMUNICATIONS, LTD., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MEREDITH CORPORATION, )<br>)<br>Defendant, )<br>)<br>and )<br>)<br>MEREDITH CORPORATION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VALERIE CRANE, )<br>)<br>Defendant. )<br>_____ ) | CASE NO 3:00CV2179 DFM |

**MOTION IN LIMINE TO PRECLUDE EVIDENCE
OR REFERENCES TO RATINGS OF MEREDITH TELEVISION STATIONS**

Plaintiff Research Communications, Ltd. and third-party defendant Valerie Crane (collectively, "RCL") move *in limine* to preclude Meredith Corporation ("Meredith") from introducing at trial any evidence concerning the Nielsen ratings of Meredith's television stations or from referring to such ratings. Meredith should be precluded from introducing such evidence or making such references for three reasons. First, because Meredith does not intend to introduce the Nielsen ratings reports themselves, any testimony or other documents concerning ratings will be hearsay. Second, Meredith has refused to produce Nielsen ratings reports or related documents during discovery, despite repeated requests. RCL, therefore, is in no position

BOS1368976.2

to defend allegations by Meredith that the ratings purportedly declined at the Meredith stations. Finally, even if somehow the hearsay objection is not sufficient, and even if Meredith had produced Nielsen reports, information as to ratings is entirely irrelevant to any of Meredith's counterclaims, third-party claims or defenses in this action.

### **Background**

RCL brought this action seeking damages on account of Meredith's wrongful termination of an Agreement pursuant to which RCL performed research studies and related services for ten Meredith television stations. The Agreement provided that RCL would conduct the research studies set forth in Exhibit A to the Agreement. In October 2000, Meredith purported to terminate the Agreement notwithstanding that a number of the research studies set forth in Exhibit A to the Agreement had not been conducted. A true and accurate copy of the Agreement, dated July 21, 1998, is attached hereto as Exhibit A.[1]

RCL commenced suit in November 2000 seeking, *inter alia,* recovery of amounts due under the Agreement.[2] In December 2000, Meredith filed an answer and counterclaims. On October 11, 2001, Meredith filed an amended answer with counterclaims and third-party complaint. The October 2001 claims added certain claims against RCL and included a third-party complaint against RCL's President, Valerie Crane.[3] In late June 2002, Meredith amended its October 2001 claims. A copy of Meredith's June 2002 amended answer with counterclaims and third-party complaint ("Counterclaims") is attached hereto as Exhibit B.

---

[1] Meredith asserts that the July 1998 Agreement was superseded by an agreement purportedly executed in November 1998. RCL alleges that Exhibit A to the Agreement was amended in May 1999 and again in August 2000. For purposes of this motion, the alleged November Agreement and any amendments to Exhibit A to the Agreement are not pertinent.

[2] RCL also has alleged claims for quantum meruit and reformation of the Agreement's attorneys' fees provision to reflect the parties' intent that the non-prevailing party (rather than the prevailing party) be responsible for certain legal fees.

[3] Meredith also dropped a civil conspiracy claim it had alleged against RCL.

**Meredith's Allegations and Alleged Damages**

Meredith's claims fall into two categories: (a) claims relating to so-called improper research practices; and (2) fraudulent inducement.[4] Only the former category is relevant to the instant motion.

Meredith's alleged counterclaims relating to RCL's research are based upon Meredith's allegation that RCL intentionally manipulated research data and engaged in other allegedly improper research practices. Specifically, Meredith alleges:

> RCL and Crane . . . employed a number of practices which were professionally and/or ethically unsound. These practices included, but were not limited to:
>
> (a) Crane's practice of hiring personnel who were not qualified and/or had little or no experience to competently perform research.
>
> (b) Crane's directives to her subordinates to remove variables from samples to produce desired outcomes.
>
> (c) Crane's establishment of research "target levels," ostensibly to measure quality of performance.
>
> (d) Crane's process of selecting focus group respondents which did not achieve an appropriate random sample for the group that the client was targeting for research. Crane's tactics include hiring respondents who could not speak English, "stacking" focus groups with respondents who were friends, family members, and referrals of RCL employees, and hiring focus group respondents who, because of their age and/or limited education, did not represent an adequate pool for research purposes.
>
> (e) Crane's objective to "get bodies in the chairs" as quickly and inexpensively as possible, without regard for whether the sampling group met the professional standards of the research represented to Meredith.
>
> (f) Crane's desire for chronic and severe turnover of researchers at RCL (in order to reduce costs of RCL's profit sharing plan), which resulted in further flaws in research methodology.

