*A*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| RESEARCH COMMUNICATIONS, LTD., ) | CASE NO. 3:00CV2179-ACV |
| Plaintiff/Counterclaim-Defendant, ) | |
| v. ) | |
| MEREDITH CORPORATION, ) | |
| Defendant/Counterclaim-Plaintiff. ) | |
| MEREDITH CORPORATION, ) | |
| Third-Party Plaintiff, ) | |
| v. ) | |
| VALERIE CRANE, ) | |
| Third-Party Defendant. ) | |

### AFFIDAVIT OF WILLIAM T. KERR

| | | |
|---|---|---|
| STATE OF IOWA | ) | |
| | ) | SS. |
| COUNTY OF POLK | ) | |

WILLIAM T. KERR, being duly sworn, deposes and states as follows:

1.  I am currently the Chairman of the Board of Directors and Chief
    Executive Officer of Meredith Corporation. Prior to becoming Chief

Executive Officer, I served as President and Chief Operating Officer of the company from May 1994 to January 1997.

2.      In my capacity as Chairman and CEO of Meredith Corporation, I am the principal executive officer of the company and, in general, am responsible for supervising and controlling all of the business, policies and affairs of the company, and all other officers of the company.

3.      During 1997 and 1998, John Loughlin served as President of the Meredith Broadcast Group and reported directly to me. Sometime in late 1997 or early 1998, Mr. Loughlin was engaged in discussions with Valerie Crane of Research Communications, Ltd. (hereinafter RCL), regarding the possibility of having RCL perform market research services for a number of television stations in the Meredith Broadcast Group.

4.      During January or February of 1998, Ms. Crane submitted a proposal to Meredith Corporation, under which RCL sought to perform such market research studies and services at ten of the twelve broadcast television stations in the Meredith Broadcast Group. However, Mr. Loughlin did not possess unilateral authority to enter into on behalf of Meredith Corporation any contract that might entail significant costs to the company. Any such contract would have required approval from the CEO, after input from the Chief Financial Officer and the General Counsel of the company.

5.      As such, prior to any agreement being reached between RCL and Meredith Corporation, it was important for me and Mr. Loughlin that I meet

personally with Ms. Crane in order to establish whether RCL was capable of performing such services in a manner consistent with the level of quality that Meredith Corporation required.

6.   In April 1998, I met with Ms. Crane in Boston, Massachusetts. Having only limited familiarity with her company, during this meeting I inquired into her experience and credentials specific to broadcast television research. I also questioned whether her firm was able to provide research studies and other services on the scale that she proposed for a company the size of Meredith. In response, Ms. Crane assured me that RCL was capable of providing services of the highest quality, pointing out that she and her company enjoyed a number of successful business relationships with other large media concerns, including The Walt Disney Company (hereinafter Disney).

7.   As a result of Ms. Crane's affirmative representations to me, I felt comfortable at that time in allowing Mr. Loughlin to proceed with entering into a contract with RCL, whereby RCL would provide market research studies and services on behalf of Meredith Corporation, provided that Meredith Corporation retained the right to determine the appropriate number of research studies to be conducted and to cancel any such studies that were determined by Meredith to be unnecessary. I have reviewed the Affidavit of John Loughlin dated December 21, 2000, which is on file with the Court in this matter. Mr. Loughlin's understanding as to the terms of the agreement between RCL and Meredith, such that Meredith

could cancel additional research projects at any time, is consistent with my own understanding of the relationship.

8.    Following the commencement of this legal action by RCL to collect additional sums that it claims to be owed under the terms of its contract with Meredith Corporation, our company has discovered that RCL did not have a successful relationship with Disney, contrary to Ms. Crane's representations to me. In fact, further investigation by Meredith Corporation has revealed that Disney representatives were sufficiently dissatisfied with the work performed by RCL that a decision was made to terminate the relationship between Disney and RCL, as reflected in a Settlement Agreement reached between RCL and Disney dated October 3, 1997, approximately six (6) months prior to my meeting with Ms. Crane.

