UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RESEARCH COMMUNICATIONS, LTD., | ) |
| | ) |
|     Plaintiff/Counterclaim-Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| MEREDITH CORPORATION, | ) |
| | ) |
|     Defendant/Counterclaim-Plaintiff, | ) |
| | ) CASE NO.: 3:00CV2179-AVC |
| | ) |
| MEREDITH CORPORATION, | ) |
| | ) |
| v. | ) |
| | ) |
| VALERIE CRANE, | ) |
| | ) MAY 14, 2004 |
|     Third-Party Defendant. | ) |

**OPPOSITION TO MOTION IN LIMINE TO PRECLUDE EVIDENCE
OR REFERENCES TO RATINGS OF MEREDITH TELEVISION STATIONS**

    Plaintiff Research Communications, Ltd. and third-party defendant Valerie Crane (collectively, "RCL"), having long relied upon and touted Nielsen ratings, now desperately attempt to exclude damaging testimony concerning the decline in ratings performance suffered by Meredith Corporation ("Meredith") television stations that followed RCL's recommendations. Despite the fact that RCL has placed ratings squarely at issue by seeking to recover in quantum meruit for the purported value of its services,

RCL would bar Meredith from so much as referring to the objective yardstick for measurement of RCL's actual performance.

RCL's motion is premised largely upon the fact that the rating reports were not produced during discovery. In a complete inversion of the truth, RCL accuses Meredith of "stonewalling," when the record demonstrates that RCL deliberately and repeatedly avoided taking proper steps to obtain Nielsen ratings reports. Far from "stonewalling," Meredith was contractually barred from producing ratings reports without Nielsen's consent, as RCL has known for some time. Yet, in a show of good faith, Meredith obtained Nielsen's agreement to voluntarily produce the reports to RCL subject only to execution of Nielsen's standard stipulation. RCL chose to reject that stipulation and undertook no efforts to obtain copies of the Nielsen reports through any number of means at its disposal.

Nor, in arguing that ratings evidence is hearsay and irrelevant, does RCL acknowledge its own repeated reliance on ratings in the progress reports and other documents it submitted to Meredith to demonstrate the value of its research. By relying upon them, RCL "manifested an adoption or belief in [the] truth" of the ratings, see Fed. R. Evid. 801(d)(2)(B) – accordingly, ratings evidence is not hearsay.[1] Moreover, as RCL's own reliance on ratings powerfully illustrates, ratings performance of the

---

[1] Even if the rating reports were hearsay, there can be no question that such reports constitute materials Meredith's experts would be entitled to rely upon pursuant to Fed. R. Evid. 703. RCL's own expert, Suzanne Sell, described ratings as the "only ratings measurement that's used . . . . It's the only currency we have." Transcript of Deposition of Suzanne Sell, at 76:19-21, attached as Exhibit A to the Affidavit of Robert Callagy sworn to May 13, 2004 ("Callagy Aff.").

Meredith television stations is critical to an assessment of the quality and utility of the work RCL performed.

Meredith respectfully submits that RCL's motion to exclude ratings evidence must be denied.

## BACKGROUND

1. <u>RCL's Heavy Reliance Upon Ratings</u>

RCL relied upon ratings both as part of its initial pitch to Meredith and in subsequent progress reports. RCL's Corporate Profile, for example, contains a section labeled "Impact" that boasts about the impact of RCL's reseach: "RCL studies generate meaningful and useful data to improve sales and ratings performance." Callagy Aff., Exhib. B, at 3. By letter dated January 8, 1998, Valerie Crane enclosed a contract for research services and specifically represented to the President of Meredith's Broadcast Group that RCL was "currently hiring someone with expertise in [ratings services]. We feel we can be helpful to the stations with meter and ratings issues in the market." Callagy Aff., Exhib. C. In a memorandum dated March 3, 1998, Valerie Crane outlined the cost for a branding effort, $125,000, and again talked about the value in terms of ratings: "The challenge of translating the strategic thinking into ratings gains comes from executing it and executing it consistently." Callagy Aff., Exhib. D.

