UNITED STATES DISTRICT COURT

FILED

DISTRICT OF CONNECTICUT

2004 JUN 21  A 10: 18

U.S. DISTRICT COURT
HARTFORD, CT.

RESEARCH COMMUNICATIONS, LTD.,  )
        Plaintiff and  )
        Counterclaim Defendant,  )
v.  )
  )
MEREDITH CORPORATION,  )
        Defendant and  )
        Counterclaim Plaintiff,  )
    and  )
  ) CASE NO 3:00CV2179-DFM
MEREDITH CORPORATION,  )
        Third-Party Plaintiff,  )
v.  )
  )
VALERIE CRANE,  )
        Third-Party Defendant.  )

**AFFIDAVIT OF DANIEL J. GLEASON IN SUPPORT OF
FEE APPLICATION SUBMITTED BY RESEARCH COMMUNICATIONS LTD**

    I, Daniel J. Gleason, depose and state as follows:

**Background**

1.  I am a Partner at Nutter McClennen & Fish, LLP ("Nutter") a general practice

    law firm of 149 lawyers, with its home office in Boston, Massachusetts. I have

    been practicing law since 1971, specializing exclusively in litigation. (A current

    resume is attached as "A" hereto.)

2.  I began practicing at Nutter in 1971, became a partner in 1980, and have served

    in various management positions at the firm which relate, in part, to subjects

    covered in this affidavit -- including for 16 years as a member of the Executive

Committee, the firm's chief management body, and for eight years as Chair of the firm's Litigation Department.

3. I received a B.A. from Harvard University *magna cum laude* in 1967, and a J.D. from Harvard Law School *cum laude* in 1970.

4. I am admitted to practice in Massachusetts and New Hampshire as well as the bars of the Federal District Court for the District of Massachusetts, the First Circuit, the U.S. Supreme Court together with *pro hac vice* admissions in various other State and Federal courts, on specific cases.

5. During more than three decades at Nutter, my practice has concentrated virtually entirely on civil litigation, with the areas of heaviest concentration varying somewhat over the years. I have, for example, over the years litigated significant cases in fields such as products liability (defending industrial and fraud manufacturers), securities fraud, consumer-and financial and insurance-oriented class actions, business based contract disputes, partnership, consumer protection, construction, non-competition, trade secret, patent, copyright and trademark cases.

6. Dozens of cases in which I have been lead counsel have tried to jury verdict or judicial decision.

7. The commercial cases where the bulk of my practice has been concentrated for many years, are roughly equally divided between representing plaintiffs and defendants.

8. I often lecture, demonstrate, write and teach in fields relating particularly to trial strategy management and advocacy techniques, including, e.g., National

Institute of Trial Advocacy courses, Massachusetts Continuing Legal Education seminars, and American Bar Association programs.

9.  In addition to my trial practice, I am appointed from time to time as an Arbitrator, usually in cases administered by the American Arbitration Association but also in private arbitrations and arbitrations under other jurisdictions such as the International Chamber of Commerce.

10. I am a Fellow of the invitation-only American College of Trial Lawyers whose membership is chosen on criteria that emphasize trial expertise and experience.

11. For approximately 20 years I have served on the Board – and  for about six of those years as an Executive Committee member -- at the Boston Bar Association Lawyers' Committee for Civil Rights Under Law ("LCCRUL"), which in addition to its in-house legal staff pursues a wide variety of civil rights litigation by partnering with many Massachusetts based firms, including Nutter.

### General Involvement with Billing of Legal Services

12. Beginning in approximately 1986, as a member of the firm's Executive Committee, I regularly participated in the process by which Nutter's lawyer and paralegal billing rates are reviewed and adjusted annually, and also have reviewed particular bills or billing arrangements that Nutter designates for firm-wide oversight, e.g., situations where court-awarded legal fees are to be applied for and other special billing cases.  These responsibilities required that I keep current on billing rates and practices, not only in Boston and Massachusetts, but among firms throughout the country involving complex civil litigation.

13. Through the LCCRUL activities, I frequently participated in overseeing fee applications filed on behalf of that organization where fees generated in civil rights litigations were part of a fee application to Court e.g., for Voting Rights redistricting litigation or cases coming under the Civil Rights Act of 1964.

14. On at least a half dozen occasions, I have been engaged by private firms to review fees arising out of complex commercial or business litigation for purposes of rendering an opinion in court. Such opinions have been provided during trials or in depositions. They have addressed the reasonableness of fees and nature of work performed by firms, or by individual lawyers, in a variety of types of civil litigation.

