IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RESEARCH COMMUNICATIONS, LTD., | ) | CASE NO. 3:00CV2179-DFM |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEREDITH CORPORATION, | ) | |
| | ) | |
| Defendant/Counterclaim-Plaintiff. | ) | |
| | ) | |
| | ) | |
| MEREDITH CORPORATION, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VALERIE CRANE, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | JULY 12, 2004 |
| | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO RCL'S MOTION FOR JUDGMENT ON
ITS CLAIM FOR ATTORNEYS' FEES AND COSTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ............................................................................................... - 1 -

FACTS ................................................................................................................ - 2 -

DISCUSSION...................................................................................................... - 6 -

I.    BECAUSE RCL REFUSED TO SUPPLY MEREDITH WITH NECESSARY
      INFORMATION CONCERNING THE SUM LEGITIMATELY OWED
      BEFORE BRINGING THIS ACTION, AND FAILED TO ALLOW MEREDITH
      REASONABLE OPPORTUNITY TO PAY THE SAME, UNDER
      APPLICABLE IOWA LAW, RCL CANNOT MEET ITS BURDEN OF
      PROVING THAT AN AWARD OF FEES IN ANY AMOUNT WOULD BE
      REASONABLE ............................................................................................ - 6 -

II.   RCL'S ATTEMPT TO JUSTIFY ITS INFLATED CLAIM FOR ATTORNEYS
      FEES BY SHIFTING THE BLAME TO MEREDITH'S COUNTERCLAIMS IS
      A PRETEXT .................................................................................................- 12 -

   A.  THE MAJORITY OF THE COSTS OF THIS LITIGATION WERE DRIVEN
       BY RCL'S LACK OF CANDOR AND OUTRIGHT FABRICATIONS .......- 12 -

      1.  MEREDITH'S FRAUDULENT INDUCEMENT DEFENSE – THE DISNEY
          EVIDENCE AND RCL'S RESPONSE .......................................................- 14 -

      2.  MEREDITH'S FRAUDULENT CONCEALMENT DEFENSE – THE
          MANIPULATION OF DATA AND RCL'S RESPONSE...........................- 18 -

         a.  THE "MISSING" SYNTAX ..................................................................- 21 -

III.  BECAUSE RCL HAS SIGNIFICANTLY OVERSTATED ITS CLAIM FOR
      ATTORNEYS FEES, IT IS NOT ENTITLED TO RECOVER ANY
      AMOUNT .....................................................................................................- 25 -

IV.   BECAUSE RCL HAS NOT PROVIDED THE REQUISITE INFORMATION
      CONCERNING ITS FEE ARRANGEMENT WITH COUNSEL, UNDER
      APPLICABLE IOWA LAW, IT HAS FAILED TO MEET ITS BURDEN OF
      PROVING THAT ITS FEES ARE REASONABLE.......................................- 27 -

V.    BECAUSE RCL HAS DECLINED TO SUPPLY ANY INFORMATION
      REGARDING THE QUALIFICATIONS OF ITS TWENTY-FOUR (24)
      TIMEKEEPERS, IT HAS FAILED TO MEET ITS BURDEN OF PROVING
      THAT ITS FEES ARE REASONABLE.........................................................- 30 -

VI.    IF THE COURT DETERMINES THAT AN AWARD SHOULD BE MADE,
       ANY SUCH AWARD MUST BE REASONABLE ......................................- 31 -

  A.   RCL IS NOT ENTITLED TO RECOVER FEES FOR TIME SPENT BY ITS
       COUNSEL DEFENDING VALERIE CRANE ..............................................- 31 -

  B.   RCL IS NOT ENTITLED TO RECOVER FEES FOR HOURS THAT ARE
       EXCESSIVE, REDUNDANT OR UNNECESSARY ....................................- 32 -

  C.   RCL'S FEE APPLICATION MUST BE VIEWED IN LIGHT OF THE
       PREVAILING RATES IN CONNECTICUT..................................................- 35 -

  D.   A REASONABLE FEE IS A PROPORTIONAL FEE...................................- 37 -

    1.   A PROPORTIONATE FEE IN THIS CASE SHOULD NOT EXCEED ONE-
         THIRD (1/3) OF THE AMOUNT IN CONTROVERSY ...........................- 38 -

CONCLUSION.......................................................................................................- 40 -

# TABLE OF AUTHORITIES

## CASES

Aetna Life Insurance Company v. Anderson, 848 F.2d 104 (8th Cir. 1988) .................... 7, 27, 31

Brown v. Stackler, 612 F.2d 1057 (7th Cir. 1980) ................................................................ 26

City of Detroit v. Grinnell Corporation, 495 F.2d 448 (2d Cir. 1974) ....................................... 26

Coop. Fin. Ass'n, Inc. v. Garst, 927 F. Supp. 1179 (N.D. Iowa 1996) .............................. 6, 25, 27

Cruz v. Local Union No. 3 of Int'l Bhd. Of Elec. Workers, 34 F.3d 1148 (2d Cir.
1994) ....................................................................................................................... 6

Federal Land Bank v. Wilmarth, 218 Iowa 339, 252 N.W. 507 (1934) ............................. 6, 8, 12

Gabriele v. Southworth, 712 F.2d 1505 (1st Cir. 1983) ........................................................ 37

Griffin v. Jim Jamison, Inc., 188 F.3d 996 (8th Cir. 1999) ..................................................... 37

Gudenkauf v. Stauffer Communications, Inc., 158 F.3d 1074 (10th Circ. 1998) ...................... 37

Hall v. Borough of Roselle, 747 F.2d 838 (3rd Cir.1984) ...................................................... 27

Hart v. Bourque, 798 F.2d 519 (1st Cir. 1986) ................................................................... 37

Hensley v. Eckerhart, 461 U.S. 424 (1983) .......................................................... 6, 13, 32, 35, 37

Holden v. Voelker, 228 Iowa 589, 293 N.W. 32 (1940) ......................................................... 28

Home Savings and Loan Ass'n v. Iowa City Inn, Inc., 152 N.W.2d 588 (Iowa
1967) .................................................................................................................. 8, 12

Jaquette v. Blackhawk County, Iowa, 710 F.2d 455 (8th Cir. 1983) ....................................... 37

Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) ................................ 26

Jordan v. United States Dept. of Justice, 691 F.2d 514 (D.D.C.1982) ..................................... 27

Kane v. Martin Pain Stores, Inc., 439 F. Supp. 1054 (S.D.N.Y. 1977) ................................. 29, 30

Kirsch v. Fleet Street, Ltd., 148 F.3d 149 (2d Cir. 1998) ....................................................... 35

Landals v. George A. Rolfes Co., 454 N.W.2d 891 (Iowa 1990) ............................... 6, 32, 38, 39

Lewis v. Kendrick, 944 F.2d 949 (1st Cir.1991) .................................................................. 26

Litton Microwave Cooking Products v. Leviton Mfg. Co., Inc., 15 F.3d 790 (8th
Cir. 1994) ................................................................................................................ 6

Moore v. Crandall, 146 Iowa 25, 124 N.W. 812 (1910) .................................................... 8, 12

Moser v. Thorp Sales Corp., 334 N.W.2d 715 (Iowa 1983) ............................................... 28, 29

Mr. and Mrs. B. v. Weston Bd. Of Ed., 34 F. Supp. 2d 777 (D. Conn. 1999) ............................ 30

Norwood v. Bain, 215 F.3d 1320 (4th Cir. 2000) ................................................................. 37

Nutrena Mills, Inc. v. Yoder, 187 F. Supp. 415 (N.D. Iowa 1960) ........................................... 28

Peoples Trust & Savings Bank v. Baird, 346 N.W.2d 1 (Iowa 1984) .................................... 8, 12

Pridgen v. Andresen, 2000 WL 863053 (D. Conn. 2000) ..................................... 6, 30, 36, 37

Savoie v. Merchants Bank, 166 F.3d 456 (2d Cir. 1999) .................................................. 6, 35, 36

Schaffer v. Frank Moyer Construction, Inc., 628 N.W.2d 11 (Iowa 2001) ................................ 38

Spegon v. Catholic Bishop of Chicago, 175 F.3d 544 (7th Cir. 1999) ...................................... 37

Tanenbaum v. Agri-Capital, Inc., 885 F.2d 464 (8th Cir. 1989) ......................................... 25, 37

Temple Lumber Co. v. Lattner, 211 Iowa 465, 233 N.W. 522 (1930) ...................................... 28

Thelen Oil Co., Inc. v. Fina Oil & Chemical Co., 962 F.2d 821 (8th Cir.1992) .......................... 27

Thorn v. Kelly, 134 N.W.2d 545 (Iowa 1965) ........................................................................ 7

United States of America v. Metropolitan District Commission, 847 F.2d 12 (1st
Cir. 1988) .......................................................................................................... 37, 39

Vocca v. Playboy Hotel of Chicago, Inc., 686 F.2d 605 (7th Cir.1982)......................................27

## STATUTE AND RULES

Iowa Code §625.22 ........................................................................................ 7, 8, 27, 31

Iowa Code §625.24 ............................................................................................ 28, 29, 30

Iowa Code §625.25 .............................................................................................. 7, 11,12

Federal Rule of Civil Procedure 26............................................................................24

## INTRODUCTION

Established in 1902 as the publisher of *Better Homes and Gardens* magazine, Meredith Corporation is *not* engaged in the business of pursuing litigation against its vendors. Nor is it in the practice of avoiding payment of legitimate debts.

For nearly four years – dating back to September 2000 – Meredith has sought to sever all relationships with RCL, a vendor to whom it paid more than $4,500,000.00 over a span of just twenty-eight months, from 1998-2000. In doing so, Meredith consistently employed its best efforts to unwind this relationship in a manner that was reasonable and equitable.

In response to Meredith's efforts, RCL refused to produce critical information necessary to confirm the amounts that it claimed to be owed. It then immediately sued Meredith under a contract which it knew had expired several months earlier, ultimately demanding an additional $1,500,000.00 for work it had never undertaken[1]. RCL now seeks to be rewarded for its conduct by asking that Meredith be ordered to pay RCL's attorneys fees and expenses in the amount of $1,093,484, in connection with RCL's prosecution of a collection claim that had a value of approximately $155,000.