---

[4] Meredith's third-party claims against Dr. Crane arise out of the same facts as do its counterclaims against RCL. The third-party claims therefore are not addressed separately. Arguments relating to Meredith's counterclaims apply equally to Meredith's third-party claims against Dr. Crane.

> (g) Crane's practice of withholding underlying data and information from clients raising questions about research results and/or clients seeking to verify that the research work performed met specifications of the research assignment or basic professional standards.

Counterclaims, ¶23.

Meredith also alleges that "RCL and Crane intentionally manipulated data . . . to achieve preconceived results that Crane desired to report to Meredith," Counterclaims, ¶33, and that "it was standard RCL practice for superiors at RCL and/or Crane directly to instruct project managers or researchers to rewrite research reports and otherwise tamper with the data in the event . . . Crane did not like the conclusions . . . or Crane wanted to manipulate the results to achieve her desired conclusions." Id., ¶34.

Meredith alleges that:

> RCL breached the [Agreement] by:
>
> a. willfully rendering imperfect performance of the contract, including, but not limited to, the provision of research results based on manipulated data;
>
> b. charging Meredith amounts that substantially exceeded the fair market value of services delivered by RCL to Meredith;
>
> c. employing personnel who were not qualified or adequately trained to perform research competently under the contract with Meredith; and
>
> d. establishing a process of selecting focus group respondents which did not meet the professional standards accepted in the industry and did not achieve an appropriate random sample for the group that Meredith was targeting for research;
>
> e. advising and encouraging Meredith to utilize the research results as a basis for implementing business changes, with knowledge that the manner in which the studies were conducted rendered the results unreliable for that purpose.

Counterclaims, ¶ 49.

Meredith in addition alleges that by virtue of such alleged conduct RCL breached the implied covenant of good faith and fair dealing (count II of Counterclaims) and that RCL did not disclose to Meredith that RCL had engaged in allegedly improper research practices in order to induce Meredith to continue utilizing RCL's services. <u>See</u> counts III (negligent misrepresentation) and IV (fraudulent nondisclosure) of Counterclaims.

Meredith alleges that it reasonably relied upon RCL's research "to make decisions about investments and expenditures by Meredith in regard to news and other programming, marketing campaigns, branding, advertising, and talent." Counterclaims, ¶41. In addition, Meredith claims that "while the Meredith Broadcast Group was relying on RCL's research, conclusions and advice, the Meredith Broadcast Group experienced substantial losses in revenues and profits, and declining ratings." Counterclaims, ¶42.

## Argument

**I.     Any Evidence of, or References to, Ratings Should Be Excluded Because Necessarily Such Evidence Would Be Based on Inadmissible Hearsay.**

On April 1, 2004, the parties filed a joint trial memorandum. In connection with the filing of the trial memorandum, RCL and Meredith submitted their respective exhibit lists, which exhibit lists, by agreement, were supplemented on April 15, 2004. Nielsen ratings books are not included in Meredith's exhibit lists. <u>See</u> Meredith April 1 and April 15 exhibit lists, attached hereto, collectively, as <u>Exhibit C</u>. Nevertheless Meredith's counsel has recently informed RCL's counsel that Meredith intends to introduce <u>testimony</u> as to alleged ratings declines at one or more of the television stations for which RCL conducted research.[5]

---

[5] In addition, RCL believes that the document identified on Meredith's exhibit list as "Spreadsheet detailing financial performance by station for FY 1998-2002" includes a summary of other documents identifying ratings of newscasts at the Meredith stations.