9.    If Ms. Crane during our meeting in April 1998 had not represented to me that RCL had enjoyed successful relationships with other large media companies such as Disney, and consistently performed research services to the satisfaction of such clients, I would have required further diligence and investigation into the company's background before Meredith Corporation would enter into any contract with RCL of the scope that was contemplated.

10. * If Meredith Corporation had been aware that the relationship between RCL and Disney was terminated due to reasons relating to the performance of RCL, Meredith Corporation would not have entered into any contract with RCL under these circumstances.



WILLIAM T. KERR

SUBSCRIBED AND SWORN TO before me this **3rd** day of January, 2002.

REBECCA J. KING
COMMISSION NO. 188713
MY COMMISSION EXPIRES
2-10-03.

Notary Public in and for the State of Iowa

1    for us your educational background in this field.

2        A.   Yes.   In this field I have a Ph.D. from the

3    University of Southern California that was dated 1973.

4    That was in educational psychology and research design.

5    My specialty was test construction and survey design.

6    That degree was granted in, as I said, 1973.

7            I also have a Masters in the same field that was

8    granted in 1972.

9            In 1983 I received an MBA degree from the

10   University of Southern California.   My concentration was

11   in marketing and marketing research for that particular

12   degree.

13       Q.   Where are you currently employed?

14       A.   I am currently self-employed.   I am an

15   independent consultant.   I try to call myself a free

16   agent.   And I have been self-employed in that capacity

17   since 1996.

18       Q.   What is the name of your firm?

19       A.   My firm's name is Psyckey Enterprises.

20       Q.   Can you give us a spelling on it?

21       A.   Yes.   P-s-y-c-k-e-y.

22       Q.   Dr. Denson, are you familiar with a

23   Massachusetts corporation by the name of Research

24   Communications, Ltd.?

25       A.   Yes, 1 am.

1    Q.   Tell us how you first became familiar with this

2    entity.

3    A.   I was doing some work as an independent

4    consultant with Disney TeleVentures that was located in

5    Burbank, and my client there was Zorina Pelant.   I don't

6    know precisely her title, but she was the research

7    director for Disney TeleVentures, and I became acquainted

8    with the project during my time working with her.   It was

9    one of the projects that was current during that period

10   of time.   It was late 1997.

11   Q.   Okay.   Had you performed work for Disney prior

12   to 1997?

13   A.   I believe I started working with Zorina in '97

14   earlier in that year and had worked on some other

15   projects.   As an independent consultant, I worked pretty

16   much on a project-by-project basis, as I do with all of

17   my clients.   If they have something for me to do, they

18   call me, and I work on it.

19   Q.   Okay.   The project that you were working on

20   whereby you became acquainted with Research

21   Communications, Ltd. was what?

22   A.   They were, the study was in progress, and

23   Zorina, or Ms. Pelant, asked me to take a look at the

24   research design.   This was before the results of the

25   study were brought in.   Take a look at the research

SANTA BARBARA/SANTA MARIA/SAN LUIS OBISPO/VENTURA

1   design and review it, become familiar with it, because

2   she mentioned that I would be working on some

3   post-analysis for the project once the results were in.

4   She also asked me to review the questionnaires that were

5   used in the study, and that was how I first became

6   acquainted with it.

7        Q.   Okay.  And the project itself, would this be the

8   same project as has been referred to in some documents as

9   the Americast project?

10       A.   Yes, it was.  Yes.

11       Q.   Can you tell us your understanding as to what

12  the Americast project essentially involved.

13       A.   It involved -- may I look at some notes that I

14  have?

15       Q.   Sure.

16       A.   Because I have some handwritten notes.  There

17  were actually two parts to the project.  The first part

18  of the project was called a competitive image and brand

19  assessment study, and that was looking at -- well, the

20  image of Americast as a provider of cable television

21  services in relation to its competitive set in various

22  markets and trying to examine what the advantages and

23  disadvantages of the Americast service were as perceived

24  by the target market, the target audience of current and

25  future cable subscribers.