In March 1999, RCL issued a newsletter to "executives in the media industry" concerning the formation of its "branding group." Callagy Aff., Exhib. E. According to

the newsletter, Meredith's use of RCL for its branding efforts has "already paid off in several Meredith markets, with ratings increases noted for four Meredith stations." Id. If RCL felt any hesitation about claiming credit for ratings increases, or in positing a connection between research and branding and ratings, none can be found in the newsletter.

In its Status Report on Meredith Broadcast Group Branding and Research Initiative dated April 2000, RCL discussed the results of its research and branding efforts in terms of ratings. Callagy Aff., Exhib. F. The memo assesses performance at each Meredith television based upon RCL's branding efforts, and contains for each station the following subheadings: Brand Positioning Statement; Brand Attributes; Core Targets; Branding Effort Status; Staffing and Systems Issues; Research; Concerns; and Ratings Results. Id. The discussion of ratings, which is the last subheading of each station's analysis, and which is also labeled "results," is plainly used by RCL as the measurement of its performance.

In the status report, RCL largely sought to trumpet its performance, taking credit for ratings gains. See, e.g., id. at 3, "Ratings Results: KCTV 5 has seen steady demo growth year-to-year and steady growth book-to-book." Where ratings performance had not improved, RCL rightly viewed that as a serious problem:

> KPHO was one of the few stations in the group whose ratings did not increase May 98 to May 99. They also had a disappointing book in February. An exception was at 4:30, which was up 60%, from 1.5 to 2.4. The product is improving but <u>branding will be the most important thing to move the numbers consistently</u> because this is a very cluttered market.

Id. (emphasis added). Thus, RCL's own written reports to Meredith demonstrate RCL's view that ratings were the key measure of its performance, and that RCL's branding suggestions would be the key driver of ratings.

    2.    <u>RCL's Request for Rating Reports</u>

In its Second Request for Production of Documents, RCL requested, among other things, rating reports for the Meredith television stations.[2] However, because of its contractual obligations to Nielsen Media Research ("Nielsen"), the company that provided the rating reports, Meredith was not at liberty to provide the reports to RCL. By letter dated July 15, 2002, counsel for Meredith informed RCL's counsel that Meredith was unable to provide copies of the Nielsen ratings books. Counsel explained that "the information is proprietary . . . and Meredith's contractual arrangement . . . will not allow for the sharing of such information." A copy of the July 15, 2002 letter, together with the subsequent correspondence discussed below, is annexed as Exhibit E to RCL's motion in limine.

By letter dated August 1, 2002, after some back and forth with Nielsen and RCL, counsel for Meredith stated that, despite his earlier belief to the contrary, he had

---

[2] Whether or not RCL was a Nielsen subscriber during the time period of its document request is not clear from the record, but it is clear that RCL was previously a subscriber and had access to and used a great deal of ratings information in the television industry. <u>See, e.g.</u>, Presentation Slide prepared by RCL in October 1999 reflecting a comparison of ratings for different broadcasters by age group and time segment. Callagy Aff., Exhib. G. Moreover, RCL's former employee, Bonita Soley, testified that RCL gave seminars to its employees on ratings books and how to read them. Callagy Aff., Exhib. H, at 64:14-21. Another former RCL employee, Wayne Cunningham, testified to a "particular strength with Nielsen" and that he "work[ed] with" Nielsen data "every day." Callagy Aff., Exhib. J. In light of RCL's rapid claim of credit for any improvement in ratings, it seems implausible that RCL would not have had access to information concerning the marked decline in ratings at those same stations.

confirmed that Nielsen would not agree to sell ratings books to RCL. Counsel stated, however, that counsel for Nielsen had agreed to provide a stipulation that would allow RCL access to the information.

      3.     <u>RCL's Refusal to Sign a Stipulation</u>

On August 10, 2002, counsel for Nielsen provided a "form stipulation" that Nielsen "often used as a basis for avoiding motion practice over use of its ratings estimates in litigation." The stipulation provides "that the methodology utilized by NielsenTV will not be a subject that is contested in this lawsuit." By letter dated August 12, 2002, counsel for RCL rejected the proposed stipulation.