15. As an Arbitrator, I also have occasion to review (and to make awards based on) fee and disbursement applications that are included as part of a party's damages claim, where reasonable attorneys' fees and costs are subject to award.

16. As concerns the conduct of my personal legal practice, each month requires that I bill cases that are being handled (either by me personally or by others whom I supervise) for clients to which I am primarily responsible. A monthly billing cycle is typically followed by Nutter.

### Tasks Assigned

17. In June, 2004 I was contacted by the firm of Nixon Peabody LLP[1] ("Nixon

    Peabody " or "the Firm"), 100 Summer Street, Boston, Massachusetts, and

    asked to review the Firms fees and disbursements in connection with

    representing a client, Research Communications Ltd. ("RCL"). The assignment

    referred exclusively to this litigation ("the case" or "the matter"). Other than

    occasionally opposing the lawyers at the Firm in litigation (one such case is

    currently active) and knowing some Nixon Peabody lawyers in professional

    contexts, I have no relationship with the Firm and did not know any lawyers that

    have been involved in this case before accepting this assignment. I am being

    compensated for this work at the rate of $500.00 per hour.

18. Specifically, I was asked to,

    a. Review Nixon Peabody's monthly billings rendered during the case.

       Those bills begin in October, 2000 and run through May, 2004 ("the

       billings");

    b. Formulate opinions concerning legal billings and disbursements, and

       specifically as to the question of reasonableness for the matter in light of

       what the case involved and particular challenges it presented;

    c. Prepare to present my conclusions in Court, through affidavit, testimony,

       or otherwise as circumstances might require.

---

[1] Effective in February, 2003, the predecessor firm, Hutchins, Wheeler & Dittmar, which had been handling this case on behalf of RLC, merged into Nixon Peabody LLP. This case was transferred, in connection with that merger. The personnel handling the case did not change with the merger. In this affidavit I have used the defined terms "Nixon Peabody" and "the Firm" to include the work done by Hutchins, Wheeler & Dittmar prior to the merger.

19. To do so, I requested and was provided by Nixon Peabody the following:

    a.  The billings rendered by Nixon Peabody for services rendered from October 1, 2000 through May 28, 2004.

    b.  The Firm's billing rates, by attorney, paralegal and other timekeepers, as applied during the relevant time periods.  (See Exhibit "B" hereto.)

    c.  The pleadings (and other submissions made to the court) relating to the case, filed by various parties -- which documents were bound and organized chronologically and indexed with a table of contents.

    d.  Correspondence, in chronologically maintained files.

    e.  Transcripts of the depositions taken in the case.

    f.  Written expert reports -- for RCL (2) and for Meredith (2).

    g.  A copy of the Affidavit of David Mack prepared in support of the Firm's fee application.

20. In addition to familiarizing myself with these materials, I focused attention particularly on,

    a.  The pleadings, and especially the Complaint, the Answer and Counterclaim, the Third Party Complaint and the Answer thereto, together with all amendments with respect to these filings;

    b.  Various discovery requests -- consisting of several sets of Interrogatories, Document Requests and Requests for Admissions propounded by parties, as well as responses (e.g., substantive answers, objections, document production and supplementations) as to same;

    c.  Portions of depositions that I selected to read in detail, e.g., with respect

to party and expert testimony;

    d.  Summary Judgment motions and *in limine* motions (and oppositions

thereto) filed by the parties;

    e.  Billing records.

21. To provide context and answer particular questions, from time to time I

interviewed Nixon Peabody's principal trial lawyers -- Joseph Tanski and David

Mack. I did so first before beginning a detailed file review and thereafter, when

questions or clarification seemed appropriate, I would inquire of the lawyers.

### Summary of Opinions

22. Based on my review of the materials generated in the case, interviews of RCL's

attorneys, and experience with respect to such matters, I have formed the

following opinions:

    a.  That the work performed by Nixon Peabody's attorneys and paralegals

was entirely appropriate to the prosecution of RCL's case.

    b.  That the billings rendered by Nixon Peabody were consistent with well-

designed billing practices and systems, accurately reflect the work

performed, and record tasks by the Firm that were well thought out,

managed effectively, and responsive to the particular and often

challenging issues that presented themselves in the case.

    c.  That the Firm's billing rates, as adjusted in the ordinary course during

the litigation, were fair and consistent with what is competitive for

lawyers of the experience and caliber that represented RCL. More

generally, that such billing rates fell well within reasonable expectations for cases of this complexity;

d.  That staffing, allocation and supervision of work by Nixon Peabody for RCL were appropriate to the tasks confronted, consistent with the strategy and goals pursued in the case, and resulted in a well-executed trial preparation plan that brought the case to the point of essentially full readiness for trial.