Prior to RCL filing suit, Meredith repeatedly offered to pay any legitimate amounts that Meredith owed under the parties' agreement, subject only to verification of the same by RCL. In fact, Meredith was ultimately forced to resort to formal discovery merely to confirm this amount. As soon as it was able to do so approximately two years ago, Meredith immediately offered judgment for this amount, in addition to offering to let the Court decide whether RCL was entitled to payment of any attorneys' fees and costs.

---

[1] At the time the case was called for trial 89% of RCL's claim consisted of interest at 70% (the contract provided for interest at the rate of 18% per annum.) claimed amounts for studies never commenced, attorneys fees and alleged cost overruns that were never billed to Meredith.

Meredith's good faith offer, just like those that were made both before and since, was summarily rejected by RCL.

In short, this entire action could have been avoided – and would have been avoided – if RCL had simply acted in good faith by providing the necessary information when asked, rather than grossly inflating its claim by approximately ten-fold in the hope of receiving a windfall. It now seems apparent that RCL's unreasonable posture throughout these proceedings, accompanied by its willingness to require both Meredith and the Court to expend significant resources in the resolution of its claims, was largely driven by its belief that Meredith eventually would be ordered to pay any amount of attorneys' fees that it demanded.

Requiring Meredith to pay *any* amount of costs and attorneys' fees to RCL would amount to commending RCL for maintaining a ridiculously inflated damages claim, all at Meredith's expense. The law does not permit such an inequitable and unfair result. Meredith submits that a full and fair examination of the facts surrounding this action will lead the Court to this very conclusion.

Through the efforts of Magistrate Judge Garfinkel this case was settled on May 26, 2004. As part of the settlement, RCL requested that the amount of the settlement be confidential.

## **FACTS**

In December 1997, RCL's principal, Valerie Crane, presented Meredith with RCL's Corporate Profile of RCL. *See* Appendix, Exhibit 1 (RCL Corporate Profile) promoting the manner in which RCL's market research could achieve gains in audience share (increased ratings), which in turn would lead to increased advertising revenue. The

- 2 -

RCL Corporate Profile also listed a number of clients, including The Walt Disney Company.[2]

Following her meeting, Ms. Crane forwarded to Meredith a proposed contract, under which she sought to perform research services for various stations within the Meredith broadcast group.

Before Meredith could agree to sign the contract supplied by RCL, Meredith's chief executive officer, William Kerr, met with Ms. Crane in April 1998 to discuss her proposal. At the meeting, Mr. Kerr specifically questioned Ms. Crane regarding her experience in working with major media companies, particularly in view of her firm's relatively small size. In response, Ms. Crane assured Kerr that RCL enjoyed a number of successful relationships with major media concerns including, by way of example, Disney. Based on the strength of Ms. Crane's assurances, and specifically her representation regarding Disney, Meredith determined to contract with RCL.

RCL and Meredith executed an agreement on July 21, 1998. *See* Appendix, Exhibit 2 (July 1998 Agreement). The contract provided, in relevant part, as follows:

- RCL proposed to conduct a total of ninety-three (93) research studies and consulting workshops for Meredith between March 1, 1998 and December 31, 2000.

- Before any project would be undertaken, Meredith was required to pay 75% of the quoted price of the project in advance.

---

[2]    The Walt Disney Company was specifically identified in the "Current and Recent Clients" section of the RCL Corporate Profile as "Disney TeleVentures," "Disney/ABC Cable Networks" and "The Disney Channel." *See* Appendix, Exhibit 1 (RCL Corporate Profile).

- Meredith reserved the right to cancel any proposed research study and, if it did so after test dates had been confirmed, it would pay RCL's reasonable and necessary preparation expenses.

- If RCL performed all of the proposed projects before the expiration of the contract, it stood to receive a total of $4,288,500 (the total sum quoted for all ninety-five (95) proposed projects identified on the attached "Exhibit A" to the contract).

RCL then prepared, signed and forwarded to Meredith a revised contract dated September 22, 1998, moving the term end date forward to June 30, 2000. *See* Appendix, Exhibit 3 (September 1998 Agreement).

Ms. Crane then forwarded to Meredith yet a third agreement also signed by her. Meredith signed this agreement on November 17, 1998. *See* Appendix, Exhibit 4 (November 1998 Agreement). Like the second contract, this third and final contract was identical to the July 1998 contract *with one very important exception*. Under the "Dates of Contract" provision, the termination date of the agreement was changed to *June 30, 2000*. This date coincided with the fiscal year end of both RCL and Meredith. This contract was the operative agreement between the parties when RCL sued Meredith in November 2000.[3]

Through June 30, 2000, RCL conducted 79 market research and consulting projects for Meredith's broadcast stations, and was promptly paid for each project.

_____
[3]    RCL filed this action based on the prior agreement between the parties, dated July 21, 1998. (Complaint, Exhibit 1). Ms. Crane subsequently testified in deposition that she had no recollection of the parties' contract dated November 17, 1998, which she acknowledged bore her signature. See Appendix, Exhibit 5 (Crane Depo. 141-145).

On June 19, 2000, shortly prior to the expiration of the parties' contract, Ms. Crane forwarded a proposed renewal contract to Meredith. This proposed contract, which Ms. Crane had already signed, was to begin on July 1, 2000 (the date after the expiration of the existing contract) and run through June 30, 2003. *See* Appendix, Exhibit 6 (June 2000 Agreement). *It is undisputed that this renewed contract was never executed by Meredith.*

By June 30, 2000, the end date of the existing contract between Meredith and RCL, Meredith had paid RCL and its consultants not less than $4,241,172.40 for the research studies and consulting workshops that were completed. In addition, RCL was paid $241,154.99 for travel and expense related items submitted to Meredith; and $205,632.81 for work performed in connection with other Meredith projects (e.g., the "Better Homes & Gardens" show); and $222,050.00 for market research activities conducted at Meredith's Nashville station that were not included in the subject contract.

By the time the parties' contract expired, RCL had completed seventy-nine (79) of the originally proposed ninety-five (95) projects identified on the attached "Exhibit A" to its contract. As noted above, the total cost quoted for all such projects pursuant to RCL's contract was $4,288,500.00. Accordingly – not including the $668,837.80 paid to RCL for work on other matters plus expenses – Ms. Crane through her company received just $47,327.60 less than the total amount she stood to receive under the November 1998 contract, *without incurring any of the expenses associated with undertaking the remaining sixteen (16) proposed projects.*

- 5 -

## DISCUSSION

It is well-settled under both Iowa law and Second Circuit precedent that a party seeking an award of attorneys' fees bears the burden of proving both the necessity of the services for which it seeks compensation and that the amount of the compensation sought is reasonable. <u>Landals v. George A. Rolfes Co.</u>, 454 N.W.2d 891, 897 (Iowa 1990)("The burden is upon the applicant for attorneys fees to prove both that the services were necessary and that the charges were reasonable in amount."); <u>Federal Land Bank v. Wilmarth</u>, 218 Iowa 339, 347, 252 N.W. 507, 511 (1934)(prevailing party must prove compliance with Iowa Code Chapter 625 in order to recover attorneys fees on a contract); <u>Pridgen v. Andresen</u>, 2000 WL 863053 at *3 (D. Conn.)("the party seeking an award of fees has the burden of establishing entitlement to such"); <u>Savoie v. Merchants Bank</u>, 166 F.3d 456 (2d Cir. 1999); <u>Cruz v. Local Union No. 3 of Int'l Bhd. Of Elec. Workers</u>, 34 F.3d 1148, 1160 (2d Cir. 1994). "The amount of the fee, of course, must be determined on the facts of each case." <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 429 (1983).

I.    BECAUSE RCL REFUSED TO SUPPLY MEREDITH WITH NECESSARY INFORMATION CONCERNING THE SUM LEGITIMATELY OWED BEFORE BRINGING THIS ACTION, AND FAILED TO ALLOW MEREDITH REASONABLE OPPORTUNITY TO PAY THE SAME, UNDER APPLICABLE IOWA LAW, RCL CANNOT MEET ITS BURDEN OF PROVING THAT AN AWARD OF FEES IN ANY AMOUNT WOULD BE REASONABLE.

Construction of the fee-shifting clause under a contract requires reference to the governing state's law. <u>Coop. Fin. Ass'n, Inc. v. Garst</u>, 927 F.Supp. 1179, 1188 (N.D. Iowa 1996)(citing <u>Litton Microwave Cooking Products v. Leviton Mfg. Co., Inc.</u>, 15 F.3d 790, 796 (8th Cir. 1994). There is no dispute that Iowa law applies to the claims at issue in this litigation and specifically to RCL's breach of contract claim. *See* RCL's Proposed

- 6 -

Jury Instructions (citing Iowa Civil Jury Instructions as well as Iowa case law in support

of proposed instructions on its breach of contract claim). It is RCL's breach of contract

claim that provides the basis for the instant attorneys' fees and cost application. *See*

Motion for Judgment, p. 1 ("RCL . . . moves for judgment on its claim for attorneys' fees

and costs under ¶ 10 of its contract with Meredith.").

Iowa Code sections 625.22 and 625.25 control the initial question of whether

Meredith may be ordered to pay attorneys' fees in *any* amount, notwithstanding the

parties' settlement stipulation that RCL is the "prevailing party" under the terms of its

contract. <u>Thorn v. Kelly</u>, 134 N.W.2d 545, 548 (Iowa 1965)("The right to recover

attorney fees as part of costs does not exist at common law. They cannot be so allowed

in the absence of a statute or agreement expressly authorizing it"); <u>Aetna Life Insurance</u>

<u>Company v. Anderson</u>, 848 F.2d 104, 108 (8th Cir. 1988)(noting that Iowa Code § 625.22

controls the extent to which a prevailing party is entitled to recover attorneys fees under

the fee-shifting clause of a written contract). These Code sections provide, in relevant

part:

> § 625.22
>
> When a judgment is recovered upon a written contract containing an agreement to pay an attorney's fee, the court shall allow and tax as a part of the costs a reasonable attorney's fee to be determined by the court.
>
> *    *    *    *
> § 625.25
>
> No such attorney fee shall be taxed . . . *unless* it shall be made to appear that such defendant *had information of* and *a reasonable opportunity to pay* the debt *before the action was brought*. (emphasis added).