Any testimony at trial as to a Meredith station's ratings necessarily will be founded upon the Nielsen ratings books themselves and/or other documents summarizing the ratings books, both of which are themselves hearsay. Such testimony would be hearsay based on hearsay. RCL has no means by which to challenge testimony concerning ratings since the Nielsen reports themselves will not be in evidence (and moreover were not produced during discovery). See, e.g., U.S. v. Ocampo, 650 F.2d 421, 423 (2d Cir. 1981)(reversible error to permit testimony concerning the contents of a document where such document was not admitted into evidence). For this reason, Meredith should be precluded from introducing any evidence ratings -- testimonial, documentary or otherwise – and from referring to ratings.

## II. Meredith May Not Introduce Evidence Concerning Ratings or Refer to Ratings Because It Refused to Produce the Nielsen Ratings Books and Related Documents During Discovery.

Meredith also should be precluded from introducing evidence as to ratings on the grounds that it refused to produce the Nielsen ratings books, or any documents related thereto, during discovery, despite repeated requests. Although RCL contends the issue of ratings is irrelevant (see §III infra), in order to defend against Meredith's allegations, it served the following document request:

> All documents reflecting the performance of each of the Meredith Stations during the period January 1, 1995 through and including the present, including without limitation ratings reports.

RCL Second Request for Production of Documents, No. 1, included in Meredith's Response to Second Request for Production of Documents, at p. 6 (Exhibit D hereto).

Meredith responded as follows:

> Meredith objects to this request in that it is overbroad and unduly burdensome. Meredith further objects to the production of such materials to the extent that the same would require the disclosure of information that is protected by the attorney-client privilege or the work-product doctrine. Meredith further objects to the

>production of such materials on the grounds that the information being sought is confidential and proprietary in nature. Without waiving and subject to the foregoing objections, non-privileged documents relating to those stations for which RCL performed research ion the possession or control of Meredith and responsive to this request will be made available for inspection.

Id.

Despite its objections, therefore, Meredith agreed to produce ratings reports and related documents. Meredith, however, did not produce such documents. A series of letters between the parties' counsel followed. The letters, collectively, appear chronologically in Exhibit E hereto:

- On June 20, 2002, RCL requested that Meredith produce the ratings reports and related documents in accordance with the document request.

- On July 15, 2002, Meredith responded that it would make the Nielsen ratings available for inspection in Des Moines if Nielsen were agreeable or that RCL could purchase the "ratings books . . . [for] approximately $15 for each market book published four times per year."

- On July 18, 2002, RCL, after having contacted Nielsen's legal department, informed Meredith that Nielsen believes its contract with Meredith prohibits Meredith from using Nielsen ratings in any litigation. RCL requested that Meredith either provide the documents or strike all references to ratings in the Counterclaims.

- On July 20, 2002, Meredith responded that "Meredith's contract with Nielsen prohibits Meredith from replicating the materials. We are attempting to contact the appropriate individuals at Nielsen to see if some arrangement can be worked out."

- On July 31, 2002, RCL informed Meredith that Nielsen's legal department stated that RCL could not purchase the ratings books and that Meredith's contract with Nielsen prohibited Meredith from using the ratings information in any litigation.

- On August 1, 2002, Meredith confirmed that RCL could not purchase the ratings books from Nielsen.

- On August 10, 2002, Nielsen's outside counsel e-mailed counsel to RCL and Meredith a proposed stipulation under which ratings reports could be used at trial. The proposed stipulation would have required RCL to waive any evidentiary objection to the ratings reports and to agree not to subpoena any Nielsen representative concerning the ratings reports.

7

BOS1368976.1

- On August 14, 2002, RCL informed Meredith that the stipulation was unacceptable.

- On August 14, 2002, Meredith responded that it found the proposed stipulation acceptable and informed RCL that unless RCL were willing to suggest changes to the proposed stipulation, "Meredith's efforts on this front will come to an end."