SANTA BARBARA/SANTA MARIA/SAN LUIS OBISPO/VENTURA

1          The second part of the study was a segmentation

2     analysis, and that, the segmentation analysis -- I don't

3     have all of the details anymore.  I just have a list of

4     what it was.  But the idea is that in marketing,

5     different companies go after different segments of the

6     market and try to position their products and services to

7     appeal to certain segments and/or to gear their

8     advertising and marketing approach to attract certain

9     segments to purchase their product instead of that of the

10    competition.  And so the segmentation analysis was done

11    to determine the size and the characteristics of the

12    segments that would be most attracted to the Americast

13    product.

14         Q.  To your understanding, were there other entities

15    involved in the Americast project besides Disney

16    TeleVentures?

17         A.  Disney TeleVentures was, my understanding of it,

18    which was somewhat limited, there were five partners that

19    were a part of Disney TeleVentures, and actually Disney

20    TeleVentures was created from the partnership as a kind

21    of umbrella entity through which much of this strategy

22    and the marketing for the Americast product would be

23    channeled.  And we had, at that time there was Ameritech.

24    There was Bell South.  There was GTE.  There was SBC and

25    SNET, were the five partners.  And the partners all

SANTA BARBARA/SANTA MARIA/SAN LUIS OBISPO/VENTURA

1      A.  If you have hard copy, you can laboriously

2  recreate some of those tab cells and take a look at the

3  various banner analyses and create additional tables by

4  hand.

5          If the information is in a format like an ASCII

6  format, or an Excel format, which many suppliers are able

7  to give you, you can then import them directly into

8  programs to create some custom graphs and charts, and

9  it's more efficient.

10     Q.  Were you told by your client, Ms. Pelant, that

11 it would not be possible to get the underlying data from

12 RCL in the format requested?

13         MR. MACK:  Objection.

14         THE WITNESS:  I believe that -- I don't know

15 exactly what format they did request the data.  I know

16 that Zorina said that it had been very difficult, because

17 when these diskettes came in -- that it had been

18 difficult to obtain anything, and that this box of

19 unmarked diskettes was going to be the best we could do.

20     Q.  BY MR. SAWTELLE:  Where did the diskettes come

21 from, to your knowledge?

22     A.  To my knowledge they came from the supplier,

23 RCL.

24     Q.  Were you ultimately able to make any

25 determination as to whether the conclusions presented by

SANTA BARBARA/SANTA MARIA/SAN LUIS OBISPO/VENTURA

1    RCL to Disney TeleVentures were supported by the

2    underlying data?

3        A.   No.

4        Q.   Did you report that to your client, Ms. Pelant?

5        A.   Yes, I did.

6        Q.   What was Ms. Pelant's reaction?

7        A.   Well, obviously she was extremely disappointed.

8    We were both frustrated about it.  Quite frankly, at that

9    point she said that we have to move on, and we were

10   forced to do another study with another supplier.

11       Q.   Did you make any observations as to whether or

12   not the product that RCL presented to Disney TeleVentures

13   was of any utility to Disney TeleVentures?

14           MR. MACK:  Objection.

15           THE WITNESS:  I read the reports.  I found some

16   of the conclusions interesting.  Some of the segmentation

17   analysis was interesting to read.  The problem is, we

18   didn't have any way of figuring out where this all came

19   from, or how it could be applied to any future marketing

20   work that would be done by Americast or Disney

21   TeleVentures, which was the original purpose of the

22   study.

23       Q.   BY MR. SAWTELLE:  So when you say "we" didn't

24   have any ability to do this, are you referring to Disney

25   TeleVentures?

SANTA BARBARA/SANTA MARIA/SAN LUIS OBISPO/VENTURA

1          MR. MACK:  Objection.

2          THE WITNESS:  Disney TeleVentures, yes.

3     Q.  BY MR. SAWTELLE:  Did you share these

4 observations that you've just testified to with Ms.

5 Pelant and Disney TeleVentures?

6     A.  Yes.  We had extensive conversations regarding

7 this particular study.

8     Q.  Did Ms. Pelant express to you whether or not she

9 agreed with your conclusion that it was really not

10 possible to determine whether there was any utility to

11 the RCL work product?

12          MR. MACK:  Objection.

13          THE WITNESS:  Yes.  In fact, she told me that I

14 was probably being more charitable.  I was trying to find

15 something to use, and she just --

16          MR. MACK:  That means we are in for a treat

17 tomorrow, huh?