By letter dated August 14, 2002, Meredith's counsel stated that Meredith had no objection to the stipulation and declined "to propose changes on [RCL's] behalf," inviting RCL's counsel to submit any such suggestions. Counsel stated, "[i]f you are unwilling to seriously discuss Nielsen's proposed stipulation, then I suggest that you seek the requested ratings materials directly from Nielsen." Further, counsel implicitly suggested that RCL might wish to consider a motion to compel, stating that "RCL has other options to gain access to these materials than simply requesting that either Meredith or Nielsen voluntarily turn them over." Counsel concluded that Meredith "is not willing to breach its contract with Nielsen because of RCL's outstanding discovery requests."

      4.     <u>RCL's Failure to Take Any Other Steps to Obtain Ratings Information</u>

RCL never responded to Meredith's August 14 letter, and, to Meredith's knowledge, took no further action to obtain the ratings reports. Specifically, RCL chose

not to subpoena the subject ratings reports from Nielsen, not to depose a representative of Nielsen concerning the information contained in its ratings reports, not to depose Douglas R. Lowe, who has been designated as an expert witness by Meredith with first-hand knowledge concerning "the performance of the various television stations within the Meredith Broadcasting Group that relied upon the validity of the RCL research services," Callagy Aff., Exhib. G, and not to engage its own expert witness to address the ratings declines.[3]

## ARGUMENT

### I.

### TESTIMONY CONCERNING RATINGS IS ADMISSIBLE UNDER THE FEDERAL RULES

1.  RCL Has Conceded the Reliability of Ratings Reports

Under the Federal Rules of Evidence, a statement is not hearsay if the party-opponent "has manifested an adoption or belief in its truth." See Fed. R. Evid. 801(d)(2)(B). RCL's objection to testimony concerning ratings reports on hearsay grounds is therefore misguided, because RCL repeatedly relied upon ratings as the measure of performance, thereby manifesting an adoption or belief in their truth.

To cite only one example, among the many discussed above, RCL itself issued a press release praising Meredith for retaining RCL to provide research and branding and

---

[3] It should be noted that RCL asked at least one of its experts, Suzanne Sell, to "[d]etermine whether *this research* would lead to a significant decline in ratings." (emphasis in original). April 25, 2002, Memorandum to Suzanne Sell from Valerie Crane, RCL, at 4, annexed as Exhibit I to the Affidavit of Robert Callagy. Suzanne Sell's expert report does not address that question, however.

noting that its "savvy" had already "paid off" in the form of higher ratings. Callagy Aff., Exhib. E. Thus, it is apparent that RCL's objection to the reliability of ratings evidence was triggered only at the moment when they began to drop and RCL could no longer claim credit for them. RCL cannot have it both ways. Having adopted the ratings, it must live with them.[4]

       2.    <u>Expert Testimony Concerning Ratings is Admissible</u>

Regardless of whether some evidence concerning ratings would fall within the hearsay rule, Federal Rule of Evidence 703 provides, concerning the bases of opinion testimony by experts, that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." See <u>United States v. Dukagjini</u>, 326 F.3d 45, 51 (2d Cir. 2003); <u>Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.</u>, 222 F.Supp.2d 423, 491 (S.D.N.Y. 2002).

As RCL's own experts concede that the Nielsen ratings are the relevant report card, RCL cannot seriously contend that Nielsen's ratings are not relied upon by experts in the field as the chief measurement of audience for television programming. Suzanne Sell testified, for example, that "[a]dvertising revenue is based on the . . . broadcast property's ability to put a particular audience in its chair watching that station at a

---

[4] Even if the rating reports were hearsay, they would fall within the exception for market reports and commercial publications "generally used and relied upon by the public or by persons in particular occupations." Fed. R. Evid. 803 (17). RCL cannot seriously dispute the fact that Nielsen ratings are relied upon by the public and by specialists alike. As Suzanne Sell, RCL's expert testified, Nielsen ratings are the "only currency we have." Callagy Aff., Exhib. __.

particular point in time." Callagy Aff., Exhib. A, at 74:10-14. That ability, in turn, "is measured through ratings." Id.