### Bases for Opinions

23. At the outset, I would note that RCL's case sought to recover both for past work performed under a written agreement ("the contract") -- on the terms that are set out in the contract – an d for lost opportunities because the contract was terminated by Meredith before its term expired.  (I note in passing that the Complaint also contained a count for reformation which, although initially opposed, was ultimately agreed to.  That count dealt with an obvious drafting mistake found in the contract's recovery of attorneys' fees provision.)

24. In response to the Complaint, Meredith asserted various claims -- pled in the alternative.  In essence, the allegations were that the RCL contract was unenforceable *ab initio* due to fraudulent inducement, that the contract was terminable at will and hence there could be no lost opportunity damages recovered, and that RCL's performance fell below standards for the research contracted for and thus entitled Meredith to recoup contract payments it had made prior to termination up to the approximate amount of $4.7 million.

- 8 -

25. Meredith's defenses evolved over time.  However, both pleadings and
interrogatory answers made it clear from early in the case that Meredith
intended to take an expansive and aggressive posture to defense, an approach
which remained true throughout the discovery, expert witness and trial
preparation phases of the case.  As various defense claims were fleshed out, and
as others expanded in scope during discovery (one claim Meredith had asserted
was eventually dropped), a broad array of factual issues and legal contentions
were put "in play."

26. While the term, "scorched earth," is overused in legal parlance, its connotations
aptly describe, in my opinion, what can be divined from the path Meredith took
to defend this case, largely founded on asserting aggressive, fact-intensive
offensive positions.

27. That approach had the result of requiring that Nixon Peabody deal with a large
spectrum of factual claims seated basically in theories of fraud and improper
research techniques –  the boundaries of which remained difficult to discern
even through the course of discovery.

28. A few pertinent examples help to illustrate how this overall approach impacted
workloads:

    a.  Meredith noticed 17 depositions –-  6 of current or former RCL
        employees, 9 of third parties and 2 of RCL's experts.  All in all, 26
        depositions took place, in approximately one dozen locales.  These
        depositions took approximately 20 days to complete, independent of
        travel.

- 9 -

b. Meredith's approach to responding to interrogatories -- supplemented on several occasions -- by and large took rather conclusory positions in responding to questions that requested factual support for the claims pled. Much effort was devoted by RCL, as a consequence, to seeking to pin down the factual basis for claims.

c. I reviewed certain depositions in detail, *e.g.*, Messrs. Cunningham, Clark and O'Brien. They left me with the impression that the claims relating to RCL's incompetence, fraud, and/or other wrongdoing set forth in Meredith's pleadings, and in written discovery responses, as supplemented did not align very closely to what the witnesses identified as having knowledge were able to testify to.

d. With respect to experts, Meredith identified seven potential experts who might testify – providing expert reports as to two of those putative experts.

29. I examined Meredith's Summary Judgment motion and supporting memorandum, as well as RCL's response, a motion that was ultimately denied. RCL's memorandum opposing the motion was well-conceived, appeared to be carefully researched and presented arguments in a succinct fashion (characteristic, generally, of RCL submissions in the case).

30. I also considered various initiatives taken by RCL to attempt to narrow issues for trial. Examples of such attempts were RCL's motion for Summary Judgment, its *in limine* motions, issue-targeted interrogatories and document requests it made, and other initiatives it took, such as its seeking a protective order with respect to three deposition notices from Meredith. I believe these initiatives were fairly representative of an overall approach that the Firm took, which focused on shaping a trial landscape, so far as feasible. What presented as multifarious litigation as pled, needed to be fashioned so as to try, before a jury. Not all such attempts were successful to be sure; all were, however, strategies that made good sense for the situation presented and all were, in my view, consistent with a sound overall approach to the narrowing and shaping effort that took place throughout the discovery and motion process.

31. I considered how Nixon Peabody had responded to the Court's pre-trial scheduling order, that required discovery to be completed and dispositive motions filed by August 31, 2002. The pace of activity in preparing this matter for trial was strong evidence that counsel (on both sides) diligently and aggressively worked to meet time constraints imposed under this order – requiring prioritizing of individual lawyer workloads. The strong emphasis that

Nixon Peabody placed on completing case preparation within the time allotted under the Court's order led, in my opinion, to efficiencies that came from a reasonably compressed, albeit intense, schedule. I believe these efficiencies benefited RCL in that, at bottom line, they resulted in likely cost savings.