As the Iowa Supreme Court has long held, "The manifest design of this statute is

that *as a condition precedent to the taxation of attorneys fees* a debtor must be afforded a

reasonable opportunity to pay his debt." <u>Moore v. Crandall</u>, 146 Iowa 25, 31, 124 N.W. 812, 815 (1910)(emphasis added); <u>Federal Land Bank v. Wilmarth</u>, 218 Iowa 339, 347, 252 N.W. 507, 511 (1934)(same); <u>Home Savings and Loan Ass'n v. Iowa City Inn, Inc.</u>, 152 N.W.2d 588, 591 (Iowa 1967)(same); <u>Peoples Trust & Savings Bank v. Baird</u>, 346 N.W.2d 1, 4 (Iowa 1984)(same).

Not surprisingly, the majority of cases under Iowa law involve contractual obligations to pay attorneys' fees in the context of banking relationships, but the Iowa legislature plainly intended for these statutes governing the allowance of attorney fees to broadly apply to any "written contract containing an agreement to pay an attorney's fee." Iowa Code §625.22.

To receive an award of attorney fees pursuant to a contract under Iowa law, the moving party must prove that it provided the necessary information verifying the debt that is owed, as well as a reasonable opportunity to pay the same, *prior* to filing suit. <u>Federal Land Bank v. Wilmarth</u>, 218 Iowa 339, 347, 252 N.W. 507, 511 (1934)("the [movant] *must* show that the [debtor] 'had information and a reasonable opportunity to pay the debt before the action was brought'")(emphasis added).  The facts of this case cannot possibly support such a conclusion and RCL does not even attempt to satisfy its burden of proof on this point.

Nowhere in RCL's motion, nor in its accompanying affidavits, does it describe *any* efforts on its part to provide Meredith with the requested information regarding the amounts owed, much less with reasonable opportunity to pay the same, prior to filing

suit.[4]   Indeed, the facts demonstrate that RCL undermined, rather than sought, an opportunity to resolve the alleged debt pre-suit.

In September 2000 – more than two months after the expiration of the parties' contract – Meredith contacted RCL by telephone to determine the status of any projects that were still in process, and to ask that RCL suspend its work until further notice.  RCL responded by letter from its counsel dated September 18, 2000, stating that there were "seven (7) studies currently underway."  *See* Appendix, Exhibit 7 (September 18, 2000 Letter from Joe Tanski to Roger Stetson).

Meredith replied by letter from attorney Roger Stetson (now deceased) requesting an itemization of each such project, including "the amount of work performed to date, the expenses which have been incurred and the amount necessary to finish the project and the timing of finishing the project."  *See* Appendix, Exhibit 8 (September 21, 2000 Letter from Roger Stetson to Joe Tanski).  Mr. Stetson went on to assure RCL's counsel that, "Meredith will pay RCL for work which has been satisfactorily performed and completed."  *See* Appendix, Exhibit 8 (September 21, 2000 Letter from Roger Stetson to Joe Tanski).

RCL responded by letter from Mr. Tanski dated September 28, 2000, enclosing invoices for the entire cost quoted on "Exhibit A" to the parties' contract relative to four (4) of the seven (7) projects claimed to be in progress.[5]  Notwithstanding Meredith's

---

[4]      Meredith acknowledges that RCL claims its counsel spent 171.5 hours "in connection with efforts to resolve the dispute without the need for litigation," and similar activities.  Mack Affidavit, ¶ 4. However, as set forth *infra*, this figure is suspect on its face, given that its communications with Meredith prior to filing suit amounted to having its counsel draft three letters and participate in one telephone conversation with counsel for Meredith.

[5]      As noted above, the RCL contract required payment of only 75% of the cost of a project in advance of starting, with the remaining 25% payable within 10 days of receipt of the final report from RCL. For reasons RCL did not explain, it had apparently commenced these seven (7) projects without first

request – and the plain language of RCL's contract which required Meredith to pay only the "reasonable and necessary preparation expenses" incurred by RCL on any canceled studies – *no such itemization of RCL's expenses was provided*. Instead, along with the invoices reflecting the full sticker price of four (4) of the studies in progress, Mr. Tanski conveyed RCL's position that Meredith could not simply "pay for all work performed and completed," but rather was obligated to pay for *all* proposed studies, even those that were never undertaken. *See* Appendix, Exhibit 9 (September 28, 2000 Letter from Joe Tanski to Roger Stetson).

Meredith replied by letter from Mr. Stetson dated October 6, 2000, again imploring RCL to provide information regarding the legitimate amounts claimed as of that date and again stressing Meredith's desire to resolve the parties' relationship, stating:

> . . . Meredith has decided to discontinue any further work with RCL . . . While there are issues which need to be resolved regarding projects which have been started, Meredith is prepared to resolve those issues promptly. It is Meredith's intention to unwind this relationship in an efficient and equitable manner . . . For those projects that have not been completed, we will need substantiation of the reasonable and necessary preparation expenses incurred by RCL prior to cancellation . . . .

*See* Appendix, Exhibit 10 (October 6, 2000 Letter from Roger Stetson to Joe Tanski).

After receiving no response from RCL or its counsel for two (2) weeks, Mr. Stetson again wrote to Mr. Tanski on October 20, 2000. Again, Mr. Stetson emphasized "Meredith's desire to resolve outstanding issues . . ." *See* Appendix, Exhibit 11 (October 20, 2000 Letter from Roger Stetson to Joe Tanski).

RCL's reply from Mr. Tanski acknowledged that his client had since been paid-in-full for one of the seven (7) studies in progress, but again declined to provide any

---

receiving the required advance payment from Meredith, then billed Meredith for 100% of the cost of four (4) of these projects, notwithstanding the fact that none of the projects were ever completed.

detail regarding RCL's "reasonable and necessary preparation expenses" on the remaining six (6) projects. Rather, he assured Mr. Stetson that:

> RCL will provide to you a report on the above-outlined preparation costs for each project . . . [and] details on . . . cost overruns and interest . . . .

Mr. Tanski then went on to state that the "total of the amounts due to RCL from Meredith on the [six] projects outlined above is $421,536 . . . . ," even though the aggregate price for all of these projects under the RCL contract (assuming all such projects were completed with reports delivered to Meredith) was just $317,000. No details were provided by Mr. Tanski regarding these additional amounts claimed, nor regarding any "reasonable and necessary preparation expenses" and RCL provided no explanation why it believed Meredith was obligated to pay for additional projects that were never started, in connection with research studies that Meredith no longer needed, pursuant to a contract that had expired four (4) months earlier. *See* Appendix, Exhibit 12 (November 1, 2000 Letter from Mr. Tanski to Roger Stetson).

While Meredith struggled to understand the basis for RCL's patently incongruous position, just twelve (12) days later, on November 13, 2000, RCL filed this suit against Meredith. Although Mr. Tanski's November 1, 2000 correspondence to Meredith contained the promise that, "RCL will provide you a report on the above-outlined preparation costs for each project," no such report was ever provided, nor was any further communication received from RCL's counsel until *after* suit was filed.[6]

---

[6]      Although the operative time frame for purposes of the §625.25 analysis is the period *before* filing suit, even after RCL filed its lawsuit, the information it supplied regarding the amounts that it claimed to be owed fluctuated wildly. Indeed, on the very same date, July 30, 2002, RCL submitted two separate damages calculations that differed by $111,909. One calculation is set forth in RCL's Damage Analysis and the other is found in its Amended Revised Supplemental Responses to Requests for Admissions.

Because RCL made no attempt to confirm the amounts owed to it or to give Meredith the opportunity to pay before filing suit, it cannot recover attorneys' fees under applicable Iowa law.  Iowa Code §625.25; <u>Moore v. Crandall</u>, 146 Iowa 25, 31, 124 N.W. 812, 815 (1910); <u>Federal Land Bank v. Wilmarth</u>, 218 Iowa 339, 347, 252 N.W. 507, 511 (1934); <u>Home Savings and Loan Ass'n v. Iowa City Inn, Inc</u>., 152 N.W.2d 588, 591 (Iowa 1967); <u>Peoples Trust & Savings Bank v. Baird</u>, 346 N.W.2d 1, 4 (Iowa 1984).

II.     RCL'S ATTEMPT TO JUSTIFY ITS INFLATED CLAIM FOR ATTORNEYS FEES BY SHIFTING THE BLAME TO MEREDITH'S COUNTERCLAIMS IS A PRETEXT.

In its attempt to justify its staggering seven-figure claim for attorneys' fees and costs in connection with a relatively modest contract claim, RCL labors mightily to shift the blame to Meredith for the stonewalling manner in which RCL and its principal chose to handle this litigation.  Consistent with its approach throughout these proceedings, however, RCL in its motion omits a number of important facts that are critical to the Court's analysis of the issue of attorney's fees, particularly those relating to its tactical choices in responding to the evidence supporting Meredith's defenses and compulsory counterclaims.[7]  In short, RCL's tactics led inevitably to a multiplication of expenses for itself and Meredith.  Those tactics should not be rewarded with an award of attorney's fees staggeringly out of proportion to the matters in dispute.

A.     THE MAJORITY OF THE COSTS OF THIS LITIGATION WERE DRIVEN BY RCL'S LACK OF CANDOR AND OUTRIGHT FABRICATIONS.

RCL acknowledges in its motion that Meredith's affirmative defenses and

---

[7]     In what appears to be RCL's final iteration of its defense to the Disney evidence discussed *infra*, RCL argues that Ms. Crane's misrepresentations to Meredith's CEO were "more business puffery than fact upon which Meredith could justifiably have relied." RCL motion, p. 11.

counterclaims arose naturally from two startling discoveries made by Meredith as it began to prepare its response to RCL's contract claim. First, Meredith learned that – in an effort to gain Meredith's commitment under the subject contract – Ms. Crane lied to Meredith's Chief Executive Officer by telling him that The Walt Disney Company lauded her work, when in fact, the opposite was true. Next, Meredith learned from three (3) former RCL employees that Ms. Crane had routinely directed RCL personnel to improperly manipulate the analysis of market research being performed for Meredith, so that the data appeared to support conclusions which Ms. Crane wished to present to Meredith. Each of these three former RCL employees (Dr. Bonita Soley, former RCL Project Manager; Mr. Wayne Cunningham, former RCL Vice President of Operations; and Ms. Randi Kestin, former RCL Data Analyst) each requested that Meredith provide them with independent counsel before testifying because they were concerned by threats that if they testified they would be sued by RCL.