Prohibiting a delinquent party from introducing in evidence material that it did not divulge in discovery has been recognized as an effective method of encouraging compliance with discovery. See, e.g., Updated Art, Inc. v. Modiin Publishing, Ltd., 843 F.2d 67, 71 (2d Cir. 1988); Surg-O-Flex of America, Inc. v. Bergen Brunswig Co., 76 F,R.D. 654, 655 (S.D.N.Y. 1977); Sinco, Inc. v. Metro-North Commuter Railroad Co., 133 F. Supp.2d 308, 311 n.3 (S.D.N.Y. 2001); Shepard v.; Frontier Communications Services, Inc., 92 F. Supp.2d 279, 285-86 (S.D.N.Y. 2000).

Having refused to produce Nielsen ratings books during discovery, Meredith seeks to introduce testimony and purported summaries of ratings. It would be patently unfair and prejudicial to RCL if Meredith were permitted to stonewall RCL during discovery yet at trial elicit testimony or introduce incomplete and/or misleading summaries of purported ratings declines. Meredith, having used its contract with Nielsen as a shield against discovery, cannot now use (hearsay) ratings information as a sword. The appropriate measure to prevent undue prejudice is to exclude ratings evidence altogether.[6]

### III. In Any Event, Ratings Information is Irrelevant to Claims and Defenses in this Action.

Evidence of and references to ratings should be excluded for the additional reason that ratings are irrelevant to RCL's claims or Meredith's defenses or counterclaims.

---

[6] To the extent any of the documents on RCL's exhibit list reference ratings, RCL is prepared to redact such references from the relevant exhibit(s).

A.   **<u>Ratings are Irrelevant to RCL's Claims.</u>**

The Agreement between RCL and Meredith required RCL to conduct certain research for ten Meredith television stations. RCL performed the contract by conducting the research until Meredith purported to terminate the Agreement. There is nothing in the contract which conditioned payment on ratings at any Meredith station. The word "ratings" does not appear in the Agreement. <u>See</u> Exhibit A. RCL's obligation was to conduct the research identified in the grid attached to the Agreement. The Agreement did not provide, explicitly or implicitly, that Meredith would pay for the studies only if the ratings went up. Even if the ratings of every single newscast at every single Meredith station declined, RCL would have still been entitled to payment provided the research was conducted appropriately. Therefore, ratings are irrelevant to RCL's claim.[7]

B.   **<u>Ratings are Irrelevant to Meredith's Counterclaims and Defenses.</u>**

Meredith's allegations pertaining to RCL's research relate to the research methodology. To reiterate, Meredith alleged in its Counterclaims:

> RCL and Crane ... employed a number of <u>practices</u> which were professionally and/or ethically unsound. These <u>practices</u> included, but were not limited to:
>
> (a)   Crane's practice of hiring personnel who were not qualified and/or had little or no experience to competently perform research.
>
> (b)   Crane's directives to her subordinates to remove variables from samples to produce desired outcomes.

---

[7] Although one of the goals of research is to provide information which Meredith could consider in taking steps to improve the stations' ratings, it would have been suicidal for RCL to contractually guarantee that its research would lead to ratings gains. Research is one of many, many factors that affect ratings. Others include, to name just a few, programming leading into the newscast, on-air personnel, actions taken by competitive newscasts, network affiliations, market conditions generally, promotional efforts, and resources dedicated to news. In addition, the ratings data themselves are subject to interpretation. For example, the ratings can be down in one demographic segment of the audience (females 25-54) but be up in another (males over 54). The ratings of all newscasts on network television could decline, but the degree of decline at a Meredith station could be less than that of its competitors. Ratings information cannot be taken at face value and cannot be interpreted in a vacuum.

  (c)  Crane's establishment of research "target levels," ostensibly to measure quality of performance.

  (d)  Crane's process of selecting focus group respondents which did not achieve an appropriate random sample for the group that the client was targeting for research. Crane's tactics include hiring respondents who could not speak English, "stacking" focus groups with respondents who were friends, family members, and referrals of RCL employees, and hiring focus group respondents who, because of their age and/or limited education, did not represent an adequate pool for research purposes.

  (e)  Crane's objective to "get bodies in the chairs" as quickly and inexpensively as possible, without regard for whether the sampling group met the professional standards of the research represented to Meredith.