18     Q.  BY MR. SAWTELLE:  Because your gestures don't

19 show up on the record, you are throwing up your hands.

20 You indicated that Ms. Pelant stated that you were being

21 charitable.

22     A.  That I was being charitable, because I did find

23 some of the information in the reports interesting on its

24 face.  And she at that point felt that not only was it

25 not useful, it was not even interesting, I guess.

SANTA BARBARA/SANTA MARIA/SAN LUIS OBISPO/VENTURA

1        Q.   Meaning the RCL work product?

2        A.   Yes.   She had more -- see, I was looking at it

3    more from a much more removed position.   I had not been

4    in a sense influenced by some of what went on before.   I

5    also did not know at the time -- I remember saying to

6    Zorina, well, you know, this probably cost 25 or $30,000.

7    We might be able to make some sense out of it.   And she

8    assured me that that was somewhat of an underestimate of

9    the total cost.   And I said, well, if it cost any more

10   than that, yes, it's useless.

11           MR. MACK:   Move to strike everything after the

12   first yes.

13           THE WITNESS:   That's fine.

14       Q.   BY MR. SAWTELLE:   And did Ms. Pelant appear to

15   agree with your conclusion?

16       A.   She did.

17       Q.   Do you know whether these conclusions that you

18   and Ms. Pelant reached were shared with the other members

19   of the Disney TeleVentures working group?

20       A.   They were during conference calls.

21       Q.   And just for purposes of clarification, I am

22   referring to the other research directors from the other

23   entities that were involved in the project.

24       A.   That's correct.

25       Q.   What is your understanding, Ms. Denson, as to

1          Q.        Do you believe that RCL could have

2    reasonably perceived Disney TeleVentures to be

3    satisfied with its performance relative to this

4    project --

5          MR. MACK:  Objection.

6    BY MR. SAWTELLE:

7          Q.        -- based on your firsthand

8    observations?

9          MR. MACK:  Objection.

10         THE WITNESS:  Are you talking about the

11   entire project or the laddering exercise?

12   BY MR. SAWTELLE:

13         Q.        I'm talking about the entire

14   project.

15         Do you believe that RCL could have

16   reasonably perceived Disney TeleVentures to be

17   satisfied with RCL's performance on the entire

18   project based on your firsthand observations?

19         MR. MACK:  Objection.  When?

20   BY MR. SAWTELLE:

21         Q.        You may answer.

22         A.        No.

23         MR. MACK:  Objection.

24   BY MR. SAWTELLE:

25         Q.        No, you don't believe RCL could

                                                        59

1    have perceived that?

2          A.     They could not have perceived that

3    Disney was satisfied.

4          Q.     And is that based upon

5    communications that you had personally with

6    Dr. Crane of RCL?

7          MR. MACK:  Objection.

8          THE WITNESS:  Among others.

9    BY MR. SAWTELLE:

10         Q.     And who else besides you

11   communicated to RCL that Disney TeleVentures was

12   not satisfied with its performance on this

13   project?

14         MR. MACK:  Objection.

15         THE WITNESS:  Francis Hogue, Barry Cottle.

16   That I know about.

17   BY MR. SAWTELLE:

18         Q.     Anybody else, to your knowledge?

19         A.     From Disney?

20         Q.     Well, let's open it up to Disney

21   and the Americast research team.

22         A.     During what time frame?  I

23   mean . . .

24         Q.     Let's focus on the time frame prior

25   to the delivery by RCL of the research report.

                                                    60

1          Okay?

2     A.     Uh-huh.

3     Q.     And if I represent to you that our

4  information is that that report was delivered in

5  December of '97, does that seem consistent with

6  your recollection?

7     A.     I think that's right.

8     Q.     Do you believe you communicated to

9  Dr. Crane of RCL that Disney was dissatisfied

10 with RCL's performance on this project prior to

11 delivery of this report?

12    A.     Yes.

13    Q.     Do you know whether others, in

14 fact, communicated that same message to RCL prior

15 to delivery of the RCL report?

16    A.     Yes.

17    MR. MACK:  Objection.

18 BY MR. SAWTELLE:

19    Q.     You believe that Mr. Cottle made

20 that clear to RCL?