RCL's admissions aside, it is common knowledge that Nielsen's ratings are the standard measurement of television viewership. See, e.g., Lyons Partnership, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 795 (4th Cir. 2001) (noting as background in a copyright dispute that "[t]he "Barney and Friends" show enjoys the number one Nielsen rating for shows directed at young children"); Apis Productions, Inc. v. IRS, 86 T.C. 1192, 1202 (Tax Ct. 1986) (stating that Nielsen ratings are "a common measure of audience appeal").

The sole case cited by RCL, U.S. v. Ocampo, 650 F.2d 421, 423 (2d Cir. 1981), concerned a drug conspiracy and whether a DEA agent's hearsay testimony concerning the identity of a defendant was admissible. In that case, which implicated Sixth Amendment Right of Confrontation concerns, and which had nothing to do with expert testimony in a civil case under Federal Rule of Evidence 703, the Second Circuit held that admission of the hearsay testimony was error. RCL's attempt to rely on Ocampo as support for its argument here only underscores the utter lack of authority for its position.

II.

**EXCLUSION IS NOT APPROPRIATE UNDER RULE 37**

Although RCL fails to specify a basis in law, it appears that it seeks exclusion under Federal Rule of Civil Procedure 37(c)(1), which provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at trial . . . information not so disclosed;" cf. Update Art, Inc. v. Modiin Publishing, Ltd., 843 F.2d 67, 71 (2d Cir. 1988) (characterizing "preclusion of evidence" as a "harsh remed[y]" that "should be imposed only in rare situations"). RCL's attempt to exclude ratings report evidence on this basis must fail, because Meredith's contractual obligation to Nielsen was substantial justification for non-disclosure of the rating reports, and because RCL demonstrated bad faith in failing to subpoena the reports from Nielsen directly. For that reason, Meredith was in no sense at fault, and, as Meredith could not have acted otherwise, preclusion would serve no deterrent effect. Cf. Update Art, Inc., 843 F.2d at 70-71 (noting that concepts of fault and deterrence lie behind exercise of discretion under Rule 37).

Regarding Meredith's contractual prohibition from producing the rating reports without Nielsen's consent, Robertson v. McCloskey, Jr., 1987 WL 12816 *1, No. 87 C 3511 (N.D. Ill. Jun. 16, 1987) is directly on point. In Robertson, the court, addressing a motion by Nielsen to quash a deposition subpoena, noted that the company for which the ratings were prepared "is a party to the confidentiality restrictions on disclosing the

information to others and therefore is not at liberty to furnish the information to [plaintiff] voluntarily." Id.  For the same reason, and as is clearly explained in the correspondence, attached as Exhibit E to RCL's motion in limine, Meredith was unable to comply with RCL's document request.

Given Meredith's contractual constraint, RCL's recourse was to either obtain the documents through third-party discovery, (as was done in Robertson), or to move to compel.  As RCL was well aware, a court order would have allowed Meredith to comply with the document request.  In his letter dated August 14, 2002, Meredith's counsel as much as suggested that course.  Having declined to seek third party discovery or to ask for the Court's intervention in a timely fashion, RCL should not now be permitted to use its own delay to exclude testimony concerning the Nielsen rating reports.

All of the cases cited by RCL stand merely for the general proposition that exclusion of evidence is a remedy provided by Rule 37(c)(1).  Yet, not one case involved the question here:  whether a "substantial justification" existed.[5]  Certainly, no case is or could be offered in support of the proposition that a party lacks "substantial justification" where a party's contractual obligation to a third-party prohibits disclosure of requested documents.  Cf. Robertson, 1987 WL 12816.

---

[5] In Surg-O-Flex of America, Inc. v. Bergen Brunswig Co., 76 F.R.D. 654, 655 (D. Conn. 1977), the Court rejected the excuse of "inexperience and unfamiliarity with the Federal Rules" offered by an attorney who had "been a member of the bar twenty-two years."  There, the Court excluded evidence where "ten months and three court orders . . . passed without an adequate response."  Id.  Such facts stand in stark contrast to those presented in this case, where Meredith has at all times proceeded in good faith to attempt to make the ratings reports available to RCL.