32. With respect to the Firm's legal fee bills, totaling $960,749.50 and the disbursements that it billed, totaling $127,945.90, my review of charges was aided by the fact that,

   a. Bills were rendered monthly.

   b. They contain (with minor exceptions that did not impact the analysis) task-specific detail – i.e., as distinct from day-specific or lawyer-specific billing.

   c. They were accompanied by a separate summary of Nixon Peabody's time charged to major tasks performed by the Firm, which summary I found to be consistent with my review of the bills and the work they reflected.

   d. Lead trial counsel, Joseph Tanski's, explanation of his practice with respect to reviewing prebills prior to finalizing bills – including his review with other responsible lawyers handling the matter when he considered downward adjustments (as against actual time spent) for particular segments of work done for special reasons. Mr. Tanski informed me that, on certain occasions he wrote off time actually spent on the matter because, in his judgment, he felt it was appropriate to withhold charging the client.

- 12 -

e. One indication of what I consider to have been the Firm's conservative approach to staffing may be found in how the Firm staffed depositions with a single attorney attending on behalf of RCL -- a practice that contrasted with the staffing approach Meredith often used:  for about half of the 26 depositions, two or more Meredith attorneys attended.

33. By and large, I feel that staffing was able to be maintained with a leaner legal team than one might well find assigned to a case of this type, especially one that moved at the pace this case proceeded at.

34. I also considered the billing rates used for all timekeepers who billed to the case.  (A summary of the rates used, and the periods to which they apply is attached as "Exhibit B" hereto.)  I found Nixon Peabody's rates billed to be consistent, throughout the matter, with rates of competitive firms for personnel of comparable stature.  (They are comparable with Nutter's rate structure during relevant periods, as billed to and paid by its clients.)  Generally, I would note that Nixon Peabody's Boston office, from which the case was staffed, is located in a highly competitive law firm market, with many excellent firms having comparable capabilities.  In some cases, rates that the Firm charged are lower than what would be expected from other firms' rates for comparable work.

35. With respect to disbursements, I believe the basis on which Nixon Peabody charged the client for disbursements to be representative to what similar law firms charge in litigation-related matters of this type.  For example, most disbursements were billed at the actual cost the Firm incurred; no markup was applied.  In some categories, e.g., faxes and photocopying, a set rate was

- 13 -

applied (with some adjustment over the four years of the case). These rates are consistent with rates in the Boston legal market.

36. In summary, it is my opinion that the total billings rendered ($960,749.50 for fees, $127,945.90 for disbursements) are entirely reasonable for the work performed.

37. As to staffing, I considered qualifications and experience of the principal trial attorneys that Nixon Peabody deployed, the methods they employed in supervising junior attorneys and paralegals, and the degree to which the lead attorneys, Mr. Tanski and Mr. Mack, focused direction and oversaw progress during the case.

38. I believe staffing of the case contributed to the efficiency by which formidable challenges posed by the case were accomplished cost-effectively. In addition, continuity of staffing– often difficult to adhere to, albeit to be sure desirable – generally had a beneficial effect on efficiency.

39. Discussions with Mr. Tanski and Mr. Mack confirmed to me that these two attorneys, having worked together before, made it feasible for Mr. Tanski to rely on Mr. Mack for a large portion of work that might, with other firms, have been done by a more senior attorney and consequently at a higher rate. The ratio of hours put in by these two lead attorneys (about one-third of that time was Mr. Tanski's, with roughly 25% of Mr. Tanski's time spent on trial preparation), as well as the tasks for which they assumed primary responsibility, were, in my view, markers of cost-efficiencies.

40. Lastly, I feel that the significant written product – e.g., RCL's p leadings, discovery requests, discovery responses, and briefs – as well as the deposition examinations it conducted (based on a sampling) are strong indicators of a pragmatic and well-focused trial preparation plan, placing the case, at the time of settlement, in the posture of being essentially ready to be tried.

### Closing

In summary, from my review of Firm records of the case, from interviews with the two lead attorneys, and based on my experience with billing rates, management of trial work and comparable cases, it is my opinion that the fee application to which this affidavit relates is reasonable and appropriate in all respects.

Signed under the penalties of perjury this 18th day of June, 2004.

_____

Daniel J. Gleason

1337203.2

- 15 -

Exhibit

A

# N Nutter



**Daniel J. Gleason**
Direct Line: 617-439-2233
E-mail: dgleason@nutter.com

Daniel Gleason is co-chair of the Intellectual Property Litigation Group and a member of the firm's Diversity Committee. His practice concentrates in complex and technical commercial and intellectual property litigation, including patent, trade secrets, and non-competition cases.