Moreover, although they at all times possessed the documents and materials that would have easily confirmed or refuted the testimony of these and other witnesses who supported Meredith's defenses and counterclaims, RCL and Ms. Crane engaged in an expensive and protracted campaign of denial and concealment, flouting their discovery obligations. As a consequence, the cost to Meredith of defending this action – and the cost to RCL of prosecuting rather than resolving it – escalated needlessly. RCL cannot be rewarded for its improper, inefficient conduct. *See* Hensley v. Eckerhart, 461 U.S. 424, 434 (1983) (in an application for attorneys' fees "counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary").

1.  MEREDITH'S FRAUDULENT INDUCEMENT DEFENSE – THE
     DISNEY EVIDENCE AND RCL'S RESPONSE.

Before Meredith agreed to engage RCL, its Chief Executive Officer, William Kerr, interviewed Ms. Crane regarding her experience.  Ms. Crane assured Mr. Kerr that RCL enjoyed a number of successful relationships with major media concerns and identified Disney as an example.[8]  Based on the strength of Ms. Crane's assurances, and specifically her representation regarding Disney, Meredith entered into the RCL contract.  *See* Appendix, Exhibit 13 (Kerr Affidavit).  It was not until much later – after RCL sued Meredith – that Meredith first discovered that Ms. Crane's representations of a successful relationship with Disney were not true.

When documents from RCL were not forthcoming, Meredith issued a third-party subpoena to Disney, which resulted in the production of a Settlement Agreement between RCL and Disney TeleVentures, entered into just months prior to Ms. Crane's meeting with Mr. Kerr.[9]  The Settlement Agreement was the product of the parties' desire to resolve their differences over RCL's work for Disney and to end their relationship.

As RCL notes, upon discovering Ms. Crane's misrepresentation, Mr. Kerr signed an affidavit which was then filed by Meredith in connection with these proceedings. In summary, Mr. Kerr testified that if he had known the relationship between RCL and Disney had ended poorly, he would not have allowed Meredith to enter into any contract with RCL.  *See* Appendix, Exhibit 1 (RCL Corporate Profile).

---

[8]     During her interview process, Ms. Crane also presented executives at Meredith with a document entitled "RCL Corporate Profile." Appendix, Exhibit 1.  This document identified several entities under a section entitled "Current and Recent Clients."  The Walt Disney Company was specifically identified as "Disney TeleVentures," "Disney/ABC Cable Networks" and "The Disney Channel."

[9]     Disney TeleVentures (DTV) was a Disney subsidiary listed by Ms. Crane in RCL's Corporate Profile as one of her companies "Representative Clients."

- 14 -

In response, Ms. Crane signed her own affidavit dated March 20, 2002 *See* Appendix, Exhibit 14 (March 20, 2002 Crane Affidavit) representing to the Court under oath that:

- "I have reviewed . . . the Affidavit of William Kerr."

- "I understand Meredith contends that representatives of the Walt Disney Company ("Disney") were dissatisfied with work performed for it by RCL and that I misrepresented to Mr. Kerr that RCL 'enjoyed a number of successful business relationships with other large media concerns, including Disney."

- "Meredith's contentions are untrue."

- "I never received any criticism for the work conducted by RCL for [Disney TeleVentures]."

*See* Appendix, Exhibit 14 (March 20, 2002 Crane Affidavit).

Following receipt of this remarkable affidavit, dated March 20, 2002, counsel for Meredith had little choice but to develop further the evidence of Ms. Crane's dissembling. Consequently, Meredith's counsel noticed the deposition of the Research Director for Disney TeleVentures, Ms. Zorina Pelant and traveled to Los Angeles to take that deposition. In short, Ms. Pelant testified that the statements in Ms. Crane's affidavit were false and that RCL was terminated by Disney due to its poor performance. *See* Appendix, Exhibit 15 (Pelant Depo. 68-71; 80-81; 137-138).

But RCL and Ms. Crane were not yet finished with their efforts to paint their Disney relationship in a positive light. In her own deposition, Ms. Crane asserted that the Disney Research Director Pelant was merely expressing her own personal views, and lacked authority to speak for Disney on the subject of its experience with RCL. Ms.

Crane went on to identify Disney's Director of Business and Legal Affairs, Mr. Jerry Longarzo, as a knowledgeable Disney representative who would confirm that RCL's relationship with Disney did not end on a negative note. *See* Appendix, Exhibit 5 (Crane Depo. 302:16- 308:19).

Once again with little choice, Meredith returned to Los Angeles to depose Mr. Longarzo, who unambiguously confirmed the testimony of Disney's Research Director, and verified that Ms. Crane's sworn statements were not true. Indeed, he testified that he had personally informed Ms. Crane of Disney's dissatisfaction with RCL. *See* Appendix, Exhibit 16 (Longarzo Depo. 29-33; 61-65; 68).

Having now forced two (2) West Coast depositions that would have been unnecessary had Ms. Crane simply accurately described RCL's problem with Disney, RCL still did not stop. Instead, it submitted yet another affidavit prepared by its counsel, this one signed by Mr. Kurt Anderson, a witness who claimed to have knowledge of the RCL-Disney relationship and who would ostensibly attest to the fact that it was very satisfactory.[10] At his deposition Mr. Anderson confirmed that, contrary to the affidavit prepared by RCL's counsel, he had "no such knowledge at all" regarding the communications between Disney and RCL. *See* Appendix, Exhibit 17 (Anderson Depo. 49). But even then, RCL's effort to mislead did not cease. Shockingly, even *after* Mr.

---

[10]    During the course of these proceedings, Mr. Anderson signed an affidavit prepared by RCL's counsel. On the surface, the statements contained in Mr. Anderson's affidavit appeared supportive of the view that the relationship between RCL and Disney TeleVentures was very positive. During Mr. Anderson's deposition, however, it became clear that the affidavit was misleading in that Mr. Anderson testified that he had no knowledge whatsoever concerning the circumstances surrounding the termination of the relationship between RCL and Disney, and was even unaware that RCL and Disney had entered into a Settlement Agreement. *See* Appendix, Exhibit 17 (Anderson Depo. 40-41; 49). Mr. Anderson was represented during his deposition by David Mack, counsel for RCL. Mr. Anderson testified that he was not responsible for paying Mr. Mack for his representation, and that the inception of their attorney-client relationship was "20 minutes" prior to his deposition. *See* Appendix, Exhibit 17 (Anderson Depo. 7-8).

Anderson testified at deposition that he lacked any knowledge regarding the matters described in his affidavit, RCL submitted this same affidavit in support of its motion for summary judgment, which motion was denied, arguing (unsuccessfully) that Mr. Anderson's now-contradicted statements were evidence of the triumph of the RCL-Disney relationship. *See* Memorandum in Support of RCL and Valerie Crane's Motion for Summary Judgment, p. 6 (". . . Ms. Crane believed that her and RCL's business relationship with Disney was successful. There is no concrete evidence on which a reasonable fact finder could conclude that in April 1998 Ms. Crane's alleged statement was false.").[11]

Further, three RCL employees Donna Lacourse (in Boston), Dr. Bonita Soley (in Washington, D.C.) and Dr. Beth Rabin (in Los Angeles), admitted knowledge of the dispute between RCL and Disney during their employment with RCL.[12]  Indeed, Dr. Soley testified that the relationship was frequently referred to by RCL employees as the "Disney Debacle" or the "Disney Disaster." *See* Appendix, Exhibit 18 (Soley Depo. 325). Ultimately, the former RCL employee responsible for preparing the Disney TeleVentures report, Ms. Randi Kestin, testified in an affidavit that it was *Ms. Crane herself* who had informed the RCL staff of Disney's dissatisfaction with their work. *See* Appendix, Exhibit 19 (Kestin Affidavit)

The record leaves no doubt that the protracted discovery, including multiple depositions in multiple locations, relating to RCL's relationship with Disney was

---

[11]    Contrary to RCL's representation to the Court, Disney's Director of Business and Legal Affairs had already testified *in response to questioning by Ms. Crane's counsel* that it was not "possible" for Ms. Crane to have understood the purpose of the Settlement Agreement to be anything other than to end the relationship between RCL and Disney TeleVentures. *See* Appendix, Exhibit 16 (Longarzo Depo. 62-63).

[12]    Ms. Lacourse is a current Vice President of Research for RCL.  Ms. Rabin is a former Vice President of Research for RCL. Dr. Soley is a former Project Manager for RCL.

necessitated by the lack of candor and cooperation of RCL and Ms. Crane in responding to Meredith's routine discovery requests, not by an overzealousness of Meredith's counsel, as RCL seeks to argue. Meredith agrees that the cost of this litigation was needlessly escalated, but the parties responsible are RCL and Ms. Crane.

### 2. MEREDITH'S FRAUDULENT CONCEALMENT DEFENSE – THE MANIPULATION OF DATA AND RCL'S RESPONSE.

As noted above, Meredith first learned after RCL filed its lawsuit of various improprieties that had occurred in the analysis of data that was ultimately presented by Ms. Crane to Meredith. The circumstances described by three (3) former RCL employees – Dr. Soley, Mr. Cunningham and Ms. Kestin – were of the nature that would render the conclusions found in RCL's reports inaccurate and unreliable. As such, these conclusions were useless and potentially damaging to Meredith, because they were used by its station management in making important business decisions.

Based on the strength of the testimony of RCL's own employees – whistleblowers – Meredith rightfully asserted affirmative defenses and counterclaims alleging that RCL and Ms. Crane failed to disclose the unreliable nature of the research when the RCL research reports were presented to Meredith.