  (f)  Crane's desire for chronic and severe turnover of researchers at RCL (in order to reduce costs of RCL's profit sharing plan), which resulted in further flaws in research methodology.

  (g)  Crane's practice of withholding underlying data and information from clients raising questions about research results and/or clients seeking to verify that the research work performed met specifications of the research assignment or basic professional standards.

Counterclaims, ¶23 (emphasis added); see also Counterclaims, ¶33 ("RCL and Crane intentionally manipulated data . . . to achieve preconceived results that Crane desired to report to Meredith . . ."); Counterclaims, ¶34 ("it was standard RCL practice for superiors at RCL and/or Crane directly to instruct project managers or researchers to rewrite research reports and otherwise tamper with the data in the event . . . Crane did not like the conclusions . . . or Crane wanted to manipulate the results to achieve her desired conclusions.").

Thus, the breach alleged by Meredith is that RCL's research was flawed and inaccurate. The damage alleged by Meredith is that it made investments and expenditures based on the research, which led to a decline in ratings and a corresponding decline in revenue performance. See Counterclaims, ¶¶41-42. Meredith must prove its breach of contract defense/counterclaim

BOS1368976.1

by proving that RCL in fact engaged in one or more of the alleged improper research <u>practices</u> identified in Meredith's Counterclaims. Meredith cannot introduce evidence of alleged ratings declines in order to raise an inference that the research performed by RCL was flawed.

Based on Meredith's answers to interrogatories, there is only one research study, a benefits segmentation study conducted for Meredith's Atlanta station in 1999, with respect to which Meredith alleges RCL engaged in any of the allegedly improper research methods identified in its Counterclaims. <u>See</u> Meredith's Second Supplemental Answers to RCL's Second Set of Interrogatories, Nos. 18-20 (<u>Exhibit F</u> hereto). RCL conducted approximately <u>70</u> studies for Meredith's ten stations pursuant to the Agreement. Meredith has identified <u>one</u> study that allegedly was not conducted appropriately.

Given the paucity of evidence of alleged improper research practices, Meredith should be precluded from introducing any evidence of ratings or referring to ratings unless and until Meredith has submitted evidence on which a jury could reasonably conclude that RCL breached its contract with Meredith through improper research <u>practices</u>. If there is not sufficient evidence of improper research practices, evidence of ratings performance is irrelevant. Permitting evidence of or references to ratings prior to a showing of sufficient evidence of improper research practices would unduly prejudice RCL by tainting the jury.

BOS1368976.1

## Conclusion

For the foregoing reasons, RCL requests that the Court:

(1) Preclude Meredith from introducing any evidence of ratings -- testimonial, documentary or otherwise -- and/or referring to ratings; or, in the alternative,

(2) Preclude Meredith from introducing any evidence of ratings -- testimonial, documentary or otherwise -- and/or referring to ratings unless and until Meredith has introduced evidence of improper research practices upon which a jury could reasonably conclude that RCL breached the Agreement; and

(3) Grant RCL such other relief as is just or appropriate.

Dated:    April 30, 2004                RESEARCH COMMUNICATIONS, LTD.

By its Attorneys,

Joseph C. Tanski   Ct. 22211
David B. Mack   Ct. 23151
NIXON PEABODY, LLP
100 Summer Street
Boston, Massachusetts  02110
(617) 345-1000

Charles W. Pieterse   Ct. 01577
WHITMAN, BREED, ABBOTT & MORGAN
100 Field Point Road
P.O. Box 2250
Greenwich, CT 06836
(203) 869-3800

## CERTIFICATE OF SERVICE

I, David B. Mack, hereby certify that a true copy of the above document was served upon the attorneys of record for each other party as follows :

James G. Sawtelle, Esq.
Duncan, Green, Brown,
  Langeness & Eckley
600 Seventeenth Street
Suite 2800 South
Denver, Colorado 80202-5402

BOS1368976.2

        Robert M. Callagy, Esq.
        Satterlee Stephens Burke & Burke LLP
        230 Park Avenue
        New York, NY 10169-0079

by first class mail on April 30, 2004.

                                              David B. Mack

BOS1368976.2