21    MR. MACK:  Objection.

22    THE WITNESS:  Yes.

23 BY MR. SAWTELLE:

24    Q.     Did you witness any of these

25 communications by these other folks with RCL

61

```
 1      wherein they communicated to RCL that Disney

 2      TeleVentures was not satisfied with RCL's

 3      performance?

 4              MR. MACK:  Objection.

 5              THE WITNESS:  Witnessed?

 6      BY MR. SAWTELLE:

 7              Q.      Yeah.  Let me ask it another way.

 8              A.      Okay.

 9              Q.      What do you base your belief upon

10      that -- let's start with Ms. Hogue -- that

11      Ms. Hogue communicated to RCL that Disney

12      TeleVentures was not satisfied with its

13      performance on this project?

14              A.      There was a phone conversation that

15      I was privy to on that one.

16              Q.      And who were the parties to that

17      conversation?

18              A.      Francis was talking with Valerie.

19              Q.      And you were also involved in the

20      conversation?

21              A.      No, I was in the room.

22              Q.      You were in the room?

23              A.      Uh-huh.

24              Q.      And Ms. Hogue communicated to

25      Dr. Crane during this conversation that Disney
```

62

```
 1    was dissatisfied?

 2           A.      Yes.

 3           Q.      Would this conversation have

 4    occurred prior to delivery of the research report

 5    by RCL?

 6           A.      Yes.

 7           Q.      With respect to Mr. Cottle, what do

 8    you base your belief upon that he communicated to

 9    RCL dissatisfaction with RCL's work product?

10           A.      Barry had a meeting with Valerie,

11    and then he called me to discuss what had gone

12    on.

13           Q.      So Mr. Cottle had a face-to-face

14    meeting with Dr. Crane?

15           A.      That's my recollection.

16           Q.      And then he informed you as to what

17    took place in that meeting?

18           A.      Yes.

19           Q.      And what did he inform you?

20           A.      I don't remember the exact words.

21           Q.      I'm not asking you for the exact

22    words, but what did you come away from your

23    discussion with Mr. Cottle -- what understanding

24    did you have coming away from your discussion

25    with Mr. Cottle?
```

63

1    BY MR. SAWTELLE:

2        Q.    Did you convey to Dr. Crane that

3    Disney TeleVentures was satisfied with the work

4    of RCL?

5        A.    No.

6        Q.    Did you convey to Dr. Crane that

7    Disney TeleVentures was dissatisfied with the

8    work of RCL?

9        A.    Yes.

10       Q.    And you're not the only person who

11   conveyed that to Dr. Crane.

12              Is that correct?

13       MR. MACK:  Objection.

14       THE WITNESS:  That's my understanding,

15   yes.

16   BY MR. SAWTELLE:

17       Q.    Let me direct you to paragraph 4 of

18   the affidavit, if I may.  And if you could read

19   along with me, it says:

20              "Moreover, the impetus of the

21              Settlement Agreement, a true and

22              accurate copy of which is attached

23              hereto as Exhibit A, was not DTV's

24              dissatisfaction with the work conducted

25              by RCL for DTV.  RCL's work for DTV

71

1          Q.        And did Disney TeleVentures

2    continue to do work with RCL after the signing of

3    the settlement agreement, other than to receive

4    the deliverables that you referred to earlier?

5          MR. MACK:  Objection.

6          THE WITNESS:  No.

7    BY MR. SAWTELLE:

8          Q.        To your knowledge, has Disney

9    retained RCL, since this incident, to perform

10   work for it?

11         MR. MACK:  Objection.

12         THE WITNESS:  To my knowledge, no.

13   BY MR. SAWTELLE:

14         Q.        You're acquainted with an

15   individual by the name of Dr. Terri Denson?

16         A.        Yes.

17         Q.        Can you tell me what Dr. Denson's

18   role was in connection with the Disney

19   TeleVentures project as it related to RCL?

20         A.        She was -- I would describe her as

21   being the person who we -- who managed the

22   project to get the information -- the next step

23   to get the information we didn't get out of the

24   RCL data.

25         Q.        In other words, Dr. Denson would be

                                                                    75

1    the individual who was -- who you were looking to

2    to continue the project after RCL's involvement

3    ceased?