Moreover, the record makes clear that Meredith did not simply rely upon the contractual constraint, as it would have been entitled to do, but actively attempted to work with RCL to find a solution. As a result of Meredith's efforts, Nielsen proposed a stipulation to the parties that would have fully resolved the issue. RCL chose to reject that stipulation, and RCL took no further steps to obtain the documents, which it might readily have obtained through a motion to compel or third-party discovery. It is transparent that RCL preferred not to acquire damaging documents and, instead, has manufactured a motion to exclude evidence it might easily have obtained.

### III.

**EVIDENCE OF A SHARP DECLINE IN RATINGS IS RELEVANT TO RCL'S QUANTUM MERUIT CLAIM, BECAUSE IT SUPPORTS MEREDITH'S POSITION THAT RCL'S RESEARCH WAS WORTHLESS**

There can be no dispute that the actual performance of those Meredith stations for which RCL conducted research is a powerful indicator of the value of RCL's services and is plainly relevant to Meredith's claims. As RCL's own expert, Suzanne Sell, testified at her deposition:

> Research is a tool. It is one of many tools that you use with the intent of increasing your ratings. Certainly revenue is driven by ratings in most cases.

Callagy Aff., Exhib. A, at 74:2-5.

Consistent with the testimony of RCL's expert, the Ninth Circuit has explicitly acknowledged the direct link between ratings and revenue:

> Arbitron and Nielsen compile ratings books. The rating given to a television station determines the amount the station can charge advertisers. The higher the rating, the greater the share of the advertising market a station may receive, and, hence, the more profitable it may become.

<u>Ralph C. Wilson Industries, Inc. v. Chronicle Broadcasting Co.</u>, 794 F.2d 1359, 1362 (9th Cir. 1986). A decline in ratings, in other words, means a loss in revenue.

As RCL well understands, ratings are thus the key measurement of performance. That is why RCL is at such pains to exclude testimony concerning sharp ratings declines. Yet, RCL seeks to recover in quantum meruit in this case. In other words, RCL will ask the jury to award money based upon the alleged value of RCL's services, even if the jury concludes that Meredith had no contractual obligations to RCL. Having thus injected into the dispute the value of its services, RCL should not be heard to argue that the jury must be prevented from learning what the value really was, based upon evidence that RCL itself has long relied upon, and the importance of which is freely acknowledged by its own experts.

## **CONCLUSION**

For the foregoing reasons, RCL's motion in limine to exclude evidence or references to ratings should be denied.

Respectfully submitted,

MEREDITH CORPORATION

By:_____
James Sicilian
(ct05608)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, Connecticut  06103-3499
Phone:  (860) 275-0100
Fax:     (860) 275-0343
email:   jsicilian@dbh.com

and

Robert M. Callagy (*pro hac vice*)
(ct24386)
SATTERLEE STEPHENS BURKE &
        BURKE LLP
230 Park Avenue
New York, New York  10169
Phone:  (212) 818-9200
Fax:     (212) 818-9606
email:   rcallagy@ssbb.com

Attorneys for Defendant/Counterclaim-Plaintiff
Meredith Corporation

**CERTIFICATION**

      THIS IS TO CERTIFY that a copy of the foregoing was mailed on this 14th day of May, 2004, by first class mail to all counsel and pro se parties as follows:

Joseph T. Tanski, Esq.  
David B. Mack, Esq.  
Nixon Peabody LLP  
101 Summer Street  
25th Floor  
Boston, Massachusetts 02110  

Charles W. Pieterse, Esq.  
Whitman Breed Abbott & Morgan  
100 Field Point Road  
Greenwich, CT  06830  

Christopher M. Miller, Esq.  
Belin Lamson McCormick Zumbach Flynn  
A Professional Corporation  
The Financial Center  
666 Walnut Street Suite 2000  
Des Moines, Iowa  50309-3989  

James G. Sawtelle, Esq.  
Duncan Green Brown Langeness &  
    Eckley  
A Professional Corporation  
Capital Square  
400 Locust Street Suite 380  
Des Moines, Iowa  50309  

_____  
James Sicilian