Mr. Gleason has significant experience in litigating business disputes, including in areas such as business torts, environmental insurance disputes, and product liability. He has also tried many major cases in areas such as malpractice, securities, ERISA and fiduciary cases, accounting and First Amendment media litigation.

Mr. Gleason often serves as an arbitrator for the American Arbitration Association and as a private mediator. He speaks and writes frequently on topics pertaining to litigation technique and intellectual property matters.

Mr. Gleason is a fellow of the American College of Trial Lawyers, and appears in *The Best Lawyers in America*. A member of the American, Massachusetts, and Boston Bar Associations, he chairs the ABA's Business Torts Subcommittee on Intellectual Property Litigation, dealing with trial practice, trade secrets, and the Lanham Act as they relate to trial issues.

With a longstanding interest in *pro bono* representation, Mr. Gleason has long been active in the Boston Lawyers' Committee for Civil Rights Under Law, and serves on the Executive Committee. He is also past counsel and a member of the Board of Directors for Wide Horizons for Children, Inc., an international adoption agency, and counsel to the National Pediculosis Association.

Daniel Gleason received a J.D. degree, *cum laude*, from Harvard Law School, and a B.A., *magna cum laude*, from Harvard College, where he was elected to Phi Beta Kappa.

Exhibit
B

Exhibit B

Billing Hours by Timekeeper

| NAME | HOURS | RATE | TOTAL |
|---|---|---|---|
| **Attorneys** | | | |
| Joseph Tanski - (Partner) | 64.30 | $425.00 | $27,327.50 |
| | 291.30 | $450.00 | $131,085.00 |
| | 32.70 | $475.00 | $15,532.50 |
| | 216.90 | $505.00 | $109,534.50 |
| Jonathan Karis - (Partner) | 8.70 | $425.00 | $3,697.50 |
| James Messenger - (Partner) | 1.50 | $400.00 | $600.00 |
| David Mack - (Class of 1995) | 937.80 | $345.00 | $323,541.00 |
| | 320.00 | $385.00 | $123,200.00 |
| James Clifford - (Class of 1997) | 229.60 | $260.00 | $59,696.00 |
| Marissa Jaffe - (Class of 2000) | 17.50 | $295.00 | $5,162.50 |
| | 307.45 | $200.00 | $61,490.00 |
| | 25.20 | $230.00 | $5,796.00 |
| | 3.50 | $285.00 | $997.50 |
| Tiffany Reece Clark - (Class of 1999) | 3.00 | $200.00 | $600.00 |
| Katy Koski Deady - (Class of 2001) | 22.20 | $185.00 | $4,107.00 |
| Scott Rostock - (Class of 1999) | 9.10 | $270.00 | $2,457.00 |
| Deborah Burton - (Class of 2001) | 127.70 | $255.00 | $32,563.50 |
| Jennifer Yen - (Class of 2001) | 38.30 | $185.00 | $7,085.50 |
| **Paralegals** | | | |
| *Susan Mello | 144.80 | $125.00 | $18,100.00 |
| | 7.80 | $140.00 | $1,092.00 |
| Gregory Hurley | 48.60 | $105.00 | $5,103.00 |
| Deborah Woodbury | 55.90 | $145.00 | $8,105.50 |
| Sean Hanlon | 3.10 | $110.00 | $341.00 |
| Rose Robichaud | 1.20 | $145.00 | $174.00 |
| Patricia Robichaud | 0.50 | $145.00 | $72.50 |
| **Library Services** | | | |
| Amy Bruce | 3.10 | $165.00 | $511.50 |
| Melissa Upton | 1.70 | $140.00 | $238.00 |
| Stephanie Murphy | 1.50 | $145.00 | $217.50 |
| **Other Services - IT** | | | |
| Richard Johnson | 0.50 | $135.00 | $67.50 |

1391591

Billing Hours by Timekeeper

| NAME | HOURS | RATE | TOTAL |
|------|-------|------|-------|
| **Attorneys** | | | |
| **Total** | 2925.45 | | $948,495.50 |
| | | | |

*In reviewing the bills, it was discovered that 2.3 hours for Susan Mello ($287.50) were mistakenly billed to RCL on 9/10/02 instead of another client. These hours are excluded from this chart. It was also discovered that .4 hours for Colette Dafoe ($52.00), a legal intern, were billed to RCL on 4/19/04 when Mr. Tanski had intended to write-off all of Ms. Dafoe's time. Ms. Dafoe's fees are not being sought by RCL.

1391591