The primary RCL whistleblower, Dr. Bonita Soley, was RCL's lead researcher on the most significant study for Meredith's largest station, station WGNX (now WGCL) in Atlanta. Dr. Soley testified quite explicitly that RCL and specifically Ms. Crane engaged in improper data manipulation.

> Valerie had made a comment that the data had to be wrong, there was something wrong with the data, because she was expecting to see a group of specific people in Atlanta, in the Atlanta audience, and they weren't there, and that she had mentioned it in passing or in a meeting to someone at Meredith and she didn't want to be embarrassed that this group wasn't

in the data.  But she felt there was something wrong with the analysis since this group didn't show up.

*See* Appendix, Exhibit 18 (Soley Depo. 69-70).  In her testimony, Dr. Soley recounted how Ms. Crane would direct researchers to remove data from the audience sample until a preconceived conclusion was reached.  Dr. Soley testified that Ms. Crane identified a specific group of "middle-aged, white, affluent type" women living in Atlanta who Ms. Crane referred to as "safety seekers."  *See* Appendix, Exhibit 18 (Soley Depo. 70:14-24).  When Dr. Soley and a colleague processed the data, no such group was revealed.  Not happy with these results, she ordered the researchers to remove variables from the sample.

*See* Appendix, Exhibit 18 (Soley Depo. 71-73):

> So we did the results again.  I can't tell you how many times we reran this analysis, because it was many.  I mean, variables were removed, do factors, check the factors, see which factors, you know, hung together well, do the new clusters, we'd present them to Valerie, she would still be unhappy.  This went on for – I mean, it felt like forever, but I know it wasn't forever.  But it went on for a few days.
>
> And finally at one point I told Scott, I said, 'I can't do this anymore, because,' I said, 'this is ridiculous, we've taken out a large number of variables, it doesn't even represent the questionnaire we used anymore, you know, you're going to have to finish it.'

*See* Appendix, Exhibit 18 (Soley Depo. 81).  Because Dr. Soley refused to continue removing variables, Ms. Crane instructed another RCL researcher to finish the Atlanta study.  This tortured data manipulation finally did produce a "safety seeker" group, but it was young African-American men, not white females as Ms. Crane had pushed for.  *See* Appendix, Exhibit 18 (Soley Depo. 84).

> [W]e found the safety seekers finally as this little subgroup somehow that if you got rid of so many variables you found them, and that it wasn't who Valerie thought they would be in the first place. . .I just laughed, because, I mean, it was like the group that Valerie had been looking for had never

> existed in the first place.  And obviously, even hunting around, removing
> variables, didn't find them, because they weren't there.

*See* Appendix, Exhibit 18 (Soley Depo. 83).   Even beyond the Atlanta study, Dr. Soley

described RCL's practice of ignoring significant research results while including

insignificant ones in preparing "Executive Summary" reports presented to Meredith.

When Dr. Soley questioned this practice, she was told by Beth Rabin, a former RCL vice

president of research, that, "Valerie knows the true story of what to tell the client, and it's

not up to us to decide what to put into a report."  *See* Appendix, Exhibit 18 (Soley Depo.

178.

> I remember one occasion sitting, actually, on the office floor, we had all
> the you know, sheets out in front of us.  And Beth was removing some and
> moving others, and I asked her why she was removing, you know, some of
> them, and she said, 'Well, Valerie doesn't want them in here.'  And I said,
> 'But they were significant,' and she said, 'Well, it's not important to the
> station.'

*See* Appendix, Exhibit 18 (Soley Depo. 179).

Faced with this compelling testimony from Dr. Soley, RCL embarked on a

campaign to discredit its former lead researcher.  Initially, RCL implied that Dr. Soley

was terminated for reasons relating to her job performance.  *See* Appendix, Exhibit 18

(Soley Depo. 287-89).  However, Wayne Cunningham, RCL's former vice president of

operations, testified that RCL researchers continually performed under the threat of

termination by Ms. Crane and that Dr. Soley was in fact terminated because of her refusal

to improperly manipulate data.  *See* Appendix, Exhibit 20 (Cunningham Dep. 160-162).

The documentation in Dr. Soley's personnel file supports this testimony.[13]  Of course,

---

[13]    Regina Cuddy, RCL's operations director, testified that she is responsible for maintaining the company's personnel files and is knowledgeable of employee performance evaluations.  According to Ms. Cuddy, if performance issues had arisen during Dr. Soley's employment, these concerns would have been

RCL never explained why Dr. Soley would be put in charge of the most critical study for Meredith, ostensibly RCL's largest client, if there were issues with her performance.[14]

a.    THE "MISSING" SYNTAX.

In light of the revelation that the RCL research, for which it had paid vast sums of money, and which some of the stations were still using, was the product of manipulated data, Meredith retained an eminently qualified market research professional to examine the results presented by RCL. This individual, Dr. A. Dwayne Ball, ultimately served as an expert witness for Meredith.

In order to carry out his assignment, Dr. Ball first interviewed Dr. Soley and Mr. Cunningham to gain an understanding of what had taken place at RCL. He then set about the task of replicating the RCL studies by requesting, through discovery, the RCL analysts' handbook and various computerized data files relating to the Meredith studies.

With the assistance of Dr. Ball, Meredith propounded narrowly tailored discovery requests to RCL, seeking the computerized data files that would either confirm or refute the allegations of RCL's former project manager, Dr. Soley. In response, RCL claimed that these very files were inexplicably "missing."

> RCL does not possess the original data file, syntax for the sample weighting and factor analysis, or for the cluster analysis for the WHNS Segmentation Study. . .RCL does not possess the original syntax for the factor analysis or the cluster analysis for the WGCL Segmentation Study. . .RCL does not possess the original syntax for the factor analysis or cluster analysis for the WHNS or the WGCL Positioning Study.

---

documented in Dr. Soley's personnel file, which is devoid of any such reference. *See* Appendix, Exhibit 21 (Cuddy Depo. 18-25).

[14]    RCL is apparently no stranger to intimidating behavior. Mr. Cunningham testified that he understands RCL to have threatened to take legal action against Randi Kestin, a former RCL employee, for merely speaking with a Meredith investigator. *See* Appendix, Exhibit 20 (Cunningham Depo. 67-68).

*See* Appendix, Exhibit 22 (message included in RCL production of raw data relative to several Meredith studies).  Susan Crohan, RCL's Vice President of Research, authored this statement and subsequently verified its accuracy.  *See* Appendix, Exhibit 23 (Crohan Depo. 55).

Through its expert, Meredith was aware that the missing "syntax" was the key piece of evidence that could either corroborate or refute Dr. Soley's testimony regarding RCL's practice of improper data manipulation.  Yet, RCL officials asserted in depositions that this syntax had mysteriously vanished, that RCL's own efforts to replicate Meredith studies were unsuccessful because the syntaxes were missing, and that Dr. Soley's testimony unfortunately could not be corroborated or refuted without the missing Atlanta syntax.  *See* Appendix, Exhibit 24 (Lacourse Depo. 102-123); *See* Appendix, Exhibit 25 (Rabin Depo. 14-38).  *See* Appendix, Exhibit 23 (Crohan Depo. 61).  Donna Lacourse, also a current RCL vice president of research, testified:

> Q.    Okay.  Is there any way that you can tell me that one could go back and determine whether that benefits segmentation study was properly conducted without the benefit of having the original syntax?
> . . .
> A.    Without the original syntax, it would be extremely difficult to try to reconstruct it.
> Q.    It would be impossible, wouldn't it?
> . . .
> A.    Pretty close to it.

*See* Appendix, Exhibit 24 (Lacourse Depo. 102-103). (objections omitted).  This view was shared by Ms. Crohan.

> Q.    If I were to come to you today and ask you to either verify or refute for me whether the statistical analysis on the WGCL segmentation study was performed properly, what would you do to accomplish that?
> . . .

> A.     It's difficult, if not nearly impossible, to do that without the missing syntax at this point.

*See* Appendix, Exhibit 23 (Crohan Depo. 61).  (objection omitted).  Ms. Crohan, like

others at RCL, was at a loss to explain why key components of the single largest study

undertaken by RCL for Meredith are mysteriously "missing."

> Q.     Do you know why these original syntaxes are missing from RCL's files?
> A.     No.
> Q.     Has anybody at RCL indicated to you why they are missing?
> A.     No.  As far as my understanding is, we don't have – you know, we do not know for sure why these are missing.

*See* Appendix, Exhibit 23 (Crohan Depo. 57).  RCL's representatives were unable to

explain how such important information could have simply disappeared.  Ms. Rabin,

former RCL vice president of research, testified that she could not explain why RCL data

files containing key syntaxes for multiple Meredith studies strangely vanished after being

requested by Meredith during discovery.

> A.     We weren't sure.  I mean, we don't – we didn't know, you know, if the server had failed or what, but we seemed to have no explanation.
> . . .
> Q.     And as you sit here today, do you know why the syntax for WGCL Atlanta Benefit Segmentation Study is missing?
> . . .
> A.     I don't know why.
> Q.     Same question with respect to the raw data relative to the WHNS study, do you know why that was incomplete, as you sit here today?
> . . .
> A.     I don't know why.

*See* Appendix, Exhibit 25 (Rabin Depo. 14, 16) (objections omitted).  Later in her

deposition, Ms. Rabin  testified that Ms. Crane  had put forth a theory that perhaps a

mysterious former RCL employee named "Shawn," whose last name she could not recall,

had surreptitiously destroyed the missing syntaxes. *See* Appendix, Exhibit 25 (Rabin Depo. 17-18). Ms Rabin acknowledged, however, that she knew of no reason why this "Shawn" would have had anything to do with destroying key syntaxes for the Meredith studies, and in fact did not believe such a theory. *See* Appendix, Exhibit 25 (Rabin Depo. 21).

It was not until after RCL permitted Meredith to depose its experts (Suzanne Sell and Michael Grossman) in October 2003, that Meredith established that, contrary to RCL's assertions, the computerized data files it had sought were not missing at all.[15] Indeed, during the depositions of RCL's experts, it came to light that RCL had printed off portions of the computerized data file for use by its experts in their attempts to discredit Dr. Soley. Yet, despite repeated requests to RCL's counsel, the "missing" materials were not produced. Finally, on the eve of trial, and under threat of a motion to strike RCL's experts, RCL's counsel finally found and produced the computerized data files first requested by Meredith more than three-and-a-half (3 ½) years earlier.