4          A.    Yes.

5          Q.    Were there other research firms

6    that were retained to do follow-on work on this

7    project after RCL's involvement terminated?

8          A.    Yes.

9          Q.    Can you give me the names of those?

10         A.    Yes.  Applied Research West.  And

11   Arbitron we also used, Roberta McConochie of

12   their staff.

13        MR. MACK:  What was the first name?

14        THE WITNESS:  Applied Research West.

15   BY MR. SAWTELLE:

16         Q.    Is that Anita Kantak?

17         A.    Yes.

18         Q.    She was your contact at Applied

19   Research?

20         A.    Yes.

21         Q.    Roberta McConochie?

22         A.    McConochie.

23         Q.    Can you give us a spelling on that?

24         A.    Yeah.

25             Where's my Palm?

76

1      Q.      We can get that later.

2              What was the firm she's with?

3      A.      Arbitron.  New Media.

4      Q.      Were these research firms hired by

5  Disney TeleVentures after the termination of the

6  relationship with RCL?

7      MR. MACK:  Objection.

8      THE WITNESS:  Yes.

9  BY MR. SAWTELLE:

10     Q.      What was the function of these

11 research firms?

12     A.      We were trying to take -- salvage

13 what we could out of the data that was provided

14 to us and make it actionable for the venture.

15     Q.      The data provided by whom?

16     A.      RCL.

17     Q.      Were you ultimately able to salvage

18 the data that was provided by RCL and arrive at

19 something that was actionable?

20     A.      No.

21     Q.      Why not?

22     A.      You know, I don't remember all the

23 details now.  I just really don't.

24     Q.      Dr. Denson was also involved in

25 this effort of attempting to salvage data?

77

1          A.        Yes.  She was intimately involved

2     with it on a day-to-day basis.

3          Q.        We deposed Dr. Denson yesterday in

4     Santa Barbara, and she indicated that she

5     conferred with you concerning her impressions of

6     the work performed by RCL.

7                    Do you recall whether or not you

8     did, in fact, confer with Dr. Denson on that

9     subject?

10         A.        Whether I conferred with her on the

11    work.

12                    I told her what the scope of the

13    project was, what we had tried to glean and the

14    methodology, yes.

15         Q.        Did Dr. Denson share with you any

16    of her impressions or observations concerning the

17    RCL work product?

18         A.        Yes.

19         Q.        What do you recall in that regard?

20         A.        There were a lot of problems.

21         Q.        Can you be a little more specific?

22         A.        It's a long time.  There were

23    analyses that should have occurred that didn't

24    occur, and she tried to re-create charts based on

25    the data.  We were unable to replicate it using

78

1    what was supposed to be the methodology.  That's

2    just generally what I recall.

3         Q.    From your conversations with

4    Dr. Denson, did you come away with the

5    understanding that she looked favorably upon the

6    work that was performed by RCL?

7         MR. MACK:  Objection.

8         THE WITNESS:  No.

9    BY MR. SAWTELLE:

10        Q.    Did you share the opinions of

11   Dr. Denson respecting the quality of the work

12   performed by RCL for Disney TeleVentures?

13        MR. MACK:  "Did you share" with whom?

14   BY MR. SAWTELLE:

15        Q.    Did you share in those opinions?

16        MR. MACK:  Oh, "did you share in those

17   opinions."  Okay.

18        THE WITNESS:  Personally?

19   BY MR. SAWTELLE:

20        Q.    Yes.

21        A.    Yes.

22        Q.    Were you critical of the work that

23   was performed by RCL for Disney TeleVentures?

24        A.    To whom?

25        Q.    Your own independent judgment.

79

1          THE WITNESS:  Yes.  Sorry.

2    BY MR. SAWTELLE:

3          Q.     Barry Cottle?

4          A.     Yes.

5          Q.     You would have shared your

6    criticisms of the RCL work product with each of

7    these people?