Meredith immediately provided the data files to Dr. Ball, who timely supplemented his expert witness report in accordance with Federal Rule of Civil Procedure 26. In summary, Dr. Ball reported that the computerized data files confirmed everything that Dr. Soley had described and further that, based on his own analysis of such files, the conclusions set forth in the remaining segmentation studies performed by RCL on behalf of Meredith could not be verified and were therefore unreliable. *See* Appendix, Exhibit 26 (Dr. Ball Expert Report).

---

[15]     Meredith first requested dates when RCL's experts could be deposed more than a year earlier, in October 2002.

RCL's hide-and-seek tactics with respect to this critical piece of evidence needlessly expanded this litigation and escalated the costs dramatically. RCL cannot now be allowed reimbursement for the legal fees incurred in pursuing its cynical, wasteful stonewalling.

III.     BECAUSE RCL HAS SIGNIFICANTLY OVERSTATED ITS CLAIM FOR ATTORNEYS FEES, IT IS NOT ENTITLED TO RECOVER ANY AMOUNT.

According to RCL's Answers to Meredith's First Requests for Admissions, the total amount of its "reasonable and necessary preparation expenses" incurred in connection with the six (6) studies that were in progress at the time of cancellation was $118,361.91.[16] *See* Appendix, Exhibit 27 (Exhibit 3 to RCL's Answers to Meredith's First Requests for Admissions). Thus, in connection with a breach of contract claim where the legitimate amount in dispute was approximately $120,000, RCL seeks an award of attorneys' fees in the amount of $960,749.50.[17] This claim is *more than eight times* the actual amount in controversy, and cannot be justified under any circumstances. *See* Tanenbaum v. Agri-Capital, Inc., 885 F.2d 464, 471 (8th Cir. 1989)(even when the law of the governing state – in this case Texas – expressly provides that recoverable fees include those incurred in countering affirmative defenses, the amount sought "must also bear some reasonable relationship to the amount in controversy"); Coop. Fin. Ass'n v. Garst, 927 F.Supp. 1179, 1187 (N.D. Iowa 1996)( pursuant to Iowa Code §625.22, only *reasonable* attorneys' fees may be awarded to a prevailing party under the fee-shifting provision of a contract)(emphasis in original).

---

[16]     These figures were confirmed by Meredith upon receipt of RCL's discovery responses in June 2002.

[17]     RCL seeks $948,495.50 for the attorneys' fees of Hutchins Wheeler & Dittmar/Nixon Peabody and $12,254.00 for the cost of its Connecticut counsel, Whitman Breed Abbott & Morgan.

There can be no dispute that RCL has dramatically inflated its attorneys fees by, among other things, assigning twenty-four (24) timekeepers to a case which it had previously described as one involving "simple and straightforward factual and legal claims." *See* RCL's Memorandum of Law in Opposition to Defendant's Motion to Transfer Venue, p. 1.  As several federal courts have noted, the dangers inherent in rewarding claimants such as RCL for submitting inflated fee requests is obvious.  *See* City of Detroit v. Grinnell Corporation, 495 F.2d 448, 469 (2$^d$ Cir. 1974)("For the sake of their own integrity [and] the integrity of the legal profession . . . it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so.").

In a related context, the award of attorney fees under various civil rights fee-shifting statutes, many federal courts have consistently held that an intolerably inflated fee request justifies a complete denial of fees. Lewis v. Kendrick, 944 F.2d 949, 958 (1st Cir.1991).

> [A]ppellant's counsel submitted a claim which was so intolerably inflated that the District Court was warranted in departing from the usual practice and reacting vigorously to prevent such abuse of the court's authority to award reasonable compensation to counsel.
>
> If, as appellant argues, the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place.

Kendrick, 944 F.2d at 958 (*quoting* Brown v. Stackler, 612 F.2d 1057, 1059 (7th

- 26 -

Cir.1980)). *See also* <u>Vocca v. Playboy Hotel of Chicago, Inc.</u>, 686 F.2d 605, 607 (7th Cir.1982); <u>Hall v. Borough of Roselle</u>, 747 F.2d 838, 841-42 (3rd Cir.1984); <u>Jordan v. United States Dept. of Justice</u>, 691 F.2d 514, 518-21 (D.D.C.1982); <u>Thelen Oil Co., Inc. v. Fina Oil & Chemical Co.</u>, 962 F.2d 821, 824 (8th Cir.1992); <u>Coop. Fin. Ass'n v. Garst</u>, 927 F.Supp. 1179, 1187 (N.D. Iowa 1996)( "an intolerably inflated fee request justifies a complete denial of fees")(*quoting* <u>Brown v. Iowa</u>, 152 F.R.D. 168, 175).

As discussed *supra*, RCL's attempt to justify the staffing of this action by shifting the blame to Meredith for asserting compulsory counterclaims does not withstand scrutiny.   Rather, it is apparent from these facts that RCL initiated and continued this litigation under the assumption that (1) Meredith legitimately owed some amount pursuant to the contract (i.e., RCL's "reasonable and necessary preparation expenses" for the six studies in progress), and (2) once Meredith was required to pay this sum to RCL, it would also be ordered to pay RCL's attorneys fees, regardless of whether the amount that it sought was in any way "reasonable" in view of the amount in controversy.   Under these facts, RCL's claim for attorneys' fees must be denied in its entirety. <u>Coop. Fin. Ass'n v. Garst</u>, 927 F.Supp. 1179, 1187 (N.D. Iowa 1996)( "an intolerably inflated fee request justifies a complete denial of fees")(*quoting* <u>Brown v. Iowa</u>, 152 F.R.D. 168, 175); <u>Aetna Life Insurance Company v. Anderson</u>, 848 F.2d 104, 108 (8th Cir. 1988)(pursuant to Iowa Code §625.22, any award of attorneys' fees pursuant to a contractual fee-shifting provision must be "reasonable").

IV.    BECAUSE RCL HAS NOT PROVIDED THE REQUISITE INFORMATION CONCERNING ITS FEE ARRANGEMENT WITH COUNSEL, UNDER APPLICABLE IOWA LAW, IT HAS FAILED TO MEET ITS BURDEN OF PROVING THAT ITS FEES ARE REASONABLE.

- 27 -

In order for a "prevailing party" to meet its burden of proving that it is entitled to attorneys fees in some amount, Iowa law requires, *inter alia*, an affidavit from counsel specifically attesting to the fact that "there is not and has not been an agreement between the attorney and the attorney's client . . . express or implied, for any division or sharing of the fee to be taxed." Iowa Code §625.24. Absent such an affidavit in compliance with this section, no attorneys' fees may be awarded. Id.; Nutrena Mills, Inc. v. Yoder, 187 F.Supp. 415, 429 (N.D. Iowa 1960), *aff'd*, 294 F.2d 505 (8th Cir. 1961)(in breach of contract action brought in federal court based on diversity of citizenship, where prevailing party sought award of attorneys fees pursuant to the parties' agreement but failed to file requisite affidavit under §625.24, Iowa law prohibits allowance of fees); Moser v. Thorp Sales Corp., 334 N.W.2d 715, 718-19 (Iowa 1983); Holden v. Voelker, 228 Iowa 589, 591, 293 N.W. 32, 32 (1940); Temple Lumber Co. v. Lattner, 211 Iowa 465, 469, 233 N.W. 522, 524 (1930).

In this regard, it is noteworthy that RCL's controller Gaughan offers no explanation in her affidavit for the disparity between the amount of fees and expenses that RCL claims to have paid ($651,616.75), and the total amount that it seeks from Meredith in the instant application ($1,093,484). *See* Gaughan Affidavit, Exhibit A.[18]

Moreover, neither RCL nor its counsel has made any effort to delineate between charges incurred in connection with RCL's contract claim versus those incurred through its lawyers' defense of Ms. Crane, individually. This is significant, in that there is no dispute that the same counsel represented Ms. Crane, individually, as well as her

---

[18]    It appears from the billing records submitted that Ms. Crane and RCL's counsel may have financed a substantial amount of this litigation. Meredith finds this quite surprising, given the fact that Ms. Crane is quite wealthy. During the course of this litigation, she purchased a $1.2 million golf course home in Stuart, Florida.

company.  Nor is there any dispute that Ms. Crane is *not* entitled to seek attorneys' fees from Meredith, and has made no application for such an award. *See* Motion for Judgment, p. 4 ("Valerie Crane will not seek reimbursement for her personal attorneys' fees."). Meredith submits that, in the absence of this detail, RCL's claim must be denied in its entirety or, at the very least, reduced dramatically.  Kane v. Martin Pain Stores, Inc. 439 F. Supp. 1054, 1056 (S.D.N.Y. 1977), *aff'd without opinion*, 578 F.2d 1368 (2d Cir. 1978)(where counsel has been imprecise in the recording of time, such that it is difficult to determine which tasks were duplicative or unrelated, "the attendant uncertainties should, in fairness, be resolved against the petitioner").

In this case, both Meredith and the Court are simply left to guess as to what the actual fee arrangement is between RCL, Ms. Crane and their counsel.  What percentage of counsel's time was spent on the defense of Ms. Crane?  Why has counsel only received about 60% of the amount billed RCL?  What arrangement exists – express or implied – between Ms. Crane, RCL and their counsel in the event Court does not award any amount of fees to RCL?  While RCL's application seems to imply that their arrangement amounts to a fixed hourly engagement based simply on the *premium* billable rates of the twenty-four (24) timekeepers assigned to this case, RCL's motion and accompanying affidavits are silent as to the details of the actual arrangement.

In sum, RCL has failed to meet is burden of proving entitlement to attorneys fees in any amount, inasmuch as the affidavit required by §625.24 *is a condition precedent* to an award of any fees, and RCL has provided no information regarding the fee arrangements between the company, Ms. Crane and their counsel. Moser v. Thorp Sales Corp., 334 N.W.2d 715, 718-19 (Iowa 1983)(although purchase agreement provided for

- 29 -

award of attorneys fees to prevailing party, plaintiff's failure to file requisite affidavit under §625.24 with their fee application was fatal to the same); *See also* <u>Kane v. Martin Pain Stores, Inc</u>. 439 F. Supp. 1054, 1058 (S.D.N.Y. 1977), *aff'd without opinion*, 578 F.2d 1368 (2d Cir. 1978)(noting that the fee arrangement between plaintiff and counsel – whether fixed or contingent – is an important consideration in determining the reasonableness of the application).  In the absence of such information, RCL's motion must be denied in its entirety.