8          A.     Yes.

9          MR. MACK:  Objection.

10   BY MR. SAWTELLE:

11         Q.     And would you have shared those

12   criticisms prior to or at about the time that RCL

13   and Disney TeleVentures were entering into the

14   settlement agreement?

15         A.     Yes.

16         Q.     To your knowledge, did those

17   criticisms that you shared form a basis in part

18   for Disney TeleVentures' decision to enter into

19   the settlement agreement with RCL?

20         MR. MACK:  Objection.

21         THE WITNESS:  Yes.

22   BY MR. SAWTELLE:

23         Q.     Did you, at any point during the

24   relationship with Disney TeleVentures and RCL,

25   become aware of a potential conflict of interest

81

1   becomes necessary for me to take Ms. Pelant's

2   deposition again, I reserve the right to do so.

3   But assuming nothing else is forthcoming, we're

4   done.

5        MR. HANDLIN:  Ms. Pelant reserves the

6   right to respond to any such application at the

7   time it may happen.

8        MR. SAWTELLE:  Don't go anywhere.  I've

9   got two questions.

10

11                FURTHER EXAMINATION

12  BY MR. SAWTELLE:

13        Q.    Ms. Pelant, did you, on behalf of

14  Disney TeleVentures, form any conclusions with

15  respect to whether the research services provided

16  by RCL were of any use to Disney TeleVentures?

17        MR. MACK:  Objection.

18        THE WITNESS:  Yes.

19  BY MR. SAWTELLE:

20        Q.    What conclusion did you form in

21  that regard?

22        A.    The analysis was inadequate, the

23  results weren't actionable, and we spent a lot of

24  money for something that we probably could have

25  done a lot less expensively.

                                          137

D

MAY-14-2004 13:28 FROM:                    7203591599              TO:850 275 0343      P.32/33
Case 3:00-cv-02179-DFM    Document 195-2    Filed 05/14/2004    Page 31 of 32

302

1    Q    (By Mr. Sawtelle)  She expressed that to you?

2         MR. MACK:  Objection.

3         THE WITNESS:  At that time?

4    Q    (By Mr. Sawtelle)  At anytime?

5    A    I do not recall that she ever said, "We really

6    are dissatisfied with RCL."  She'd look at a thing that

7    she might like or not like.  Just as if you had six

8    partners, one might say, "I like this or I don't like

9    this."

10        There was nothing that led us to believe at

11   the end of the first day that there was

12   dissatisfaction --

13   Q    Was there anything that led you to believe --

14   A    -- with us.  There was nothing we did wrong.

15   Q    I understand.

16        Was there anything about the relationship

17   between you -- that is RCL and Disney TeleVentures --

18   that led you to believe that Disney TeleVentures was in

19   any way dissatisfied or critical of RCL's performance

20   at anytime?

21   A    Even when Zorina didn't like this report she

22   created, I never attributed that to a Disney

23   TeleVentures opinion.  So if she didn't like a

24   particular thing, I attributed it to her, not

25   TeleVentures as a whole.

MAY-14-2004 13:29 FROM:                    7203591599         TO:860 275 0343      P.33/33
Case 3:00-cv-02179-DFM    Document 195-2    Filed 05/14/2004    Page 32 of 32

303

1    In the meantime, I'm getting very positive

2    feedback from the rest of the members in the

3    partnership.  So I did not feel that this was work that

4    was not well done or that, "Oh, my gosh.  We really

5    missed the boat here."  I felt very confident that we

6    had produced high-quality work.  If we could just

7    finish our work and get it in front of people, that

8    they would be happy with it.

9    There was not any real work product that --

10   the things -- the benchmarks had been met.  At each

11   step, they had been fine.

12   Then I attributed some of her concerns to the

13   pressure she was feeling that she suddenly had to do

14   this presentation that came up at the last minute.  I

15   took it more to be that she was just feeling a lot of

16   stress over that.

17   Q    Okay.

18   A    But I didn't take it personally.

19   Q    I understand.

20   Am I correct in understanding that you did not

21   interpret her dissatisfaction as being comments made to

22   you in her capacity as the research director for

23   Disney TeleVentures?

24   MR. MACK:  Objection.

25   THE WITNESS:  I can't answer that.  I don't