> V.     BECAUSE RCL HAS DECLINED TO SUPPLY ANY INFORMATION REGARDING THE QUALIFICATIONS OF ITS TWENTY-FOUR (24) TIMEKEEPERS, IT HAS FAILED TO MEET ITS BURDEN OF PROVING THAT ITS FEES ARE REASONABLE.

RCL has submitted no information regarding the qualifications of any of the twenty-four (24) timekeepers whose names appear on the billing records it has submitted.[19]   It is well-settled that, in order for the Court to determine whether RCL's fee application is reasonable, it must engage in an analysis of the prevailing rates in Connecticut for attorneys of reasonably comparable skill, experience and reputation. <u>Pridgen v. Andresen</u>, 2000 WL 863063 at *9 (D. Conn. 2000); Failure to provide information regarding a timekeeper's qualifications, including professional accomplishments and experience, constitutes a failure on the part of the moving party "to meet their burden of proving that their fees are reasonable." <u>Pridgen</u>, 2000 WL 863963 at *9; *See also* <u>Mr. and Mrs. B. v. Weston Bd. Of Ed.</u>, 34 F.Supp.2d 777, 783 (D. Conn. 1999)(without information in the form of affidavits from each timekeeper regarding their

---

[19]     RCL's filings indicate that Nixon Peabody assigned twenty-one (21) timekeepers to this case and its local counsel, Whitman, Breed & Abbott, assigned three (3) timekeepers.  Although RCL seeks an additional award of $12,254.00 for fees paid to their local counsel, as in the case of the Nixon Peabody timekeepers, it has provided *no* information regarding the qualifications of these attorneys.  More importantly, RCL does not offer any explanation as to why the Nixon Peabody attorneys of comparable skill seek to be compensated *at rates that are greater than twice the amount* charged by Whitman Breed.

qualifications "the court lacks information from which it could make a determination as to the reasonableness of the requested fees"). Even if RCL's counsel is able to prove that its three (3) librarians, computer technician and six (6) paralegals possess impeccable credentials, Meredith submits that paragraph 10 of the parties' contract, which was drafted by RCL and refers only to payment of "court costs and attorney fees" does not permit an award of fees for these individuals.

> VI.     IF THE COURT DETERMINES THAT AN AWARD SHOULD BE MADE, ANY SUCH AWARD MUST BE REASONABLE.

As noted in RCL's motion, the contractual provision upon which its application for attorneys' fees is based provides that "[non]-prevailing party shall pay the other party's court costs and *reasonable* attorney's fees."(emphasis added). *See also* Aetna Life Insurance Company v. Anderson, 848 F.2d 104, 108 (8th Cir. 1988)(pursuant to Iowa Code §625.22, any award of attorneys' fees pursuant to a contractual fee-shifting provision must be "reasonable").

> A.     RCL IS NOT ENTITLED TO RECOVER FEES FOR TIME SPENT BY ITS COUNSEL DEFENDING VALERIE CRANE.

As noted above, the parties' settlement agreement of May 24, 2004 expressly states that, "Valerie Crane will not seek reimbursement for her personal attorneys' fees." *See* Mack Affidavit, Exhibit 6. Nevertheless, review of the materials submitted by RCL in connection with its fee application shows that no time has been segregated for defending Ms. Crane, nor fee ascribed to her representation. Insofar as the burden rests with RCL "to prove both that the services were reasonably necessary and that the charges were reasonable in amount," it should not be left to Meredith and the Court to guess at what amount of time was spent by counsel for RCL defending the

counterclaims asserted against Ms. Crane. <u>Landals v. George A. Rolfes Co.</u>, 454 N.W.2d 891, 897 (Iowa 1990). The failure on the part of RCL's counsel to delineate between time devoted to Ms. Crane's representation versus time spent in connection with RCL's claims must result in the denial of RCL's motion, insofar as it has failed to meet its burden of proof that all services were "reasonably necessary" in the representation of RCL alone.

> **B.    RCL IS NOT ENTITLED TO RECOVER FEES FOR HOURS THAT ARE EXCESSIVE, REDUNDANT OR UNNECESSARY.**

It is well-settled that a party seeking an award of attorneys' fees cannot recover for hours that are excessive, redundant or unnecessary. <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 434 (1983). As discussed *supra*, RCL's fee application does not allow any reduction for time spent defending Ms. Crane. Further, although it is difficult to discern the exact amount incurred from review of RCL's fee application, there can be no doubt that its counsel – along with Meredith's counsel – was forced to spend countless hours refuting what amounted to complete fabrications regarding RCL's relationship with Disney and the mysteriously "missing" computerized data files.

In addition, it should be noted that RCL engaged in a very deliberate pattern of frivolous motion practice that dramatically drove up the cost of this litigation for all parties. During the course of these proceedings, RCL filed not less than thirty-four (34) motions. Only eleven (11) were granted, in whole or in part, amounting to a success rate of less than thirty-three percent (33%). Much of RCL's motion practice was obviously designed to impede Meredith's ability to conduct discovery or otherwise present important testimony to the Court for its consideration. Its filings included four (4) motions to strike portions of affidavits filed by Meredith (all of which were denied); two

(2) failed motions for protective orders designed to prevent Meredith from speaking with potential witnesses (for which RCL was charged $10,320 in fees); and various oppositions to motions filed by Meredith regarding matters normally agreed to by counsel as a matter of course. For example, according to RCL's billing records, not less than $15,187.00 in fees were incurred in connection with a failed Opposition to Meredith's Motion for Leave to Amend (an effort undertaken by Meredith to dismiss certain claims in order to streamline the case for trial).

Equally notable among RCL's billing entries are the following: $103,199 in fees on RCL's first motion for summary judgment (which was denied); $55,250 in fees on Valerie Crane's motion for summary judgment and RCL's second motion for summary judgment (both of which were denied); $10,924 in fees preparing a settlement position statement and attending mediation; $36,734 in fees for time spent traveling (travel expenses were an additional $16,067); $26,806 in fees preparing for and taking a single deposition (John Loughlin); $18,493 in fees preparing this same witness for his trial testimony; $6,753 in fees in connection with efforts to avoid turning over the RCL analysts' handbook (which it had certified would be produced in response to a motion to compel filed by Meredith); $3,976 in fees in connection with efforts to avoid turning over computerized data files (also requested by Meredith through discovery); $27,054 in fees preparing reports to be signed by RCL's experts; $14,766 in fees preparing a motion to strike Meredith's experts; $5,584 responding to RCL's auditor and insurance carrier; $2,366 preparing a motion to sever (which was never filed); and $93,008 in conferences with Valerie Crane, some of which clearly had to do with her personal representation. The total of these items alone comes to $420,976.

Although RCL audaciously claims that it was Meredith's conduct that needlessly escalated the cost of this litigation, a careful review of the pleadings reveals that – like many of the positions RCL has taken throughout these proceedings – this one simply does not square with the record.

RCL also goes to considerable lengths in its motion to describe various efforts that it contends were taken as a direct result of Meredith asserting counterclaims in this case. *See* Mack Affidavit, Exhibit 3 (describing twenty-six depositions and stating that all but four dealt primarily with Meredith's allegations regarding flawed research and/or Disney). Again, however, RCL's contention does not withstand scrutiny. In truth, of the twenty-six (26) individuals who were deposed in this case, eleven (11) were identified by RCL as potential witnesses in its Initial Disclosure Statement of June 5, 2001, *more than two months before Meredith even filed the subject counterclaims. See* Plaintiff's Initial Disclosure Statement, pp. 1-4. Moreover, five (5) of these eleven (11) depositions were taken by RCL *of its own witnesses. See* Mack Affidavit, Exhibit 3.

Of the remaining depositions, four (4) were noticed and taken by RCL and six (6) were depositions of individuals identified as witnesses by RCL – including its two experts – who would testify as to the value of the services that RCL provided to Meredith.[20] In short, of the twenty-six (26) depositions taken in this action, only four (Pelant, Longarzo, Denson and Anderson) were called by Meredith in an effort to establish its counterclaims, namely the Disney evidence. *See* Mack Affidavit, Exhibit 3. As discussed more fully in Section I(A)(1) *supra*, these four (4) depositions might have been avoided altogether if Ms. Crane had only been candid at the outset regarding the

---

[20]    RCL's motion is silent with respect to the fact that, in addition to its breach of contract claim, it also asserted a claim for quantum meruit in the amount of $450,000, which necessarily put at issue evidence regarding the value of its research services to Meredith.

relationship between her company and Disney. Nevertheless, according to the billing records submitted with RCL's motion, the total fees incurred by RCL in connection with the Disney depositions was $16,424.00, less than two percent (2%) of the total fees being sought in the instant motion.

In view of these facts, the following statement found in RCL's motion underscores its cavalier attitude toward the instant motion:

> "RCL should be awarded all of its fees and costs for the additional reason that Meredith is responsible for the bulk of the fees and costs incurred by RCL in this action."

Motion for Judgment, p. 6. Indeed, Meredith submits that statements such as these – which are riddled throughout RCL's filings – merely serve to confirm RCL's failure to exercise the good faith that is required of it in making the instant application. Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)(in an application for attorneys fees "counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary").

## C.    RCL'S FEE APPLICATION MUST BE VIEWED IN LIGHT OF THE PREVAILING RATES IN CONNECTICUT.

The appropriate analysis for determining whether an attorney fee application is reasonable must begin with an examination of the prevailing rates in the community where the case is litigated. Savoie v. Merchants Bank, 166 F.3d 456, 463 (2[d] Cir. 1999)("In calculating the lodestar fee, district courts generally must apply prevailing market rates 'for comparable attorneys of comparable skill and standing *in the pertinent legal community*.'") *quoting* Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 172 (2d Cir. 1998)(emphasis added). As the Second Circuit Court of Appeals has noted:

- 35 -

> The burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing *in the community* for similar services by lawyers of reasonably comparable skill, experience and reputation.

Savoie, 166 F.3d at 463 *quoting* Blum v. Stenson 465 U.S. 886, 895 n.11 (1984)(emphasis added).

In this case, RCL has presented no evidence to show what the prevailing rates are in Hartford, or even in Connecticut, for attorneys of comparable skill and standing other than the billings of its own counsel, Whitman Breed Abbott & Morgan. *See* Pridgen v. Andresen, 2000 WL 86053 at *9 (D. Conn.)(noting that, although lead trial counsel was from New York, the court should "*consider the prevailing rates in Connecticut* for attorneys of reasonably comparable skill, experience and reputation" in determining the "lodestar")(emphasis added).

Although RCL's expert witness is silent with respect the prevailing rates charged by attorneys of comparable skill in Connecticut, the rates charged by RCL's local counsel is instructive on this issue.

RCL's local counsel, Whitman Breed Abbott & Morgan is a reputable Greenwich, Connecticut law firm with a long history and a solid litigation practice. The rates charged by this Connecticut firm are *far more competitive* than those demanded by RCL's Boston counsel in the instant motion. In "Exhibit B" attached to the affidavit of RCL's controller, Kathleen Gaughan, the billing statements submitted by Whitman Breed reflect that attorney Charles W. Pieterse (a partner practicing for eighteen years in the area of complex commercial litigation) charges an hourly rate of $250.00, as compared to Joseph Tanski's hourly rate of $505.00. Further, Whitman Breed attorney Matt A. Piatkowski (a

seven-year litigation associate) charges an hourly rate of $150.00, in comparison to the $385.00 per hour charged by David Mack (also an associate).

Indeed, based on the information supplied by RCL regarding the number of hours its attorneys have spent on this case, it is clear that it could have very easily cut its total fees *by more than one-half*, if it had simply retained the competent counsel who were already licensed to practice in the district where it chose to sue Meredith.  In short, Meredith should not be forced to pay for RCL's decision to instead retain counsel *whose rates are more than double* those charged by attorneys of comparable skill in the relevant community. *See* Pridgen, 2000 WL 863053 at * 9 (D. Conn. 2000).

Indeed, Frances Brady, a distinguished member of the Hartford, Connecticut bar, with very substantial trial experience, confirms that the rates sought by RCL's counsel are substantially higher than the applicable rates for very experienced trial counsel in Hartford.

D.    A REASONABLE FEE IS A PROPORTIONAL FEE.

If the touchstone of any fee award is reasonableness, the touchstone of reasonableness is *proportionality*.  While this is true even in civil rights cases, which frequently involve nonpecuniary interests, it is especially true in commercial cases, where monetary damages are almost always the sole objective.[21]

_____

[21]    *See* Hensley v. Eckerhart, 461 U.S. 424, 436, 438 (1983) ("the most critical factor is the degree of success obtained … the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained"); Norwood v. Bain, 215 F.3d 1320 (4th Cir. 2000) (considerations of proportionality should guide district courts in exercising their discretion in awarding attorneys' fees); Griffin v. Jim Jamison, Inc., 188 F.3d 996 (8th Cir. 1999) (strict proportionality not required, but amount of recovery and results obtained are certainly relevant factors); Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 558 (7th Cir. 1999) (proportionality is a factor the court should consider in determining attorney fees); Gudenkauf v. Stauffer Communications, Inc., 158 F.3d 1074, 1084-85 (10th Circ. 1998) (approving district court's proportionality analysis); Tanenbaum

In <u>Schaffer v. Frank Moyer Construction, Inc.</u>, 628 N.W.2d 11 (Iowa 2001), after identifying various factors that comprise a proportionality analysis, the Iowa Supreme Court noted that:

> Additionally, "<u>[t]he district court must look at the whole picture and</u>, using independent judgment with the benefit of hindsight, <u>decide on a total fee appropriate for handling the complete case</u>." <u>Id.</u>, at 24 (emphasis added); *citing* <u>Landals v. George A. Rolfes Co.</u>, 454 N.W.2d 891, 898 (Iowa 1990).

In this purely commercial case, based on straightforward claims of breach of contract and business torts, the Court must award an appropriately "proportionate" fee.

1.   A PROPORTIONATE FEE IN THIS CASE SHOULD NOT EXCEED ONE-THIRD (1/3) OF THE AMOUNT IN CONTROVERSY.

Cases such as this one are typically handled on a contingent fee basis, unless, as here, the plaintiff elects to strike an hourly arrangement with its counsel.[22] Had RCL so chosen, it could have retained highly capable Connecticut counsel to represent it on a standard one-third contingent fee basis. In fact, if RCL had so chosen, it might have

---

v. Agri-Capital, Inc., 885 F.2d 464, 471 (8th Cir. 1989) (stating "attorney's fees must be reasonable under the facts of the case and must also bear some <u>reasonable relationship to the amount in controversy</u>" and approving as reasonable a fee equivalent to <u>9-1/2%</u> of recovery); <u>United States v. Metropolitan District Commission</u>, 847 F.2d 12, 16 (1st Cir. 1988) (in setting attorneys' fees, district court may "concentrate on what was necessary to be accomplished rather than on a welter of time sheets"); <u>Hart v. Bourque</u>, 798 F.2d 519, 523 (1st Cir. 1986) ("<u>the real test cannot be the number of hours logged, but what was done</u>"); <u>Gabriele v. Southworth</u>, 712 F.2d 1505, 1507 (1st Cir. 1983) (in fixing a reasonable attorney fee, <u>the court must "retain a sense of overall proportion</u>"); <u>Jaquette v. Blackhawk County, Iowa</u>, 710 F.2d 455, 460 (8th Cir. 1983) ("in private litigation counsel naturally must decide <u>whether the cost of his services are commensurate with the result</u> the client wishes to achieve").

[22]  It is worth observing that both parties, in agreeing to the fee-shifting provision, would very likely have expected this case to be handled on a contingent fee basis or, if not, at no greater cost. The provision of the contract in which the fee-shifting clause is found, references payment of fees "In the event that Researcher institutes legal action to collect any sum(s) due under this Agreement . . ." RCL obviously believed the cost to it would be no greater than a customary contingent fee of one-third when it retained Hutchins, Wheeler & Dittmar on an hourly basis, or it would have presumably insisted the case be taken on a contingent fee.

hired competent Connecticut counsel *on an hourly basis*, and still paid *less* than a standard one-third contingent fee.

Here, in contrast, Plaintiff's counsel was billed an exorbitant hourly rate without regard to success or failure. Accordingly, the very most they should be awarded is a fee equivalent to one-third of the amount in controversy.

Such an award is clearly within the Court's discretion:

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.

Id., at 436-37.

RCL chose to pay by the hour, it chose to pay Boston rates, and it clearly chose to give its attorneys *carte blanche*. It is equally clear, however, that having made such a choice, RCL cannot now ask the Court to make Meredith pay for their extravagance. As one federal court has noted:

> A law firm's customary schedule of charges, though entitled to consideration, is not dispositive of the issue: a private client might well be willing to buy a Stradivarius when a Guadagnini would plainly do, or to pay top dollar for either when the same instrument could be purchased less expensively elsewhere. The court must, therefore, turn a realistic eye on the proffered pricing, endeavoring to fashion rates "adequate to attract competent counsel but which do not produce windfalls to attorneys."

United States of America v. Metropolitan District Commission, 847 F.2d 12, 19 (1st Cir. 1988).

- 39 -

## CONCLUSION

For all of the foregoing reasons, Meredith respectfully asks that the Court deny RCL's Motion for Judgment and refuse to award attorneys fees to RCL *in any amount*. Alternatively, should the Court determine that an award of some attorneys' fees is warranted, Meredith respectfully requests that any such award be reduced dramatically in view of the factors discussed herein, and limited to a proportional fee reflecting the amount in controversy between the parties.

MEREDITH CORPORATION

By:_____
      Robert M. Callagy (*pro hac vice*)
      (ct24386)
      SATTERLEE STEPHENS BURKE &
          BURKE LLP
      230 Park Avenue
      New York, New York  10169
      Phone:  (212) 818-9200
      Fax:     (212) 818-9606
      email:   rcallagy@ssbb.com

By:_____
      James G. Sawtelle
      DUNCAN, GREEN, BROWN,
          LANGENESS & ECKLEY
      600 Seventeenth Street
      Suite 2800 South
      Denver, Colorado  80202-5402
          Phone:  (303) 634-2280
      Fax:     (303) 634-2278
      email:  JSawtelle@duncangreenlaw.com

- 40 -

James Sicilian
       (ct05608)
DAY, BERRY & HOWARD LLP
CityPlace I
Hartford, Connecticut  06103-3499
Phone:  (860) 275-0100
Fax:     (860) 275-0343
email:   jsicilian@dbh.com

Attorneys for Defendant/Counterclaim-Plaintiff
Meredith Corporation

## **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was mailed on this 12th day of July, 2004, by overnight delivery to all counsel and pro se parties as follows:

| | |
|---|---|
| Joseph C. Tanski, Esq. | Charles W. Pieterse, Esq. |
| David B. Mack, Esq. | Whitman, Breed, Abbott & Morgan |
| Nixon Peabody, LLP | 100 Field Point Road |
| 100 Summer Street | P.O. Box 2250 |
| Boston, Massachusetts 02110-2131 | Greenwich, CT  06836 |

_____
James Sicilian

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RESEARCH COMMUNICATIONS, LTD., | ) | CASE NO. 3:00CV2179-DFM |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEREDITH CORPORATION, | ) | |
| | ) | |
| Defendant/Counterclaim-Plaintiff. | ) | |
| | ) | |
| | ) | |
| MEREDITH CORPORATION, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VALERIE CRANE, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |
| | ) | JULY 12, 2004 |
| | ) | |
| | ) | |

**APPENDIX TO MEMORANDUM IN OPPOSITION TO RCL'S MOTION FOR JUDGMENT ON ITS CLAIM FOR ATTORNEYS' FEES AND COSTS**